**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**BRADLEY MARTIN, MATTHEW CRULL,**                    **CASE NO.:**
**KRISTIN SCHMIER, MELISSA MORALES,**
**JABARI SCHWEITZER, DILLON FELTS,**
**KENNETH HOGAN, KELSEA CALLAHAN,**
**GRAYSON KYTE, GARY SAUNDERS,**
**JAMES SUTTON, CICILIO PEREZ,**
**JOHN VELTRE and SAMUEL PALMIERI**

      **Plaintiffs,**

**v.**

**WILLIAM D. SNYDER, in his official**
**capacity as Sheriff, Martin County, Florida,**
**and STEVEN O'LEARY, individually,**

      **Defendants.**
_____/

## COMPLAINT

Plaintiffs, BRADLEY MARTIN, MATTHEW CRULL, KRISTIN SCHMIER, MELISSA MORALES, JABARI SCHWEITZER, DILLON FELTS, KENNETH HOGAN, KELSEA CALLAHAN, GRAYSON KYTE, GARY SAUNDERS, JAMES SUTTON, CICILIO PEREZ, JOHN VELTRE and SAMUEL PALMIERI, hereby sue Defendants, WILLIAM D. SNYDER, in his official capacity as Sheriff, Martin County, Florida, and STEVEN O'LEARY, individually, and allege:

## NATURE OF THE ACTION

1.     This is an action brought under the common law of the State of Florida and for violations of the Fourth and Fourteenth Amendments to the United States Constitution, brought through 42 U.S.C. §1983. This is an action for damages in excess of Seventy-Five Thousand Dollars ($75,000.00) exclusive of costs and interests, and for prospective injunctive relief.

1

Attorneys' fees and costs are sought under 42 U.S.C. §1988.

## JURISDICTION AND VENUE

2.      Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §1331 (federal question jurisdiction), 28 U.S.C. §1343 (civil rights claim jurisdiction) and 28 U.S.C. § 1367 (supplemental jurisdiction).

3.      Venue is appropriate in this Court as the illegal acts alleged to have been committed by Defendants against Plaintiffs occurred wholly within Martin County, Florida.

## THE PARTIES

4.      Plaintiff, BRADLEY MARTIN, (hereinafter "MARTIN") is a citizen of the State of Florida residing in Martin County and is otherwise *sui juris*.

5.      Plaintiff, MATTHEW CRULL, (hereinafter "CRULL") is a citizen of the State of Florida residing in Saint Lucie County and is otherwise *sui juris*.

6.      Plaintiff, KRISTIN SCHMIER, (hereinafter "SCHMIER") is a citizen of the State of Florida residing in Martin County and is otherwise *sui juris*.

7.      Plaintiff, MELISSA MORALES, (hereinafter "MORALES") is a citizen of the State of Florida residing in Martin County and is otherwise *sui juris*.

8.      Plaintiff, JABARI SCHWEITZER, (hereinafter "SCHWEITZER") is a citizen of the State of Florida residing in Martin County and is otherwise *sui juris*.

9.      Plaintiff, DILLON FELTS, (hereinafter "FELTS") is a citizen of the State of Florida residing in Martin County and is otherwise *sui juris*.

10.      Plaintiff, KENNETH HOGAN, (hereinafter "HOGAN") is a citizen of the State of Alabama residing in Mobile County and is otherwise *sui juris*.

11.      Plaintiff, KELSEA CALLAHAN, (hereinafter "CALLAHAN") is a citizen of the

State of Alabama residing in Mobile County and is otherwise *sui juris*.

12.    Plaintiff, GRAYSON KYTE, (hereinafter "KYTE") is a citizen of the State of Florida residing in Martin County and is otherwise *sui juris*.

13.    Plaintiff, GARY SAUNDERS, (hereinafter "SAUNDERS") is a citizen of the State of Florida residing in Martin County and is otherwise *sui juris*.

14.    Plaintiff, JAMES SUTTON, (hereinafter "SUTTON") is a citizen of the State of Florida residing in Martin County and is otherwise *sui juris*.

15.    Plaintiff, CICILIO PEREZ, (hereinafter "PEREZ") is a citizen of the State of Florida residing in Martin County and is otherwise *sui juris*.

16.    Plaintiff, JOHN VELTRE, (hereinafter "VELTRE") is a citizen of the State of Florida residing in Martin County and is otherwise *sui juris*.

17.    Plaintiff, SAMUEL PALMIERI, (hereinafter "PALMIERI") is a citizen of the State of Florida residing in Brevard County and is otherwise *sui juris*.

18.    At all times pertinent hereto, Defendant, WILLIAM D. SNYDER (hereinafter "SNYDER" or "SHERIFF"), in his official capacity as Sheriff of Martin County, has been organized and existing under the laws of the State of Florida as the Martin County Sheriff's Office (hereinafter "MCSO") with its headquarters located at Stuart, Florida.

19.    At all times pertinent hereto, Defendant, STEVEN O'LEARY (hereinafter "O'LEARY"), has been a resident of the state of Florida. He is *sui juris*. At all times hereto, Defendant O'LEARY was employed as a Deputy with MCSO.

**CONDITIONS PRECEDENT**

20.    Written notices of intent to initiate litigation on Plaintiffs' state law claims asserted herein, were timely submitted to Defendants pursuant to 768.28(6), Florida Statutes. Plaintiffs have satisfied all conditions precedent to bringing this action, if any. This action is

timely filed thereafter.

### STATEMENT OF FACTS

21.     The MCSO was designated as a High Intensity Drug Trafficking Area by the National Drug Control Policy and submitted an application to receive federal grant money in September 2017.

22.     At all times material, MCSO deputies were under pressure to increase the number of narcotics arrests in Martin County to continue to qualify for this federal grant money.

23.     At all times pertinent hereto, Defendant O'LEARY was employed by SHERIFF as a deputy with a date of hire of February 1, 2018 and assigned to the Road Patrol Division on March 21, 2018.

24.     At all times material, O'LEARY was pressured by MCSO to increase the number of narcotics arrests, and, as a result, increase the likelihood of fulfilling his own ambition for a promotion to become a narcotics detective within MCSO.

25.     After being hired, O'LEARY observed and learned the MCSO customs and practices as it related to narcotics investigations by assisting other deputies within MCSO and even assisting SHERIFF SNYDER personally with vehicle searches following traffic stops.

26.     From these observations and experiences with the MCSO deputies and SNYDER, O'LEARY learned the MCSO practices related to: reasonable suspicion; probable cause; search and seizure; securing and inventory of evidence.

27.     O'LEARY began falsifying official statements, tampering with evidence, falsifying and/or planting evidence and falsely arresting citizens in order to increase his narcotics arrests for the MCSO on or about May 3, 2018 (Exhibit A, Warrant and Complaint Affidavit):

> "Base[d] on the investigation conducted by the Martin County Sheriff's Office your Affiant has probable cause to believe that between February 2018 and January 2019, Steven O'Leary, while under the color of law, employed as a

4

Deputy Sheriff for the Martin County Sheriff's Office, engaged in an ongoing pattern of Official Misconduct, Fabricating Evidence, False Imprisonment, and False Official Statement."

28.     O'Leary continued to engage in this pattern of misconduct from May 2018 through December 30, 2018, which noticeably escalated to more serious charges and arrests as noted in the Complaint Affidavit (Exhibit A):

During his eleven months working for the Martin County Sheriff's Office Steven O'Leary made eighty-six arrests for narcotics related charges. In many cases, especially early in his tenure, these cases centered on Cannabis and THC oil. In the vast majority of those cases he was successful in locating and identifying the controlled substances in question. However, as his number of felony cases increased, the number of instances where no controlled substance was found also exponentially increased.

29.     O'LEARY was actively committing felonies against citizens of Martin County, including the Plaintiffs, during his 11 months of employment where he worked side by side to process his arrests with numerous MCSO deputies including K-9 Units, evidence custodians, shift supervising sergeants and even prosecutors with the State Attorney's Office.

30.     Local defense attorneys began to notice irregularities in O'LEARY's arrests and were able to uncover O'LEARY'S misconduct.

31.     A 50 count Information was filed against O'LEARY on August 9, 2019, in the Martin County Circuit Court before the Honorable Sherwood Bauer, in State of Florida vs. Steven O'Leary, Case No. 2019-CF-872 (Exhibit B):

Eighteen (18) counts of Official Misconduct; Nine (9) counts of False Official Statement; Eight (8) counts of Tampering with Evidence; Thirteen (13) counts of False Imprisonment; One (1) count of 2nd Degree Petit Theft; and One (1) count of Battery

32.     Also, during that 11-month timeframe, facts existed that place SNYDER on actual or constructive notice as to O'LEARY's illegal actions, including: the failure to impound vehicles in which drugs had been found following arrests; the size and quantity of narcotics he was seizing compared to historical drug arrests in Martin County; the frequency with which he

5

was making narcotics arrests compared to other road patrol deputies within MCSO.

33.    O'LEARY's shift partners and shift supervisors at MCSO also stood idly by while O'LEARY made numerous false arrests.

34.    Furthermore, as detailed in many of the arrest affidavits of the Plaintiffs, K-9 Deputy Justin Albauer was also personally involved with the false arrests of many of the Plaintiffs given that his K-9 allegedly alerted to the presence of narcotics in vehicles. We now know this is impossible given that the evidence seized did not test positive as narcotics by the crime lab.

35.    MCSO was complicit in O'LEARY's misconduct through its failure to address O'LEARY's illegal actions over the course of 11 months. This was a complete failure of department management and command structure by actively choosing to bury their collective heads in the sand and turn a blind eye to O'LEARY's behavior.

36.    O'LEARY, acting as a SHERIFF deputy, through the course and scope of his employment, willfully and maliciously agreed to and did engage in a conspiracy in furtherance of certain criminal, illegal and otherwise improper acts and conduct including but not limited to acts and conduct previously mentioned and detailed herein.

37.    While acting in furtherance of the conspiracy, he committed specific criminal, illegal, and tortious acts against Plaintiffs as described in greater detail herein. At all times pertinent hereto, O'LEARY were acting in furtherance of the custom and practice of SNYDER of pretextual stops, falsifying probable cause affidavits to effect arrests, illegally detaining and arresting citizens and others within the State of Florida and maliciously prosecuting them. These actions violated the civil and constitutional rights of Plaintiffs.

38.    Each Plaintiff was damaged by the acts and conduct of the Defendants acting individually or in combination as detailed more fully herein.

**BRADLEY MARTIN**

39.     On October 20, 2018, Plaintiff, BRADLEY MARTIN, (hereinafter "MARTIN"), was traveling in his vehicle and was stopped by O'LEARY based on an allegation of expired registration.

40.     O'LEARY approached the vehicle and falsely claimed to smell a strong odor of burnt cannabis.

41.     Next, O'LEARY performed an illegal search without probable cause of MARTIN's vehicle based upon O'LEARY's false accusations. This was a pretextual stop and search of MARTIN's vehicle. Consent to search the vehicle was either not given or coerced based on O'LEARY's false statements.

42.     During the illegal search, O'LEARY found a plastic bag that was labeled laundry detergent. Inside the bag labeled "laundry detergent", O'LEARY found a white and light blue substance that would have been readily apparent to anyone who does their own laundry as laundry detergent.

43.     Inexplicably, O'LEARY thought that based upon the packaging of this white and blue substance, it must be an illegal substance.

44.     O'LEARY conducted a field test of the substance and falsified the results and stated the test was positive for heroin. O'LEARY fabricated additional facts by saying the substance also tested positive for Fentanyl.

45.     All of these illegal actions by O'LEARY were conducted in front of, and with the help of, two additional SHERIFF Deputies – Deputy Ferreira and Deputy Corley.

46.     At no time pertinent hereto did MARTIN knowingly or willfully possess, constructively or otherwise, any illegal drugs or paraphernalia including, but not limited to, heroin and/or Fentanyl.

47. On October 20, 2018, MARTIN was wrongfully arrested by O'LEARY, handcuffed and transported to the Defendant SHERIFF's jail where he was booked and charged with trafficking in heroin. MARTIN was wrongfully detained at SHERIFF's detention facility.

48. Defendant O'LEARY knowingly, willfully and maliciously provided a sworn affidavit containing false information that formed the basis for MARTIN's wrongful arrest and subsequent incarceration.

49. On January 8, 2019, the State Attorney filed a Nolle Prosequi, and all criminal charges against MARTIN were dismissed.

50. MARTIN has retained the undersigned to represent his interests in this cause and is obligated to pay a fee for these services. Defendants should be made to pay said fee under the laws referenced above.

## **MATTHEW CRULL**

51. On December 5, 2018, Plaintiff, MATTHEW CRULL, (hereinafter "CRULL"), was sleeping in his vehicle and was stopped by O'LEARY based on a contrived allegation of it being a "suspicious vehicle."

52. O'LEARY approached the vehicle and falsely claimed to observe an open container, paraphernalia and a green leafy substance in plain view.

53. Next, O'LEARY performed an illegal search without probable cause of CRULL's vehicle based upon O'LEARY's false accusations. This was a pretextual stop and search of CRULL's vehicle. Consent to search the vehicle was either not given or coerced based on O'LEARY's false statements.

54. During the illegal search, O'LEARY claimed to find a white substance in the driver side door.

55. O'LEARY conducted a field test of the "green leafy" and "white powder"

8

substance and falsified both results. He stated the "green leafy" substance tested positive for THC and the white powder substance tested positive for heroin.

56.     At no time pertinent hereto did CRULL knowingly or willfully possess, constructively or otherwise, any illegal drugs or paraphernalia including, but not limited to, heroin, marijuana, and/or paraphernalia.

57.     On December 5, 2018, CRULL was wrongfully arrested by O'LEARY, handcuffed and transported to the Defendant SHERIFF's jail where he was booked and charged with trafficking in heroin, possession of marijuana and paraphernalia. CRULL was wrongfully detained at SHERIFF's detention facility.

58.     Defendant O'LEARY knowingly, willfully and maliciously provided a sworn affidavit containing false information that formed the basis for CRULL's wrongful arrest and subsequent incarceration.

59.     On January 11, 2019, the State Attorney filed a Nolle Prosequi, and all criminal charges against CRULL were dismissed.

60.     CRULL has retained the undersigned to represent his interests in this cause and is obligated to pay a fee for these services. Defendants should be made to pay said fee under the laws referenced above.

**KRISTIN SCHMIER**

61.     On December 30, 2018, Plaintiff, KRISTIN SCHMIER, (hereinafter "SCHMIER"), was traveling in her vehicle and was stopped by O'LEARY based on a contrived allegation of an illegal window tint and improper turn.

62.     O'LEARY approached the vehicle and falsely claimed to smell the "faint" odor of cannabis.

63.     Next, O'LEARY performed an illegal search without probable cause of

9

SCHMIER's vehicle based upon O'LEARY's false accusations. This was a pretextual stop and search of SCHMIER's vehicle. Consent to search the vehicle was either not given or coerced based on O'LEARY's false statements.

64.     During the illegal search, O'LEARY claimed to find "shake" on the floorboard of the vehicle and a loose pill in SCHMIER's purse.

65.     O'LEARY conducted a field test of the substance and falsified the results and stated the "shake" tested positive for THC and the pill tested positive for Oxycodone.

66.     At no time pertinent hereto did SCHMIER knowingly or willfully possess, constructively or otherwise, any illegal drugs or paraphernalia including, but not limited to, cannabis and/or Oxycodone.

67.     On December 30, 2018, SCHMIER was wrongfully arrested by O'LEARY, handcuffed and transported to the Defendant SHERIFF's jail where she was booked and charged with possession of a controlled substance. SCHMIER was wrongfully detained at SHERIFF's detention facility.

68.     Defendant O'LEARY knowingly, willfully and maliciously provided a sworn affidavit containing false information that formed the basis for SCHMIER's wrongful arrest and subsequent incarceration.

69.     On January 15, 2019, the State Attorney filed a No Information, and all criminal charges against SCHMIER were dismissed.

70.     SCHMIER has retained the undersigned to represent her interests in this cause and is obligated to pay a fee for these services. Defendants should be made to pay said fee under the laws referenced above.

## **MELISSA MORALES**

71.     On   October   24,   2018,   Plaintiff,   MELISSA   MORALES,   (hereinafter

"MORALES"), was riding her bicycle when she was stopped by O'LEARY based on a contrived allegation of no lights on the bicycle.

72.     O'LEARY then requested to search MORALES' purse with no legal cause or justification.

73.     Next, O'LEARY performed an illegal search without probable cause. This was a pretextual stop and search of MORALES' person and property. Consent to search was either not given or coerced based on O'LEARY's false statements.

74.     During the illegal search, O'LEARY claimed to find white rock like substances which, based upon his training and experience, he believed to be Methamphetamine.

75.     O'LEARY conducted a field test of the substance and falsified the results and stated the test was positive for methamphetamine.

76.     All of these illegal actions by O'LEARY were conducted in front of, and with the help, of another SHERIFF Deputy – Deputy Blasak.

77.     O'LEARY continued the fabrication of this arrest in his affidavit when he lied and stated that when MORALES was being booked at the SHERIFF's jail, another white substance fell out of her pant leg, and that it, too, tested positive for Methamphetamine.

78.     At no time pertinent hereto did MORALES knowingly or willfully possess, constructively or otherwise, any illegal drugs or paraphernalia including, but not limited to, methamphetamines.

79.     On October 24, 2018, MORALES was wrongfully arrested by O'LEARY, handcuffed and transported to the Defendant SHERIFF's jail where she was booked and charged with possession of a controlled substance (methamphetamine) and introduction of contraband into a correctional facility. MORALES was wrongfully detained at SHERIFF's detention facility.

11

80.   Defendant O'LEARY knowingly, willfully and maliciously provided a sworn affidavit containing false information that formed the basis for MORALES' wrongful arrest and subsequent incarceration.

81.   On January 16, 2019, the State Attorney filed a Nolle Prosequi, and all criminal charges against MORALES were dismissed.

82.   MORALES has retained the undersigned to represent her interests in this cause and is obligated to pay a fee for these services. Defendants should be made to pay said fee under the laws referenced above.

## JABARI SCHWEITZER

83.   On November 1, 2018, Plaintiff, JABARI SCHWEITZER, (hereinafter "SCHWEITZER"), was riding his bicycle and was stopped by O'LEARY based on a contrived allegation of no lights.

84.   O'LEARY approached SCHWEITZER with no probable cause and ordered him to stop which SCHWEITZER refused. Based upon these allegations, O'LEARY falsely arrested SCHWEITZER for resisting without violence.

85.   Next, O'LEARY performed an illegal search without probable cause of SCHWEITZER's person and property based upon O'LEARY's false accusations. This was a pretextual stop and search. Consent to search was either not given or coerced based on O'LEARY's false statements.

86.   During the illegal search, O'LEARY claimed to find a red substance inside SCHWEITZER's bag.

87.   O'LEARY conducted a field test of the substance and falsified the results and stated the test was positive for ketamine. O'LEARY fabricated additional charges by stating he found numerous white rocks inside his vehicle after he transported SCHWEITZER. He falsified

the field test results of these white rocks, as well, and stated they tested positive for cocaine.

88.    At no time pertinent hereto did SCHWEITZER knowingly or willfully possess, constructively or otherwise, any illegal drugs or paraphernalia including, but not limited to, ketamine and cocaine.

89.    On November 1, 2018, SCHWEITZER was wrongfully arrested by O'LEARY, handcuffed and transported to the Defendant SHERIFF's jail where he was booked and charged with trafficking in ketamine, possession of cocaine, introduction of contraband into a detention facility and resisting without violence. SCHWEITZER was wrongfully detained at SHERIFF's detention facility.

90.    Defendant O'LEARY knowingly, willfully and maliciously provided a sworn affidavit containing false information that formed the basis for SCHWEITZER's wrongful arrest and subsequent incarceration.

91.    On January 11, 2019, the State Attorney filed a Nolle Prosequi, and all criminal charges against SCHWEITZER were dismissed.

92.    SCHWEITZER has retained the undersigned to represent his interests in this cause and is obligated to pay a fee for these services. Defendants should be made to pay said fee under the laws referenced above.

**DILLON FELTS**

93.    On October 26, 2018, Plaintiff, DILLON FELTS, (hereinafter "FELTS"), was traveling on his bicycle and was stopped by O'LEARY based on a contrived allegation of no lights.

94.    O'LEARY approached FELTS and falsely claimed he gave him permission to search his backpack.

95.    O'LEARY then performed an illegal search without probable cause. This was a

pretextual stop and search. Consent to search the backpack was either not given or coerced based on O'LEARY's false statements.

96.    During the illegal search, O'LEARY claimed to find a pill bottle with numerous papers that contained a white crystal like substance.

97.    O'LEARY conducted a field test of the substance and falsified the results and stated the test was positive for MDMA.

98.    All of these illegal actions by O'LEARY were conducted in front of, and with the assistance of, two other SHERIFF Deputies – Deputy Castro and Deputy Gonzales.

99.    O'LEARY continued the fabrication of in his affidavit when he stated that the substance filed tested positive three times for MDMA.

100.    During FELTS being transported to the jail, O'LEARY falsified another charge and stated FELTS was in possession of hashish.

101.    At no time pertinent hereto did FELTS knowingly or willfully possess, constructively or otherwise, any illegal drugs or paraphernalia including, but not limited to, MDMA, and/or hashish.

102.    On October 26, 2018, FELTS was wrongfully arrested by O'LEARY, handcuffed and transported to the Defendant SHERIFF's jail where he was booked and charged with trafficking in MDMA, possession of hashish, and introduction of contraband into a detention facility. FELTS was wrongfully detained at SHERIFF's detention facility.

103.    Defendant O'LEARY knowingly, willfully and maliciously provided a sworn affidavit containing false information that formed the basis for FELTS' wrongful arrest and subsequent incarceration.

104.    On January 15, 2019, the State Attorney filed a Nolle Prosequi, and all criminal charges against FELTS were dismissed.

14

105.    FELTS has retained the undersigned to represent his interests in this cause and is obligated to pay a fee for these services. Defendants should be made to pay said fee under the laws referenced above.

## KENNETH HOGAN

106.    On or around December 9, 2018, Plaintiff, KENNETH HOGAN (hereinafter "HOGAN") and Plaintiff, KELSEA CALLAHAN (hereinafter "CALLAHAN") were camping at the Dupois Management Area in south Martin County with a co-worker, Hailey Green.  Shortly before midnight, Defendant O'LEARY arrived at the campsite with Deputy Wilkey. HOGAN had no knowledge of why law enforcement would be there.

107.    Defendant O'LEARY advised the Plaintiff that a neighboring camper complained of being threatened by a male and there was loud noise from a suspicious vehicle. HOGAN disputed these claims, stating they had not spoken with anyone at the campground and their vehicle was locked up. Defendant O'LEARY proceeded to physically slam HOGAN against his patrol car, injuring his face and head, and instructed CALLAHAN and Hailey Green to present identification.

108.    Without cause, Defendant O'LEARY entered the tent.

109.    On December 9, 2018, HOGAN was wrongfully arrested by O'LEARY, handcuffed and transported to the Defendant SHERIFF's jail where he was booked and charged with possession of a controlled substance (heroin), possession of drug paraphernalia and resisting/obstruction.

110.    HOGAN was wrongfully detained at SHERIFF's detention facility.

111.    Defendant O'LEARY knowingly, willfully and maliciously provided a sworn affidavit containing false information that formed the basis for HOGAN's wrongful arrest and subsequent incarceration.

112.   On January 15, 2019, the State Attorney filed a Nolle Prosequi, and all criminal charges against HOGAN were dismissed.

113.   HOGAN has retained the undersigned to represent his interests in this cause and is obligated to pay a fee for these services.  Defendants should be made to pay said fee under the laws referenced above.

**KELSEA CALLAHAN**

114.   On or around December 9, 2018, Plaintiff, CALLAHAN and Plaintiff, HOGAN were camping at the Dupois Management Area in south Martin County with a co-worker, Hailey Green.  Shortly before midnight, Defendant O'LEARY arrived at the campsite with Deputy Wilkey. CALLAHAN had no knowledge of why law enforcement would be there.

115.   Defendant O'LEARY advised the Plaintiff that a neighboring camper complained of being threatened by a male and there was loud noise from a suspicious vehicle. CALLAHAN disputed these claims, stating they had not spoken with anyone at the campground and their vehicle was locked up. Defendant O'LEARY instructed CALLAHAN and Hailey Green to present identification.

116.   Without cause, Defendant O'LEARY entered the tent.

117.   On December 9, 2018, CALLAHAN was wrongfully arrested by O'LEARY, handcuffed and transported to the Defendant SHERIFF's jail where she was booked and charged with possession of a controlled substance (THC oil) and possession of marijuana less than 20 grams and paraphernalia.

118.   At no time pertinent hereto did CALLAHAN knowingly or willfully possess constructively or otherwise any illegal drugs including, but not limited to, THC oil or marijuana.

119.   CALLAHAN was wrongfully detained at SHERIFF's detention facility.

120.   Defendant O'LEARY knowingly, willfully and maliciously provided a sworn

affidavit containing false information that formed the basis for CALLAHAN's wrongful arrest and subsequent incarceration.

121.    On January 15, 2019, the State Attorney filed a Nolle Prosequi, and all criminal charges against CALLAHAN were dismissed.

122.    CALLAHAN has retained the undersigned to represent her interests in this cause and is obligated to pay a fee for these services.  Defendants should be made to pay said fee under the laws referenced above.

### **GRAYSON KYTE**

123.    On August 7, 2018, Plaintiff, GRAYSON KYTE, (hereinafter "KYTE"), was traveling in his vehicle and was stopped by O'LEARY based on a contrived allegation of improper display of license plate and an odor of burning cannabis that O'LEARY, with the olfactory senses of a highly trained bloodhound, could allegedly smell from his vehicle as he travelled behind KYTE.

124.    After conducting the illegal stop, O'LEARY approached the vehicle and falsely claimed to smell marijuana and that KYTE made an excited utterance admitting to the crime.

125.    Next, O'LEARY performed an illegal search without probable cause of KYTE's vehicle based upon O'LEARY's false accusations. This was a pretextual stop and search of KYTE's vehicle. Consent to search the vehicle was either not given or coerced based on O'LEARY's false statements.

126.    During the illegal search, O'LEARY claimed to find marijuana inside an open container located in the center console.

127.    O'LEARY conducted a field test of the substance and falsified the results and stated the test was positive for THC.

128.    At no time pertinent hereto did KYTE knowingly or willfully possess,

constructively or otherwise, any illegal drugs or paraphernalia including, but not limited to, marijuana.

129.    On August 7, 2018, KYTE was wrongfully arrested by O'LEARY, handcuffed and transported to the Defendant SHERIFF's jail where he was booked and charged with possession of marijuana and tampering with evidence.

130.    Defendant O'LEARY knowingly, willfully and maliciously provided a sworn affidavit containing false information that formed the basis for KYTE's wrongful arrest and subsequent incarceration.

131.    On January 15, 2019, the State Attorney filed a Nolle Prosequi, and all criminal charges against KYTE were dismissed.

132.    KYTE has retained the undersigned to represent his interests in this cause and is obligated to pay a fee for these services. Defendants should be made to pay said fee under the laws referenced above.

## **GARY SAUNDERS**

133.    On   October   18,   2018,   Plaintiff,   GARY   SAUNDERS,   (hereinafter "SAUNDERS"), was in his legally parked vehicle and was stopped by O'LEARY based on a contrived allegation that he thought the vehicle was being burglarized.

134.    O'LEARY approached the vehicle and falsely claimed to smell the odor of burnt cannabis and observe two syringes in plain view in the center cup holder of the vehicle.

135.    Next, O'LEARY performed an illegal search without probable cause of SAUNDERS' vehicle based upon O'LEARY's false accusations. This was a pretextual stop and search of SAUNDERS' vehicle. Consent to search the vehicle was either not given or coerced based on O'LEARY's false statements.

136.    During the illegal search, O'LEARY claimed to find THC oil, off-white powder

substance on the front floorboard, two glass pipes with burnt residue in a backpack in the back seat of the vehicle, white rocks in the back seat, and syringes.

137.    O'LEARY conducted a field test of the substances and falsified the results and stated the off-white powder substance tested positive for Fentanyl and the white rocks tested positive for cocaine.

138.    At no time pertinent hereto did SAUNDERS knowingly or willfully possess, constructively or otherwise, any illegal drugs or paraphernalia including, but not limited to, THC oil, Fentanyl, and/or syringes or paraphernalia of any kind used for illegal drug use.

139.    On October 18, 2018, SAUNDERS was wrongfully arrested by O'LEARY, handcuffed and transported to the Defendant SHERIFF's jail where he was booked and charged with three counts of possession of a controlled substance (THC oil, cocaine and heroin) and two counts of possession of drug paraphernalia. SAUNDERS was wrongfully detained at SHERIFF's detention facility.

140.    Defendant O'LEARY knowingly, willfully and maliciously provided a sworn affidavit containing false information that formed the basis for SAUNDERS' wrongful arrest and subsequent incarceration.

141.    On January 15, 2019, the State Attorney filed a Nolle Prosequi, and all criminal charges against SAUNDERS were dismissed.

142.    SAUNDERS has retained the undersigned to represent his interests in this cause and is obligated to pay a fee for these services. Defendants should be made to pay said fee under the laws referenced above.

**<u>JAMES SUTTON</u>**

143.    On November 14, 2018, Plaintiff, JAMES SUTTON, (hereinafter "SUTTON"), was stopped by O'LEARY based upon false allegations of disturbing the peace.

19

144.    O'LEARY arrested SUTTON based upon these allegations.

145.    During SUTTON's transport to the SHERIFF's jail, O'LEARY falsely claimed to notice a white rock on the back floorboard of his vehicle.

146.    O'LEARY conducted a field test of the substance and falsified the results and stated the test was positive for cocaine.

147.    At no time pertinent hereto did SUTTON knowingly or willfully possess, constructively or otherwise, any illegal drugs or paraphernalia including, but not limited to, cocaine.

148.    On November 14, 2018, SUTTON was wrongfully arrested by O'LEARY, handcuffed and transported to the Defendant SHERIFF's jail where he was booked and charged with resisting with violence, possession of a controlled substance, introduction of contraband into a detention facility and disorderly conduct.

149.    SUTTON was wrongfully detained at SHERIFF's detention facility.

150.    Defendant O'LEARY knowingly, willfully and maliciously provided a sworn affidavit containing false information that formed the basis for SUTTON's wrongful arrest and subsequent incarceration.

151.    On December 3, 2018, the State Attorney filed a No Information, and all criminal charges against SUTTON were dismissed.

152.    SUTTON has retained the undersigned to represent his interests in this cause and is obligated to pay a fee for these services. Defendants should be made to pay said fee under the laws referenced above.

### **CICILIO PEREZ**

153.    On September 18, 2018, Plaintiff, CICILIO PEREZ, (hereinafter "PEREZ"), was stopped by O'LEARY based upon false allegations of failing to stop at a stop sign.

154.    O'LEARY approached the vehicle and falsely claimed to observe him sweating profusely and being so nervous he was shaking.

155.    O'LEARY then had K-9 unit Deputy Albauer respond to assist and walk his K-9 around PEREZ's vehicle, which allegedly alerted to narcotics.

156.    Next, O'LEARY performed an illegal search without probable cause of PEREZ's vehicle based upon O'LEARY's false accusations. This was a pretextual stop and search of PEREZ's vehicle. Consent to search the vehicle was either not given or coerced based on O'LEARY's false statements.

157.    After ripping up the inside of PEREZ's truck and finding nothing, O'LEARY instructed PEREZ to empty his pockets.  O'LEARY's report falsely claims that PEREZ had a lipstick container which had a white substance and a small cut piece of cloth inside.

158.    O'LEARY conducted a field test of the substances and falsified the results and stated the white substance tested positive for cocaine.

159.    At no time pertinent hereto did PEREZ knowingly or willfully possess, constructively or otherwise, any illegal drugs or paraphernalia of any kind used for illegal drug use.

160.    On September 18, 2018, PEREZ was wrongfully arrested by O'LEARY, handcuffed and transported to the Defendant SHERIFF's jail where he was booked and charged with one count of possession of a controlled substance (cocaine) and one count of possession of drug paraphernalia.  PEREZ was wrongfully detained at SHERIFF's detention facility.

161.    Defendant O'LEARY knowingly, willfully and maliciously provided a sworn affidavit containing false information that formed the basis for PEREZ's wrongful arrest and subsequent incarceration.

162.    On January 15, 2019, the State Attorney filed a Nolle Prosequi, and all criminal

charges against PEREZ were dismissed.

163.    PEREZ has retained the undersigned to represent his interests in this cause and is obligated to pay a fee for these services.  Defendants should be made to pay said fee under the laws referenced above.

## **JOHN VELTRE**

164.    On October 23, 2018, Plaintiff, JOHN VELTRE, (hereinafter "VELTRE"), was stopped by O'LEARY based upon him standing next to a closed business.

165.    O'LEARY approached VELTRE and claimed to notice an orange straw in the second fold of his wallet when VELTRE opened up his billfold. Based upon this, O'LEARY requested to search VELTRE's person and property.

166.    Next, O'LEARY performed an illegal search without probable cause. Consent to search was either not given or coerced based on O'LEARY's false statements.

167.    During the illegal search, O'LEARY claimed to find a white powdery substance in VELTRE's wallet.

168.    O'LEARY conducted a field test of the substance and falsified the results and stated the test was positive for cocaine. O'LEARY fabricated additional charges by stating VELTRE had marijuana in his sock that that field tested positive for THC.

169.    O'LEARY continued the fabrication of this arrest in his affidavit when he lied and stated he found 97 grams of another white powder like substance in an ice cream container in VELTRE's bag. O'LEARY falsified the field test results, again, and stated this substance tested positive for Oxycodone.

170.    All of these illegal actions by O'LEARY were conducted in front of, and with the help, of another SHERIFF Deputy – K-9 Deputy Albauer.

171.    At no time pertinent hereto did VELTRE knowingly or willfully possess,

constructively or otherwise, any illegal drugs or paraphernalia including, but not limited to, cannabis, cocaine, and oxycodone.

172.    On October 23, 2018, VELTRE was wrongfully arrested by O'LEARY, handcuffed and transported to the Defendant SHERIFF's jail where he was booked and charged with two counts of possession of a controlled substance (cocaine and oxycodone), possession of cannabis and possession of drug paraphernalia.

173.    VELTRE was wrongfully detained at SHERIFF's detention facility.

174.    Defendant O'LEARY knowingly, willfully and maliciously provided a sworn affidavit containing false information that formed the basis for VELTRE's wrongful arrest and subsequent incarceration.

175.    On January 15, 2019, the State Attorney filed a Nolle Prosequi, and all criminal charges against VELTRE were dismissed.

176.    VELTRE has retained the undersigned to represent his interests in this cause and is obligated to pay a fee for these services. Defendants should be made to pay said fee under the laws referenced above.

**SAMUEL PALMIERI**

177.    On September 13, 2018, Plaintiff, SAMUEL PALMIERI, (hereinafter "PALMIERI"), was traveling in his vehicle and was stopped by O'LEARY based on a contrived allegation of an illegal window tint.

178.    Although O'LEARY never presented a test meter for the window tint, he advised that the area he was in had experienced several break-ins and requested to search PALMIERI's vehicle.

179.    Next, O'LEARY performed an illegal search without probable cause. Consent to search was either not given or coerced based on O'LEARY's false statements.

23

180.    PALMIERI was handcuffed and placed in the back of O'LEARY's patrol car enroute to the Martin County jail before he was advised any charges that warranted an arrest.

181.    During the illegal search, O'LEARY claimed to find a white powdery substance in a clear plastic bag.

182.    O'LEARY claimed to have conducted a field test of the substance and falsified the results and stated the test was positive for cocaine, which was the fabrication he used in the arrest affidavit.

183.    All of these illegal actions by O'LEARY were conducted in front of, and with the help and supervision of approximately five other SHERIFF deputies.

184.    At no time pertinent hereto did PALMIERI knowingly or willfully possess, constructively or otherwise, any illegal drugs including, but not limited to, cocaine.

185.    On September 13, 2018, PALMIERI was wrongfully arrested by O'LEARY, handcuffed and transported to the Defendant SHERIFF's jail where he was booked and charged with one counts of possession of a controlled substance.

186.    PALMIERI was wrongfully detained at SHERIFF's detention facility.

187.    Defendant O'LEARY knowingly, willfully and maliciously provided a sworn affidavit containing false information that formed the basis for PALMIERI's wrongful arrest and subsequent incarceration.

188.    On January 15, 2019, the State Attorney filed a Nolle Prosequi, and all criminal charges against PALMIERI were dismissed.

189.    PALMIERI has retained the undersigned to represent his interests in this cause and is obligated to pay a fee for these services. Defendants should be made to pay said fee under the laws referenced above.

## COUNT I
## CIVIL RIGHTS VIOLATION UNDER 42 U.S.C. § 1983
### (Brought by All Plaintiffs Against O'LEARY)

190.    Paragraphs 1 through 189 are hereby re-alleged and incorporated by reference in this Count.

191.    The actions of O'LEARY occurred within the scope of his employment with MCSO, under color of state law, having occurred within the authorized time and space limits of his duties and for a purpose to serve SNYDER.

192.    At all times material hereto, O'LEARY had a legal duty to not subject Plaintiffs to unreasonable search and seizure, without probable cause, warrant or exigent circumstances.

193.    O'LEARY subjected Plaintiffs to an unreasonable search and seizure, without probable cause, warrant or exigent circumstances, which was objectively unreasonable in light of the facts and circumstances confronting O'LEARY.

194.    O'LEARY violated Plaintiffs' rights under the Fourth and Fourteenth Amendments to the Constitution of the United States and violated Plaintiffs' rights to be free from unreasonable searches and seizures by searching their persons and vehicles without a search warrant, probable cause or exigent circumstances.

195.    These violations were of a type and character as to which any reasonable person would be aware, and further, the law prohibiting such conduct as unconstitutional is clearly established in Florida, in federal case law, including that of the Federal Court of Appeals of the United States, 11th Circuit, and under the case law of the U.S. Supreme Court.

196.    The aforesaid acts of O'LEARY were performed knowingly, intentionally, and maliciously, and/or were performed in a reckless manner with callous and deliberate indifference to the health, safety and civil rights of all Plaintiffs and for this reason, Plaintiffs are entitled to an award of punitive damages.

197.    As a direct and proximate result of the unlawful conduct of O'LEARY as aforesaid, Plaintiffs were deprived of their civil rights and forced to suffer great aggravation, humiliation, embarrassment, mental anguish and harm, loss of standing in the community and pecuniary losses including loss of income and loss of earning capacity.

**COUNT II**
**CIVIL RIGHTS VIOLATION UNDER 42 U.S.C. § 1983**
**(Brought by All Plaintiffs Against SNYDER)**

198.    Paragraphs 1 through 189 are hereby re-alleged and incorporated by reference in this Count.

199.    At all times, SNYDER was responsible for MCSO, its agents and employees, including supervising, overseeing, training and establishing policies, customs and procedures to conform their conduct to the United States Constitution and Florida common law.

200.    At all times material hereto, SNYDER was charged with the responsibility of adopting and implementing rules and procedures for the proper and efficient maintenance, supervision and control of the officers of the MCSO. These duties include, but are not limited to:

    a.    To create, adopt and implement rules, regulations, practices and procedures, toward hiring and retaining law enforcement officers who do not have a propensity of searching citizens' vehicles without warrant or exigent circumstances, arresting and incarcerating citizens without cause, falsifying evidence, planting false evidence, fabricating charges and making false sworn statements of fact in support of their false arrest and incarceration;

    b.    To create, adopt and implement rules and regulations, practices and procedures for proper and efficient training of law enforcement officers in a way and to an extent necessary to ensure officers would be prevented from searching citizens' vehicles without warrant or exigent circumstances, arresting and incarcerating

citizens without cause, falsifying evidence, planting false evidence, fabricating charges and making false sworn statements of fact in support of their false arrest and incarceration;

c. To create, adopt and implement rules and regulations, practices and procedures for the proper and efficient supervision, control, discipline and assignment of law enforcement officers in a way and to an extent necessary to ensure that officers will not search citizens' vehicles without warrant or exigent circumstances, arresting and incarcerating citizens without cause, falsifying evidence, planting false evidence, fabricating charges and making false sworn statements of fact in support of their false arrest and incarceration; and

d. To implement rules, regulation, policies, practices and procedures for the proper and efficient supervision, discipline and control of law enforcement officers to reduce or eliminate instances of untruthfulness and to properly punish those officers who commit same; and

e. To implement rules, regulations, policies, practices and procedures necessary to properly and fully investigate claims by citizens that law enforcement officers searched citizens' vehicles without warrant or exigent circumstances, arresting and incarcerating citizens without cause, falsifying evidence, planting false evidence, fabricating charges and making false sworn statements of fact in support of their false arrest and incarceration.

201. SNYDER, with deliberate indifference, failed to adequately train or otherwise supervise and direct MCSO and its deputy sheriffs concerning the rights of the citizens they encounter in their duties, such that it is a policy, practice and custom for deputy sheriffs, including O'LEARY, to take extreme and reckless actions against the citizens they encounter,

27

including all Plaintiffs.

202.    SNYDER has directly participated in the inadequate training as he personally conducted a traffic stop and search without probable cause to justify the search on June 14, 2018.

203.    This detention and search was conducted by SNYDER in the presence of O'LEARY, further cementing MCSO and SNYDER'Ss customs and practices as it relates to search and seizure rights of citizens.

204.    Such action by SNYDER was taken by O'LEARY as tacit approval of the constitutional violations suffered by Plaintiffs and others.

205.    In further disregard of the rights of citizens that MCSO and its deputy sheriffs encounter, SNYDER has, with deliberate indifference, either failed to direct, failed to otherwise fully require, or has sought to limit, MCSO and others in the proper investigation of the extreme and wanton acts of his deputy sheriffs, such that it is the policy, practice and custom of limiting investigations of deputy sheriffs with few or no serious questions raised as to deputy sheriff's actions or a deputy sheriff's claims as to citizens they encounter.

206.    These actions by SNYDER amount to a purposeful failure of oversight in the actions of his deputies as it relates to making narcotics arrests.

207.    By limiting and/or failing to investigate, resulting in findings of no violations of law, accepting deputy sheriff's word as gospel and otherwise adopting the justification for his deputy sheriff's extreme and wanton actions, SNYDER has ratified, condoned and consented to the deputy sheriff's unlawful conduct, including the ratification, condoning and consenting to the unlawful conduct of O'LEARY to Plaintiffs.

208.    Had SNYDER not consciously engaged in the foregoing, keeping a blind eye to the actions of his deputy sheriffs, including O'LEARY, and properly investigated and punished (including terminating and bringing charges) against deputy sheriffs who violated the law and

MCSO General Orders, the actions of O'LEARY as to Plaintiffs would not have taken place and the damages to Plaintiffs would not have occurred, thus obviating the need to bring this lawsuit.

209.    The aforementioned actions in this case committed by O'LEARY were proximately caused by these policies, customs, and practices of SNYDER in failing to fulfill his duties as alleged in this Complaint.

210.    Had O'LEARY known he was not free to lie on police reports and make false arrests because such conduct was regularly being investigated by SNYDER and his staff when such instances came to their attention, he would not have engaged in his illegal and fraudulent conduct against Plaintiffs and the consequences and damages of same would not have inured to Plaintiffs.

211.    The aforementioned policies, customs and practices of SNYDER and the actions of SNYDER were the cause of Plaintiffs being deprived of their civil rights, being forced to suffer great aggravation, humiliation, embarrassment, mental anguish and harm, loss of standing in the community and pecuniary losses including loss of income and loss of earning capacity.

212.    The recklessness and deliberate indifference of SNYDER identified above was a further underlying cause of the constitutional torts committed by O'LEARY and was the proximate cause of Plaintiffs' injuries and damages.

**COUNT III**
**COMMON LAW FALSE IMPRISONMENT/ARREST**
**(Brought by All Plaintiffs Against SNYDER)**

213.    Paragraphs 1 through 189 are hereby re-alleged and incorporated by reference in this Count.

214.    This is an action against Defendant SNYDER in his official capacity for common law false imprisonment/arrest. This Count is pled in the alternative and for the purposes of this count, individual Defendant O'LEARY was acting within the course and scope of employment

with Defendant SHERIFF.

215.   All Plaintiffs are entitled to relief against SNYDER in that he, through his employees and/or agents, intentionally and unlawfully detained and restrained each Plaintiff, when each Plaintiff was unlawfully seized and deprived of their liberty without any reasonable cause or color of authority and maintained such complete restraint and deprivation for a period of time.

216.   This unlawful restraint of the Plaintiffs' liberty was also accomplished by SNYDER'S confining Plaintiffs to an area in which the Plaintiffs did not wish to be confined.

217.   Plaintiffs were further restrained by SNYDER'S use of coercive words and threats of force as well as actual force and immediate means of coercion against Plaintiffs, so that the Plaintiffs were restrained and deprived of liberty. SNYDER restrained Plaintiffs without any justification and in the absence of probable cause. SNYDER, through his agents and assigns, falsified evidence, planted drugs, drug paraphernalia and other items to falsely arrest Plaintiffs and others within Martin County. SNYDER knew of should have known of the actions of his deputies in effecting these arrests.

218.   At all times material to this action, and at all times during which Plaintiffs were being unlawfully restrained, the Plaintiffs were restrained against their will, and without consent, so that Plaintiffs were not free to leave their places of confinement.

219.   As a direct and proximate cause of Defendant SNYDER'S actions, Plaintiffs have been damaged, which damages include: mental anguish, pain and suffering, bodily injury, loss of capacity for the enjoyment of life, embarrassment, humiliation, loss of reputation, lost employment opportunities, lost wages, and the loss of other emoluments. These damages have occurred at present, in the past and will most likely occur in the future.

30

## COUNT IV
## COMMON LAW FALSE IMPRISONMENT/ARREST
### (Brought by All Plaintiffs Against O'LEARY)

220.    Paragraphs 1 through 189 are hereby re-alleged and incorporated by reference in this Count.

221.    This is an action against Defendant O'LEARY for common law false imprisonment/arrest. This Count is pled in the alternative and for the purposes of this count, O'LEARY was acting outside the course and scope of his employment with Defendant SHERIFF.

222.    Plaintiffs identified in the paragraphs herein are entitled to relief against O'LEARY in that he intentionally and unlawfully detained and restrained each Plaintiff, when each Plaintiff was unlawfully seized and deprived of their liberty without any reasonable cause or color of authority and maintained such complete restraint and deprivation for a period of time.

223.    This unlawful restraint of the Plaintiffs' liberty was also accomplished by O'LEARY confining Plaintiffs to an area in which the Plaintiffs did not wish to be confined.

224.    Plaintiffs were further restrained by O'LEARY's use of coercive words and threats of force as well as actual force and immediate means of coercion against Plaintiffs, so that the Plaintiffs were restrained and deprived of liberty. O'LEARY restrained Plaintiffs without any justification and in the absence of probable cause.

225.    At all times material to this action, and at all times during which Plaintiffs were being unlawfully restrained, the Plaintiffs were restrained against their will, and without consent, so that Plaintiffs were not free to leave their places of confinement. O'LEARY engaged in a pattern of falsifying drug tests against Plaintiffs, drug paraphernalia and other items to falsely arrest Plaintiffs and others within Martin County over a period of years.

226.    As a direct and proximate cause of Defendant O'LEARY's actions, Plaintiffs

have been damaged, which damages include: mental anguish, pain and suffering, bodily injury, loss of capacity for the enjoyment of life, embarrassment, humiliation, loss of reputation, lost employment opportunities, lost wages, and the loss of other emoluments. These damages have occurred at present, in the past and will most likely occur in the future.

**COUNT V**
**FALSE ARREST BROUGHT UNDER 42 U.S.C. §1983**
**(Brought by All Plaintiffs Against SNYDER)**

227.    Paragraphs 1 through 189 are hereby re-alleged and incorporated by reference in this Count.

228.    This count sets forth a claim against Defendant SNYDER, who through his officers, deputies, employees, and agents, violated Plaintiffs' rights under the Fourth Amendment to the United States Constitution to be free from unlawful and false arrests. These violations were of the type and character as to which any reasonable law enforcement agency and/or officer would be aware. At all times pertinent hereto, SNYDER was responsible for the deputies and employees working with MCSO including supervising, overseeing, training and establishing policies, customs and procedures to conform their conduct to the United States Constitution and Florida law.

229.    At all times pertinent hereto, SNYDER was responsible for (1) creating, adopting and implementing rules, regulations, orders, policies and procedures in the proper and effective hiring, supervising and retaining of law enforcement officers who do not have a propensity towards lying, falsifying evidence, planting evidence and falsifying probable cause affidavits to effect arrests; (2) creating, adopting and implementing rules, regulations, orders, policies and procedures for the proper and efficient training of law enforcement officers in a way and to an extent necessary to ensure that the officers are properly completing probable cause affidavits and not falsifying evidence against citizens in Martin County; (3) creating, adopting and

implementing rules, regulations, orders, policies and procedures for proper policing, enduring the elimination of corruption in his ranks and to ensure that his officers/deputies are properly stopping citizens with reasonable suspicion and arresting with probable cause; (4) creating, adopting and implementing rules, regulations, orders, policies and procedures for the proper and efficient supervision, control, discipline and assignment of law enforcement officers in a way and to an extent necessary to ensure that citizens will not be subject to being falsely arrested; and (5) to implement rules, regulations, policies, orders and procedures for the elimination or reduction of instances of untruthfulness, including the unlawful arrests and instances of corroboration or ratification of untruthful accounts of criminal activities.

230.    Through his officers, employees, and agents, and through his own actions and inactions SNYDER, misused his powers, possessed by virtue of state law and made possible only because SNYDER, his officers, employees and agents were clothed with the authority of state law. The violations of Plaintiffs' rights, as described above, occurred under color of state law and are actionable under 42 U.S.C. §1983.

231.    The foregoing actions of SNYDER were taken in bad faith, with malicious purpose, and in a manner exhibiting willful and wanton disregard of human rights, safety and property, and were engaged in without any lawful justification and in the absence of probable cause. SNYDER knew or should have known that there was no probable cause or other legal justification to arrest Plaintiffs, given the circumstances present with SHERIFF's deputies and other personnel including but not limited to individual Defendant, O'LEARY, who routinely engaged in a systematic pattern and practice of making illegal traffic stops, falsifying drug tests, planting illegal drugs, drug paraphernalia, narcotics equipment, and other contraband on Plaintiffs person or in their presence, making false statements in probable cause affidavits and other charging documents, and causing the false arrests, and seizures of Plaintiffs.

33

232.    Based upon the facts presented to SNYDER through his officers, employees, and agents and applicable law, no reasonable law enforcement agency or officer could have concluded that there existed any probable cause to arrest Plaintiffs. The law was well settled and clearly established that the actions of SNYDER, his delegates, deputies, officers, employees and agents constituted false arrest under the Fourth Amendment to the United States Constitution at the time the actions were engaged in.

233.    The actions or inactions of SNYDER as set forth in part above constituted deliberate indifference and/or reckless disregard for the constitutional rights of Plaintiffs.

234.    SNYDER acted with deliberate indifference in the failure to implement adequate hiring and supervisory procedures--or implemented no such policies or procedures-- to prevent the harm that was caused to Plaintiffs including policies or procedures to properly identify suspects who committed criminal activity; policies and procedures to identify officers who falsify facts to support probable cause affidavits; policies and procedures to supervise officers/deputies in SHERIFF's employ; policies and procedures to detect officers/deputies who may engage in criminal activity by falsifying drug tests against innocent citizens like Plaintiffs; the rights of citizens the officers/deputies encounter in their duties; and policies and procedures to properly discipline officers/deputies who willfully trample on the constitutional rights of law abiding citizens like Plaintiffs, and to prevent the type of harm described in part above, as a direct result of which Plaintiffs were injured. SNYDER was also deliberately indifferent in failing to train his officers in basic human dignity which resulted in constitutional violations as set forth in part above.

235.    SNYDER was deliberately indifferent in hiring, retaining and supervising the individual Defendant, O'LEARY, and other deputies, as they were known to have engaged in constitutional violations prior to their illegal and malicious actions against Plaintiffs described

34

herein. After knowledge of the constitutional violations by O'LEARY and other deputies, SNYDER failed to investigate their actions or to fire them, which ultimately led to the violation of Plaintiff's constitutional rights.

236.     SNYDER acted with deliberate indifference to the possibility of false arrests by his deputies, has encouraged the well-settled policy, practice and custom of these false arrests caused by falsifying drug tests and other illegal things on Plaintiffs and others in Martin County. This involved SNYDER knowledge of the disproportionate number of traffic stops in which drugs were located by O'LEARY. Despite knowing of the unconstitutional behavior and the needs to take corrective actions, SNYDER failed to do so.

237.   SNYDER was on notice, by the history of widespread abuse, of the need to correct the well-settled policy, practice and custom of O'LEARY and O'LEARY's extreme and illegal actions against the citizens in Martin County. The need for more or different training and supervision had been so obvious and the inadequacy of same, combined with SNYDER'S conscious choice not to act, has resulted in the violation of constitutional rights, as alleged herein. SNYDER, in further disregard of the citizens of Martin County, has, with deliberate indifference, either failed to direct, failed to require or has sought to limit investigations by MCSO into its deputies/officers conduct such that it is well settled policy, practice and custom of MCSO to limit internal investigations, with few or no questions ever raised about O'LEARY's and O'LEARY's decisions to arrest multiples of citizens and others in Martin County. By limiting the investigations, O'LEARY's illegal actions have continued, unchecked and have been ratified, condoned and/or consented to by SNYDER.

238.     SNYDER, after being on notice of the history of the failure to properly investigate and thus address and correct the extreme and wanton acts of O'LEARY and failed to do so, leading to the deprivation of Plaintiffs' civil rights. The deprivation of civil rights described

herein is a widespread pattern sufficient to notify SNYDER and were obvious, flagrant, rampant and on continued duration over a period of years rather than isolated occurrences.

239.    SNYDER, individually and through delegated final decision makers, acted under color of state law and failed to supervise, investigate and discipline the O'LEARY and other officers/deputies, employees and agents *as* alleged herein, and was deliberately indifferent in their training and supervision, the results of which were constitutional violations against Plaintiffs and others. SNYDER and his delegates failure to, supervise, investigate and discipline O'LEARY and other officers/deputies, employees and agents, constitutes a willful failure to implement or enforce SHERIFF's policies and law by SNYDER which resulted in the deliberate indifference to the constitutional rights of the Plaintiffs set forth above.

240.    SNYDER supervisory and delegated final policymakers also, after notice of the constitutional violations alleged herein, officially sanctioned these actions and refused to discipline O'LEARY the individually named Defendants and other officers/deputies, employees, and agents, which established a policy and practice, by a final policymaker, that directly or indirectly resulted in the violation of Plaintiffs constitutional rights.

241.    The failures attributed to SNYDER above including his ratification of O'LEARY's behavior, was a moving force or proximate cause of the injuries to Plaintiffs.

242.    The actions, inactions, well-settled polices, customs, practices and procedures referenced above were the moving force behind the violation of Plaintiffs' rights. SNYDER were grossly negligent, reckless and/or deliberately indifferent to the health, safety and welfare of Plaintiffs in that SNYDER assented to the failure to properly train, supervise, control, conduct proper investigations into prior arrests of O'LEARY screen and review for continued employment, the person and conduct of O'LEARY. As a result, SNYDER knew of had reason to know that O'LEARY would act unlawfully and he failed to stop their actions, resulting in the

36

violations of Plaintiff's civil rights.

243.    As a direct and proximate cause of SNYDER'S actions, Plaintiffs have been damaged, which damages include: grave mental anguish. pain and suffering, loss of capacity for the enjoyment of life, embarrassment, humiliation, lost wages and other tangible losses, loss of reputation, and the loss of other emoluments. These damages have occurred at present, in the past and will most likely occur in the future.

**COUNT VI**
**FALSE ARREST BROUGHT UNDER 42 U.S.C. §1983**
**(Brought by All Plaintiffs Against O'LEARY)**

244.    Paragraphs 1 through 189 are hereby re-alleged and incorporated by reference in this Count.

245.    This count sets forth a claim against individual Defendant O'LEARY, who, individually and in tandem, violated Plaintiffs' rights under the Fourth Amendment to the United States Constitution to be free from false arrests. These violations were of the type and character as to which any reasonable law enforcement agency or officer would be aware.

246.    O'LEARY misused his power, possessed by virtue of state law and made possible only because he was clothed with the authority of state law. The violations of Plaintiffs' rights, as described above, occurred under color of state law and are actionable under 42 U.S.C. §1983. O'LEARY is a person under the laws applicable to this Count.

247.    The foregoing actions of O'LEARY were engaged in bad faith, with malicious purpose, and in a manner exhibiting willful and wanton disregard of human rights, safety and property, and were engaged in without any lawful justification and in the absence of probable cause. O'LEARY knew or should have known that there was no probable cause to arrest Plaintiffs given the circumstances present and the clearly established law on the proof needed to establish "arguable probable cause." Defendant O'LEARY lied and falsified drug tests against

37

each Plaintiff identified in this count. O'LEARY falsified probable cause affidavits and other documents to cause the arrest and malicious prosecution of Plaintiffs. These actions violated the Fourth Amendment to the United States Constitution.

248.    Defendant O'LEARY is a person under applicable law, and is liable to Plaintiffs for the violation of legal and constitutional rights.

249.    Based upon the facts presented to Defendant O'LEARY, no reasonable law enforcement officer could have concluded that there existed any probable cause to arrest Plaintiffs. The law was settled and clearly established that the actions of Defendant O'LEARY constituted false arrest under the Fourth Amendment to the United States Constitution at the time the actions were engaged in.

250.    The actions or inactions of Defendant O'LEARY as set forth in part above constituted a deliberate indifference or reckless disregard for the safety of Plaintiffs when he knew of and disregarded a risk to Plaintiffs' health and safety.

251.    As a direct and proximate cause of Defendant O'LEARY's actions, Plaintiffs have been damaged, which damages include: grave mental anguish, pain and suffering, loss of capacity for the enjoyment of life, embarrassment, humiliation, loss of reputation, and the loss of other emoluments. These damages have occurred at present, in the past and will most likely occur in the future. Plaintiffs are entitled to punitive damages.

**COUNT VII**
**COMMON LAW MALICIOUS PROSECUTION**
**(Brought by All Plaintiffs Against O'LEARY)**

252.    Paragraphs 1 through 189 are hereby re-alleged and incorporated by reference in this Count.

253.    This count sets forth claims against Defendant O'LEARY for malicious prosecution and is pled in the alternative. For purposes of this count, Defendant O'LEARY was

acting outside the course and scope of his employment with SHERIFF.

254.     Defendant O'LEARY caused the commencement and/or continuation of criminal proceedings against the Plaintiffs subject to this Count.  The subject proceedings had bona fide terminations in Plaintiff's favor in that the charges against Plaintiff were dropped or dismissed or otherwise resolved in Plaintiff's favor. Defendant was a person for the purposes of this Count.

255.     There was no probable cause or reasonable basis in fact or in law for O'LEARY to cause the commencement of the criminal proceedings against Plaintiff.

256.     O'LEARY acted intentionally and with malice in initiating the criminal proceedings against the Plaintiff subject to this Count, as well as in making the arrests of Plaintiff, and Defendant O'LEARY knew that his actions against Plaintiff were not supported by even arguable probable cause.

257.     As a direct and proximate cause of Defendant O'LEARY's actions, Plaintiff Watkins has been damaged, which damages include: mental anguish, pain and suffering, loss of capacity for the enjoyment of life, embarrassment, humiliation, bodily injury, and loss of reputation. These damages have occurred at present, in the past and will most likely occur in the future. Plaintiff is entitled to punitive damages under this count.

### COUNT VIII
### NEGLIGENCE
### (Brought by All Plaintiffs Against SNYDER)

258.     Paragraphs 1 through 189 are hereby re-alleged and incorporated by reference in this Count.

259.     This count sets forth a claim against Defendant SNYDER for common law negligence. Defendant SNYDER knew or should have known that Plaintiffs were with a zone of risk related to contact with its agents/employees.

260.     Defendant SNYDER owed a duty of care to Plaintiffs due to the nature of the relationship

between Plaintiffs and Defendant SNYDER. He had a special relationship with Plaintiffs and, consequently, a duty of care was attendant thereto. Alternatively, legal duties devolved upon Defendant SNYDER because Plaintiffs were in the foreseeable zone of risk to be harmed by the actions thereof.

261.   Defendant SNYDER further breached its duty to properly supervise his employees and agents, to ensure the safety of the Plaintiffs and/or to properly investigate the circumstances of criminal and/or tortious activity by his deputies.

262.   The actions of Defendant SNYDER were "operational" functions, i.e., functions that were not necessary to or inherent in policymaking or planning, that merely reflected secondary decisions as to how policies or plans were to be implemented.

263.   As a direct and proximate result of the above unlawful acts and omissions, Plaintiffs sustained economic damages, including lost income, sustained emotional pain, anguish, humiliation, insult, indignity, loss of self-esteem, inconvenience and hurt, all because of the actions of Defendant SNYDER and is therefore entitled to compensatory damages.

## COUNT IX
## COMMON LAW NEGLIGENT HIRING, RETENTION, TRAINING, AND SUPERVISION
### (Brought by All Plaintiffs Against SNYDER)

264.   Paragraphs 1 through 189 are hereby re-alleged and incorporated by reference in this Count.

265.   This count sets forth a claim against Defendant SNYDER for negligent hiring, retention, training and supervision.

266.   Defendant SNYDER breached its duty to properly hire, supervise, train and retain Defendant O'LEARY other officers, employees, and agents that all participated in the false arrests, stops and prosecutions of Plaintiffs.

267.    The breach of this duty to properly hire, retain, train and supervise the Individual Defendant O'LEARY and other officers, employees and agents resulted in damages and injury to Plaintiffs. Defendant SNYDER knew or should have known that the actions, omissions, and derelictions of officers, employees, and agents could cause injury to Plaintiffs.

268.    Defendant SNYDER breached its duties to hire and/or maintain the employment of employees who were fit for the duties they performed and to supervise and train its employees and agents.

269.    As a direct and proximate result of the above unlawful acts and omissions, Plaintiffs sustained damages, including emotional pain, anguish, humiliation, insult, indignity, loss of self-esteem and inconvenience and hurt and are therefore entitled to compensatory damages pursuant to the above provisions.

## COUNT X
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (Brought by All Plaintiffs Against O'LEARY)

270.    Paragraphs 1 through 189 are hereby re-alleged and incorporated by reference in this Count.

271.    This count sets forth a claim against O'LEARY for intentional infliction of emotional distress. This claim is pled in the alternative, and for the purpose of this claim, O'LEARY was acting outside the course and scope of their employment with SHERIFF.

272.    O'LEARY's conduct set forth in part above included multiple instances of mistreatment of Plaintiffs. This conduct by O'LEARY constituted extreme and outrageous conduct that would shock the conscience of a reasonable person and goes beyond all bounds of decency. O'LEARY's conduct was the proximate cause of Plaintiffs' emotional distress and Plaintiffs' emotional distress is severe. O'LEARY's conduct constitutes the actionable tort of intentional infliction of emotional distress.

41

273.    O'LEARY maliciously and intentionally caused Plaintiff emotional distress by making false statements all to cause Plaintiffs to be unjustifiably subjected to arrest, imprisonment, and prosecution. These actions by O'LEARY were taken in bad faith and with a malicious purpose and with a willful disregard for Plaintiffs' rights.

274.    As a direct and proximate result of the above unlawful acts and omissions, Plaintiffs were injured and sustained economic damages, including lost income, lost prestige, lost potential employment and good standing in the community, he has lost the capacity for the enjoyment of life; sustained severe emotional pain, anguish, humiliation, insult, indignity, loss of self-esteem, inconvenience and hurt, because of O'LEARY's actions, and is therefore entitled to compensatory damages pursuant to the above provisions. Plaintiffs' damages are continuous; they have occurred in the past, are occurring in the present, and will continue to occur in the future. Plaintiffs are entitled to punitive damages under this count.

**COUNT XI**
**FOURTEENTH AMENDMENT VIOLATIONS**
**(Brought by All Plaintiffs Against SNYDER)**

275.    Paragraphs 1 through 189 are hereby re-alleged and incorporated by reference in this Count.

276.    This count sets forth claims against Defendant SNYDER for abuse of power and the violation of the Plaintiffs' property and liberty interests under the Due Process clause of the Fourteenth Amendment, brought through U.S.C. §1983. This count is set forth in the alternative and both the procedural and substantive Due Process rights of the Plaintiffs are implicated and a claim for outrageous and shocking the conscious conduct is made herein.

277.    Defendant SNYDER violated the substantive and procedural Due Process clause of the Fourteenth Amendment by conducting illegal traffic stops, conducting illegal searches of

Plaintiffs' vehicles and persons, placing illegal drugs, drug paraphernalia, narcotics equipment and devices, and other contraband on or around Plaintiffs, illegally arresting and detaining Plaintiffs, causing the malicious criminal prosecution of Plaintiffs, making illegal false sworn statements in official documents regarding Plaintiffs, and violating the civil and constitutional rights of Plaintiffs against illegal search and seizure of their person and property, and their illegal and improper detention, prosecution and incarceration, for which there was no justification or legal basis. There was no process available to Plaintiffs to prevent or stop the Defendant SNYDER, through O'LEARY, and other officers, employees, and agents from taking these illegal actions against Plaintiffs. The actions against Plaintiffs were taken knowingly, maliciously, and unlawfully, and under color of state law.

278.    Defendant SNYDER misused and abused his power, possessed by virtue of state law and made possible only because he was clothed with the authority of state law.  The violation of Plaintiff's rights, as described above, occurred under color of state law and is actionable under 42 U.S.C. §1983.

279.    Defendant SNYDER is a person under applicable law and is liable to Plaintiff for the violation of legal and constitutional rights. Defendant SNYDER delegated final policymaking to O'LEARY and other officers, employees, and agents to make the decisions adversely affecting Plaintiffs.

280.    Defendant SNYDER acted in bad faith, with malicious purpose, and in a manner exhibiting wanton and willful disregard for human rights, safety, and property. Defendant SNYDER was further deliberately indifferent in failing to properly train O'LEARY and other officers, employees, and agents to prevent the harm that was caused to Plaintiffs including policies or procedures to properly identify suspects who committed criminal activity; policies

and procedures to identify officers who falsify facts to support probable cause  affidavits; policies and procedures to supervise officers/deputies in SHERIFF's employ; policies and procedures to detect officers/deputies who may engage in criminal activity by falsifying drug tests against innocent citizens like Plaintiffs; and policies and procedures to properly discipline officers/deputies who willfully trample on the constitutional rights of law abiding citizens like Plaintiffs, and to prevent the type of harm described in part above.

  281. At all times pertinent hereto, SNYDER was responsible for (1) creating, adopting and implementing rules, regulations, orders, policies and procedures in the proper and effective hiring, supervising and retaining of law enforcement officers who do not have a propensity towards lying, falsifying drug tests, planting evidence and falsifying probable cause affidavits to effect arrests; (2) creating, adopting and implementing rules, regulations, orders, policies and procedures for the proper and efficient training of law enforcement officers in a way and to an extent necessary to ensure that the officers are properly completing probable cause affidavits and not falsifying drug tests against citizens in Martin County; (3) creating, adopting and implementing rules, regulations, orders, policies and procedures for proper policing, enduring the elimination of corruption in his ranks and to ensure that his officers/deputies are properly stopping citizens with reasonable suspicion and arresting with probable cause; (4) creating, adopting and implementing rules, regulations, orders, policies and procedures for the proper and efficient supervision, control, discipline and assignment of law enforcement officers in a way and to an extent necessary to ensure that citizens will not be subject to being falsely arrested; and (5) to implement rules, regulations, policies, orders and procedures for the elimination or reduction of instances of untruthfulness, including the unlawful arrests and instances of corroboration or ratification of untruthful accounts of criminal activities.

282.    Through his officers, employees, and agents, and through his own actions and inactions SNYDER, misused his powers, possessed by virtue of state law and made possible only because SNYDER, his officers, employees and agents were clothed with the authority of state law. The violations of Plaintiffs' rights, as described above, occurred under color of state law and are actionable under 42 U.S.C. §1983.

283.    The foregoing actions of SNYDER were taken in bad faith, with malicious purpose, and in a manner exhibiting willful and wanton disregard of human rights, safety and property, and were engaged in without any lawful justification and in the absence of probable cause. SNYDER knew or should have known that there was no probable cause or other legal justification to arrest Plaintiffs, given the circumstances present with SHERIFF's deputies and other personnel including but not limited to O'LEARY who routinely engaged in a systematic pattern and practice of making illegal traffic stops, falsifying drug tests, making false statements in probable cause affidavits and other charging documents, and causing the false arrests, and seizures of Plaintiffs.

284.    Based upon the facts presented to SNYDER through his officers, employees, and agents and applicable law, no reasonable law enforcement agency or officer could have concluded that there existed any probable cause to arrest Plaintiffs. The law was well settled and clearly established that the actions of SNYDER, his delegates, deputies, officers, employees and agents constituted false arrest under the Fourth Amendment to the United States Constitution at the time the actions were engaged in.

285.    The actions or inactions of SNYDER as set forth in part above constituted deliberate indifference and/or reckless disregard for the constitutional rights of Plaintiffs.

286.    SNYDER acted with deliberate indifference in the failure to implement adequate hiring and supervisory procedures--or implemented no such policies or procedures-- to prevent the harm that was caused to Plaintiffs including policies or procedures to properly identify suspects who committed criminal activity; policies and procedures to identify officers who falsify facts to support probable cause affidavits; policies and procedures to supervise officers/deputies in SHERIFF's employ; policies and procedures to detect officers/deputies who may engage in criminal activity by falsifying drug tests against innocent citizens like Plaintiffs; the rights of citizens the officers/deputies encounter in their duties; and policies and procedures to properly discipline officers/deputies who willfully trample on the constitutional rights of law abiding citizens like Plaintiffs, and to prevent the type of harm described in part above, as a direct result of which Plaintiffs were injured. SNYDER was also deliberately indifferent in failing to train his officers in basic human dignity which resulted in constitutional violations as set forth in part above.

287.    SNYDER was deliberately indifferent in hiring, retaining and supervising O'LEARY and other deputies, as they were known to have engaged in constitutional violations prior to their illegal and malicious actions against Plaintiffs described herein. After knowledge of the constitutional violations by O'LEARY and other deputies, SNYDER failed to investigate their actions or to fire them, which ultimately led to the violation of Plaintiff's constitutional rights.

288.    SNYDER acted with deliberate indifference to the possibility of false arrests and detentions by his deputies, has encouraged the well-settled policy, practice and custom of illegal stops, false arrests caused by falsifying drug tests and other illegal things on Plaintiffs and others in Martin County. This involved SNYDER knowledge of the disproportionate number of traffic

stops in which drugs were located by O'LEARY. Despite knowing of the unconstitutional behavior and the needs to take corrective actions, SNYDER failed to do so.

289.   SNYDER was on notice, by the history of widespread abuse, of the need to correct the well-settled policy, practice and custom of O'LEARY's extreme and illegal actions against the citizens in Martin County. The need for more or different training and supervision had been so obvious and the inadequacy of same, combined with SNYDER'S conscious choice not to act, has resulted in the violation of constitutional rights, as alleged herein. SNYDER, in further disregard of the citizens of Martin County, has, with deliberate indifference, either failed to direct, failed to require or has sought to limit investigations by MCSO into its deputies/officers conduct such that it is well settled policy, practice and custom of MCSO to limit internal investigations, with few or no questions ever raised about O'LEARY's decisions to arrest multiples of citizens and others in Martin County. By limiting the investigations, O'LEARY's illegal actions have continued, unchecked and have been ratified, condoned and/or consented to by SNYDER.

290.   SNYDER, after being on notice of the history of the failure to properly investigate and thus address and correct the extreme and wanton acts of O'LEARY, leading to the deprivation of Plaintiffs' civil rights. The deprivation of civil rights described herein is a widespread pattern sufficient to notify SNYDER and were obvious, flagrant, rampant and on continued duration over a period of years rather than isolated occurrences.

291.   SNYDER, individually and through delegated final decision makers, acted under color of state law and failed to supervise, investigate and discipline the O'LEARY and other officers/deputies, employees and agents *as* alleged herein, and was deliberately indifferent in their training and supervision, the results of which were constitutional violations against

Plaintiffs and others. SNYDER and his delegates failure to, supervise, investigate and discipline O'LEARY and other officers/deputies, employees and agents, constitutes a willful failure to implement or enforce SHERIFF's policies and law by SNYDER which resulted in the deliberate indifference to the constitutional rights of the Plaintiffs set forth above.

292.    SNYDER supervisory and delegated final policymakers also, after notice of the constitutional violations alleged herein, officially sanctioned these actions and refused to discipline O'LEARY and other officers/deputies, employees, and agents, which established a policy and practice, by a final policymaker, that directly or indirectly resulted in the violation of Plaintiffs constitutional rights.

293.    The failures attributed to SNYDER above including his ratification of O'LEARY's behavior, was a moving force or proximate cause of the injuries to Plaintiffs.

294.    The actions, inactions, well-settled polices, customs, practices and procedures referenced above were the moving force behind the violation of Plaintiffs' rights. SNYDER were grossly negligent, reckless and/or deliberately indifferent to the health, safety and welfare of Plaintiffs in that SNYDER assented to the failure to properly train, supervise, control, conduct proper investigations into prior arrests by O'LEARY, screen and review for continued employment, the person and conduct of O'LEARY. As a result, SNYDER knew of had reason to know that O'LEARY would act unlawfully and he failed to stop their actions, resulting in the violations of Plaintiff's civil rights.

295.    The foregoing actions of Defendant SNYDER were willful, wanton and in reckless disregard of Plaintiffs' rights and were taken without any lawful justification. Defendant SNYDER knew or should have known that his deputies were abusing their power, in violation of both the United States Constitution and federal law.

296.    As a direct and proximate result of the actions of Defendant SNYDER, Plaintiffs have been damaged, which damages include: grave mental anguish, pain and suffering, loss of capacity for the enjoyment of life, embarrassment, humiliation, loss of reputation, lost employment opportunities, lost wages, and the loss of other emoluments. These damages have occurred at present, in the past, and will most likely occur in the future.

## COUNT XII
## FOURTEENTH AMENDMENT VIOLATIONS
### (Brought by All Plaintiffs Against O'LEARY)

297.    Paragraphs 1 through 189 are hereby re-alleged and incorporated by reference in this Count.

298.    This count sets forth claims against O'LEARY for abuse of power and the violation of the Plaintiff's property and liberty interests under the Due Process clause of the Fourteenth Amendment, brought through U.S.C. §1983. This count is set forth in the alternative and both the procedural and substantive Due Process rights of the Plaintiff are implicated and a claim for outrageous and shocking the conscious conduct is made herein.

299.    O'LEARY violated the substantive and procedural Due Process clause of the Fourteenth Amendment by conducting illegal traffic stops, conducting illegal searches of Plaintiffs' vehicles and persons, placing illegal drugs, drug paraphernalia, narcotics equipment and devices, and other contraband on or around Plaintiffs, illegally arresting and detaining Plaintiffs, causing the malicious criminal prosecution of Plaintiffs, making illegal false sworn statements in official documents regarding Plaintiffs, and violating the civil and constitutional rights of Plaintiffs against illegal search and seizure of their person and property, and their illegal and improper detention, prosecution and incarceration, for which there was no justification or legal basis. There was no process available to Plaintiffs to prevent or stop O'LEARY from taking

49

these illegal actions against Plaintiffs. The actions against Plaintiffs were taken knowingly, maliciously, and unlawfully, and under color of state law.

300.    O'LEARY misused and abused their power, possessed by virtue of state law and made possible only because they were clothed with the authority of state law. The violation of Plaintiff's rights, as described above, occurred under color of state law and is actionable under 42 U.S.C. §1983.

301.    O'LEARY is liable to Plaintiffs for the violation of legal and constitutional rights.

302.    O'LEARY acted in bad faith, with malicious purpose, and in a manner exhibiting wanton and willful disregard for human rights, safety, and property by conducting illegal traffic stops, conducting illegal searches of Plaintiffs' vehicles and persons, placing illegal drugs, drug paraphernalia, narcotics equipment and devices, and other contraband on or around Plaintiffs, illegally arresting and detaining Plaintiffs, causing the malicious criminal prosecution of Plaintiffs, making illegal false sworn statements in official documents regarding Plaintiffs, and violating the civil and constitutional rights of Plaintiffs against illegal search and seizure of their person and property, and their illegal and improper detention, prosecution and incarceration as described in part above.

303.    The foregoing actions of O'LEARY were willful, wanton and in reckless disregard of Plaintiffs' constitutional rights, and were taken without any lawful justification and resulted in the violation of the Plaintiffs' constitutional rights.

304.    As a direct and proximate result of the actions of O'LEARY, Plaintiffs have been damaged, which damages include: grave mental anguish, pain and suffering, loss of capacity for the enjoyment of life, embarrassment, humiliation, loss of reputation, lost employment

opportunities, lost wages, and the loss of other emoluments. These damages have occurred at present, in the past, and will most likely occur in the future. Plaintiffs are entitled to punitive damages.

## COUNT XIII
### FOURTH AMENDMENT VIOLATION –
### UNCONSTITUTIONAL SEARCH AND SEIZURE
### (Brought by All Plaintiffs Against O'LEARY)

305.    Paragraphs 1 through 189 are hereby re-alleged and incorporated by reference in this Count.

306.    This count sets forth claims against O'LEARY for unconstitutional searches and seizures under the Fourth Amendment to the United States Constitution when they conducted pretextual stops of the Plaintiffs as alleged herein.

307.    The Defendant's violations of Fourth Amendment to the United State Constitution were of the type and character as to which any reasonable person would be aware.

308.    O'LEARY acted in bad faith and with malicious purpose and in a manner exhibiting wanton and willful disregard of human rights, safety, and property.

309.    The foregoing actions of O'LEARY were willful, wanton and in reckless disregard of Plaintiffs' rights, and were taken without any lawful justification and/or in the absence of reasonable suspicion, arguable probable cause and/or probable cause.

310.    Based upon the facts presented to O'LEARY and the applicable law, no reasonable law enforcement officer could have concluded that there existed any legal basis to stop and search Plaintiffs' vehicles and to seize property therefrom. The law was well settled and clearly established that the actions of O'LEARY constituted an unlawful search and seizure under the Fourth Amendment to the United States Constitution at the time the actions by O'LEARY were committed.

311.    The actions or inactions of O'LEARY as set forth in part above constituted deliberate indifference or reckless disregard for the safety of Plaintiffs when O'LEARY knew of and disregarded a risk to Plaintiff s health and safety.

312.    O'LEARY misused his power, possessed by virtue of state law and made possible only because they were clothed with the authority of state law. The violation of Plaintiffs' rights, as described above, occurred under color of state law and is actionable under 42 U.S.C. §1983.

313.    As a direct and proximate cause of O'LEARY's actions, Plaintiffs have been damaged, which damages include: grave mental anguish, pain and suffering, loss of capacity for the enjoyment of life, embarrassment, humiliation, loss of reputation, and the loss of other emoluments. These damages have occurred at present, in the past and will most likely occur in the future. Plaintiffs are also entitled to punitive damages under this count.

**COUNT XIV**
**FOURTH AMENDMENT VIOLATION –**
**UNCONSTITUTIONAL SEARCH AND SEIZURE**
**(Brought by All Plaintiffs Against SNYDER)**

314.    Paragraphs 1 through 189 are hereby re-alleged and incorporated by reference in this Count.

315.    This count sets forth claims against Defendant SNYDER for unconstitutional search and seizure under the Fourth Amendment to the United States Constitution. Defendant SNYDER is a person under the laws applicable to this count.

316.    This count sets forth a claim against Defendant SNYDER, who through his officers, deputies, employees, and agents, violated Plaintiffs' rights under the Fourth Amendment to the United States Constitution to be free from illegal searches and seizures. These violations were of the type and character as to which any reasonable law enforcement agency and/or officer would be aware. At all times pertinent hereto, SNYDER was responsible for the

deputies and employees working with MCSO including supervising, overseeing, training and establishing policies, customs and procedures to conform their conduct to the United States Constitution and Florida law.

317.    At all times pertinent hereto, SNYDER was responsible for (1) creating, adopting and implementing rules, regulations, orders, policies and procedures in the proper and effective hiring, supervising and retaining of law enforcement officers who do not have a propensity towards pretextual stops of vehicles and creating circumstances to illegal search vehicles, falsifying drug tests and falsifying probable cause affidavits to effect arrests; (2) creating, adopting and implementing rules, regulations, orders, policies and procedures for the proper and efficient training of law enforcement officers in a way and to an extent necessary to ensure that the officers are properly stopping vehicles where there is reasonable suspicion to believe that a crime has occurred and to search vehicles; (3) creating, adopting and implementing rules, regulations, orders, policies and procedures for proper policing, enduring the elimination of corruption in his ranks and to ensure that his officers/deputies are properly stopping citizens with reasonable suspicion and arresting with probable cause; (4) creating, adopting and implementing rules, regulations, orders, policies and procedures for the proper and efficient supervision, control, discipline and assignment of law enforcement officers in a way and to an extent necessary to ensure that citizens will not be subject to being stopped and/or searched in violation of the Fourth Amendment; and (5) to implement rules, regulations, policies, orders and procedures for the elimination or reduction of instances of pretextual stops and searches in an effort to falsify drug tests and/or other items to effect arrests.

318.    Through his officers, employees, and agents, and through his own actions and inactions SNYDER, misused his powers, possessed by virtue of state law and made possible only

because SNYDER, his officers, employees and agents were clothed with the authority of state law. The violations of Plaintiffs' rights, as described above, occurred under color of state law and are actionable under 42 U.S.C. §1983.

319.    The foregoing actions of SNYDER were taken in bad faith, with malicious purpose, and in a manner exhibiting willful and wanton disregard of human rights, safety and property, and were engaged in without any lawful justification and in the absence of reasonable suspicion and/or probable cause. SNYDER knew or should have known that there was no probable cause or other legal justification to stop and/or search Plaintiffs, given the circumstances present with SHERIFF's deputies and other personnel including but not limited to individual Defendant, O'LEARY, who routinely engaged in a systematic pattern and practice of making illegal traffic stops, falsifying drug tests, making false statements in probable cause affidavits and other charging documents, and causing the false arrests, and seizures of Plaintiffs.

320.    Based upon the facts presented to SNYDER through his officers, employees, and agents and applicable law, no reasonable law enforcement agency or officer could have concluded that there existed any legitimate reason to stop and/or search Plaintiffs. The law was well settled and clearly established that the actions of SNYDER, his delegates, deputies, officers, employees and agents constituted false arrest under the Fourth Amendment to the United States Constitution at the time the actions were engaged in.

321.    The actions or inactions of SNYDER as set forth in part above constituted deliberate indifference and/or reckless disregard for the constitutional rights of Plaintiffs.

322.    SNYDER acted with deliberate indifference in the failure to implement adequate hiring and supervisory procedures--or implemented no such policies or procedures-- to prevent the harm that was caused to Plaintiffs including policies or procedures to properly identify

suspects who committed criminal activity; policies and procedures to identify officers who falsify facts to support stops and searches; policies and procedures to supervise officers/deputies in SHERIFF's employ; policies and procedures to detect officers/deputies who may engage in criminal activity by illegally stopping and searching innocent citizens like Plaintiffs; the rights of citizens the officers/deputies encounter in their duties; and policies and procedures to properly discipline officers/deputies who willfully trample on the constitutional rights of law abiding citizens like Plaintiffs, and to prevent the type of harm described in part above, as a direct result of which Plaintiffs were injured. SNYDER was also deliberately indifferent in failing to train his officers in basic human dignity which resulted in constitutional violations as set forth in part above.

323.    SNYDER was deliberately indifferent in hiring, retaining and supervising O'LEARY, and other deputies, as they were known to have engaged in constitutional violations prior to their illegal and malicious actions against Plaintiffs described herein. After knowledge of the constitutional violations by O'LEARY and other deputies, SNYDER failed to investigate their actions or to fire them, which ultimately led to the violation of Plaintiff's constitutional rights.

324.    SNYDER acted with deliberate indifference to the possibility of false arrests by his deputies, has encouraged the well-settled policy, practice and custom of these illegal stops and searches which allowed O'LEARY and other deputies to falsify drug tests and other illegal things on Plaintiffs and others in Martin County. This involved SNYDER knowledge of the disproportionate number of traffic stops in which drugs were located by O'LEARY. Despite knowing of the unconstitutional behavior and the needs to take corrective actions, SNYDER failed to do so.

325.    SNYDER was on notice, by the history of widespread abuse, of the need to correct the well-settled policy, practice and custom of O'LEARY's extreme and illegal actions against the citizens in Martin County. The need for more or different training and supervision had been so obvious and the inadequacy of same, combined with SNYDER'S conscious choice not to act, has resulted in the violation of constitutional rights, as alleged herein. SNYDER, in further disregard of the citizens of Martin County, has, with deliberate indifference, either failed to direct, failed to require or has sought to limit investigations by MCSO into its deputies/officers conduct such that it is well settled policy, practice and custom of MCSO to limit internal investigations, with few or no questions ever raised about O'LEARY's and O'LEARY's decisions to stop, search and arrest multiples of citizens and others in Martin County. By limiting the investigations, O'LEARY's illegal actions have continued, unchecked and have been ratified, condoned and/or consented to by SNYDER.

326.    SNYDER, after being on notice of the history of the failure to properly investigate and thus address and correct the extreme and wanton acts of O'LEARY, leading to the deprivation of Plaintiffs' civil rights. The deprivation of civil rights described herein is a widespread pattern sufficient to notify SNYDER and were obvious, flagrant, rampant and on continued duration over a period of years rather than isolated occurrences.

327.    SNYDER, individually and through delegated final decision makers, acted under color of state law and failed to supervise, investigate and discipline the O'LEARY and other officers/deputies, employees and agents *as* alleged herein, and was deliberately indifferent in their training and supervision, the results of which were constitutional violations against Plaintiffs and others. SNYDER and his delegates failure to, supervise, investigate and discipline O'LEARY and other officers/deputies, employees and agents, constitutes a willful failure to

implement or enforce SHERIFF's policies and law by SNYDER which resulted in the deliberate indifference to the constitutional rights of the Plaintiffs set forth above.

328.    SNYDER supervisory and delegated final policymakers also, after notice of the constitutional violations alleged herein, officially sanctioned these actions and refused to discipline O'LEARY and other officers/deputies, employees, and agents, which established a policy and practice, by  final policymakers, that directly or indirectly resulted in the violation of Plaintiffs constitutional rights.

329.    The failures attributed to SNYDER above including his ratification of O'LEARY's behavior, was a moving force or proximate cause of the injuries to Plaintiffs.

330.    The actions, inactions, well-settled polices, customs, practices and procedures referenced above were the moving force behind the violation of Plaintiffs' rights. SNYDER were grossly negligent, reckless and/or deliberately indifferent to the health, safety and welfare of Plaintiffs in that SNYDER assented to the failure to properly train, supervise, control, conduct proper investigations into prior arrests of O'LEARY, screen and review for continued employment, the person and conduct of O'LEAR. As a result, SNYDER knew of had reason to know that O'LEARY would act unlawfully and he failed to stop their actions, resulting in the violations of Plaintiff's civil rights.

331.    As a direct and proximate cause of SNYDER'S actions, Plaintiffs have been damaged, which damages include: grave mental anguish. pain and suffering, loss of capacity for the enjoyment of life, embarrassment, humiliation, lost wages and other tangible losses, loss of reputation, and the loss of other emoluments. These damages have occurred at present, in the past and will most likely occur in the future.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demands judgment against Defendants for the following:

(a)    that process issue and this Court take jurisdiction over this case;

(b)    that this Court grant equitable relief against Defendants under the applicable counts set forth above, mandating Defendant's obedience to the laws enumerated herein and providing other equitable relief to Plaintiffs;

(c)    enter judgment against Defendants and for Plaintiffs awarding all legally-available general and compensatory damages and economic loss to Plaintiffs from Defendants for Defendants violations of law enumerated herein;

(d)    enter judgment against Defendants and for Plaintiffs permanently enjoining Defendants from future violations of law enumerated herein;

(e)    enter judgment against Defendants and for Plaintiffs awarding Plaintiffs attorney's fees and costs;

(f)    award Plaintiffs interest where appropriate; and

(g)    grant such other further relief as being just and proper under the circumstances, including but not limited to reinstatement.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury on all issues herein that are so triable.

Respectfully submitted,

/s/ Lance P. Richard
Lance P. Richard [FBN 44156]
**LANCE P. RICHARD, P. A.**
51 SE Ocean Blvd.
Stuart, FL 34994
Telephone:  (772) 223-9600
Facsimile:  (772) 223-0859

/s/ Jordan R. Wagner
Jordan R. Wagner [FBN 0014852]
**KIBBEY | WAGNER**
73 SW Flagler Ave.
Stuart, FL 34994
Telephone: (772) 444-7000
Facsimile:  (772) 872-5185

ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was conveyed via CM/ECF to all counsel of record this _7th_ day of December, 2021.

/s/ Lance Richard
Lance Richard

/s/ Jordan R. Wagner
Jordan R. Wagner

O'Leary

ORIGINAL

# COMPLAINT AFFIDAVIT

**Martin County Sheriff's Office**
**800 SE Monterey Road**
**Stuart, Florida 34994**

**CASE:** 19-00833

**DETECTIVE:**
  Detective Mark Diapoules
  800 SE Monterey Road
  Stuart, FL 34994

**DEFENDANT:**
  Steven O'Leary
  278 SE Kitchling Circle
  Stuart, FL 34994

**PHYSICAL DESCRIPTION:**

| AGE: 28 | RACE: White | HGT: 5'10" | HAIR: Brown | EYE: Brown |
|---------|-------------|------------|-------------|------------|
| DOB:08/16/1990 | SEX: Male | WGT: 180 | SSN: ▓▓▓▓▓ | |

**TYPE OF COMPLAINT:**
  Official Misconduct F.S.S. 838.022 (17 Counts)
  False Imprisonment F.S.S. 787.02 (13 Counts)
  Tampering with or Fabricating Physical Evidence F.S.S. 918.13 (8 Counts)
  False Statement F.S.S. 837.06 (9 Counts)
  Petit Theft F.S.S. 812.014
  Battery F.S.S. 784.03

**DATE OCCURRED:**
  05/28/2018 through 01/11//2019

**LOCATION:**
  800 SE Monterey Road
  Stuart, FL 34994

**VICTIM:**
  State of Florida
  800 SE Monterey Road
  Stuart, FL 34994

  Grayson Kyte
  3411 NE Skyline Drive,
  Jensen Beach, FL, 34957

1

EXHIBIT "A"

O'Leary

**Weston Landis**
**5455 SW Ranchito Street,**
**Palm City, FL, 34990**

**Dana Schimpf**
**2832 SE Hibiscus Street,**
**Stuart, FL, 34997**

**Robin Page**
**7770 SE Federal Highway**
**Hobe Sound, FL 33455**

**Fabrico Vasquez**
**7770 SE Federal Highway**
**Hobe Sound, FL 33455**

**Kaylyn Waters**
**6633 Gaviota Court,**
**Fort Pierce, FL, 34951**

**Bradley Martin**
**148 Trant Road,**
**Wynnewood, PA**

**Melissa Morales**
**3551 SE Fairway West,**
**Stuart, FL, 34997**

**Jabari Schweitzer**
**2020 Scott Street,**
**Hollywood, FL, 33020**

**Yener Lopez**
**5162 SE Flounder Ave,**
**Stuart, FL, 34997**

**Nikolas Cook**
**2 SE Keuka Terrace,**
**Stuart, FL, 34997**

**James Sutton**
**Homeless,**
**Stuart, FL, 34994**

**Victor Aguillon Lopez**
**9814 SW 34th Terrace,**
**Miami, FL, 33165**

**Jason Farrenkopf**

2

O'Leary

2271 SW Chestnut Lane,
Port St. Lucie, FL, 34957

Kristin Schmier
2051 SE Hillmoor Drive,
Port St. Lucie, FL, 34957

## NARRATIVE:

Your Affiant, Detective Mark Diapoules, of the Martin County Sheriff's Office (MCSO), Investigated allegations of Official Misconduct committed by MCSO Deputy Steven O'Leary.  Base on the investigation conducted by the Martin County Sheriff's Office your Affiant has probable cause to believe that between February 2018 and January 2019, Steven O'Leary, while under the color of law, employed as a Deputy Sheriff for the Martin County Sheriff's Office, engaged in an ongoing pattern of Official Misconduct, Fabricating Evidence, False Imprisonment, and False Official Statement. Your Affiant provides the following summary and additional facts that are either personally known to your Affiant or have been obtained by other law enforcement officers during the investigation.

On 01/10/2019, the Circuit 19 State Attorney's Office, brought to the attention of the Martin County Sheriff's Office that the Indian River Crime Lab reported three separate items of narcotics evidence failed to test positive for the listed controlled substance.  Sheriff's Office records show that Deputy Steven O'Leary was the law enforcement officer responsible for submitting all of these items for evidence. As a result of the Crime Lab's findings, the State Attorney's Office dismiss three trafficking drug cases.  In Turn, Sheriff's Major Robert Seaman ordered an internal administrative review of Deputy O'Leary's pending drug cases.

### Initial Administrative Review

On 01/11/2019, Sgt. Croft from MCSO Internal Affairs directed Crime Scene Supervisor Sgt. Nelson to retrieve randomly selected items of narcotics evidence that had been submitted by Deputy O'Leary. Sgt. Nelson was further instructed to perform presumptive field tests of the selected items using agency issued testing kits[1].

Sgt. Nelson randomly selected ten items of evidence submitted by O'Leary with agency case numbers 18-20275, 18-19437, 18-20062, 18-20744, and 18-20594. Sgt. Nelson removed the items from the secure evidence locker and transported them to the secure processing room located in the garage of the MCSO Forensic Science Unit (FSU). He reviewed and processed the previously noted items of evidence documenting his work with photographs.  It should be noted that Sgt. Croft was present as an observer during all of Nelson's processing of the evidence.

Sgt. Nelson's review determined that only one out of seven presumptive field tests conducted resulted in a positive result for the presence of a controlled substance. Sgt. Nelson forwarded these results to his supervisors, repackaged, resealed and returned all submitted evidence. The State Attorney's Office was contacted and advised of the results.  All of these items were sent to the Indian River Crime Lab for full testing and analysis.  Based on the results of the initial review the State Attorney's Office immediately

---

[1] The field tests were conducted using Nark II kits, which are the standard issue test kits of the Sheriff's Office.

3

O'Leary

dismissed the cases based on evidence which did not test positive for the presence of a controlled substance. The results of Sgt. Nelson's investigation are as follows.

| Case | Item | Result | Test |
|------|------|--------|------|
| 18-20275 | S01   (Cocaine) | Negative | Nark II |
| 18-19437 | S01   (Ketamine) | Negative | Tru-Nark |
|  | S02   (Cocaine) | Negative | Nark II |
| 18-20062 | S01   (Cocaine) | Negative | Cobalt |
| 18-20744 | S01   (Heroin) | Negative | Mark II |
|  | S02   (Cocaine) | Positive | Cobalt |
| 18-20594 | S03   (Cocaine) | Negative | Cobalt |

**Non-Custodial Interview with O'Leary**

On 01/11/2019 at 1753 hours Sgt. Nelson and your Affiant conducted a voluntary noncustodial interview with Deputy O'Leary in the Crime Scene Office of the Martin County Sheriff's Office. The interview was audio recorded and the recording placed into evidence. What follows is a summary of the audio recording of that interview.

Your Affiant began by asking Deputy O'Leary if he would assist them [Diapoules and Nelson] with some narcotics field test kits in the Crime Scene Office. Once in the office, O'Leary was asked if he had been made aware that any of the narcotics evidence he submitted for his narcotics arrests had come back from the crime lab negative for the presence of a controlled substance. O'Leary replied he knew [some evidence] did not "pop" at the lab but insisted that they did "pop" on the road.

O'Leary was asked to explain his method for conducting a presumptive field test. To this O'Leary replied, that he used them in the same way he has always has. O'Leary further explained, "put the substance in there, always tap it to make it go to the bottom". O'Leary stated "you break, then you break the one in the middle, then you break the right and I [O'Leary] always shake it once and then wait for the separation." O'Leary further explained "I just break it, break the middle, and break the third. Then there's no other reaction besides the blue." O'Leary stated the liquid would stay pink; however, if Crack or Powder Cocaine were present they would react to the chemical and would turn blue. In his vernacular there would be a couple of "blue spots" in the test kit.

Your affiant then asked him if there was ever a time that he believed a suspect who denied that the substance O'Leary found was narcotics. O'Leary said "yeah it was only one young dude that I [O'Leary] kind of believed but I mean, the kits were popping on the road".

Sgt. Nelson then pulled out one of the items O'Leary's had submitted as evidence which was identified as a cut piece of straw. O'Leary was asked if he could attribute a specific defendant to this evidence. He said he could. Your affiant asked "do you remember what he said." O'Leary replied "...man I've had like a 107 dope arrests." When asked if he tests everything he collects as evidence, O'Leary said "everything I put in evidence doesn't get tested, only the substance that will pop and then I put everything that I suspect I send to the, I put into evidence." Indicating that he only tested substances that he felt sure would test positive. He also said that he submits everything he suspects to be a controlled substance into evidence.

4

O'Leary

Your affiant asked about Bradley Martin reference agency case number 18-18750. O'Leary replied "reeked of weed, he was super sketched when he was hanging out with them. I read him, post Miranda, admitted basically he smokes weed, didn't, he didn't basically said he bought the shit in east Stuart and kept, kept saying it was only, only detergent. But the fact was, the way that it was packaged. Man it was like seran wrapped inside a little thin, then in a Crown Royal bag, it popped three different times green." When asked why he tested it three times, O'Leary replied "cause it was such a large amount".

Your Affiant asked O'Leary "do they look good cause I haven't seen their…." O'Leary stated "every one of them, the totality of the circumstance is there, the way it's packaged, the way they're carrying it, I mean why else". O'Leary indicated that his decision on whether to test the suspected narcotics would be influenced by several factors including but not limited to the way the substance was packaged, the manner in which the defendant was carrying the substance and defendants overall demeanor. O'Leary was asked, if he gave much credence to the defendant's professions of innocence. O'Leary stated "I put it in the kit when it tests. That's the thing, is none of them are saying, no it's not that dope, absolutely not".

When presented with the reality that incorrectly performed test results would or have led to innocent people being arrested, O'Leary's response was "[I am] as blown away as you". He did then go on to say, "I care more about putting [the defendants] in jail than making the charge".

When asked by Sgt. Nelson about his law enforcement experience with cocaine, O'Leary responded, "I haven't seen it that much before I got here [working for MCSO], but I have seen a lot of meth and a lot of heroin, but crack we didn't have that many of [that] demographic". Sgt. Nelson then asked about any narcotics identification schools/training he had attended. O'Leary's response was, "Yes, I have taken the schools online." Sgt. Nelson then specifically inquired about "in person" narcotics classes or trainings. O'Leary responded, "No". It should be noted this response directly conflicts with training records from the Town of Palm Beach Police Department. These records will be explained in detail later in this report.

Your affiant inquired if there were any cases he could recall where he may have incorrectly used a test kit. O'Leary responded, "Once I put it in the kit and it turns the color, man I question them from there and that is what it is". Your affiant then asked specifically about the cocaine test kits, to which O'Leary responded "no, I haven't done anything wrong to be honest", continuing, "If I made a mistake, in regards to reading the colors, the colors are there".

As part of the criminal investigation numerous Law Enforcement Officers were interviewed. What follows are excerpts from the interviews of two of O'Leary's supervisors. Followed by an excerpt from another of O'Leary's supervisors.

During her interview Lt. Carde-Watson recalled a specific traffic stop made at the Cracker Barrel in Stuart by O'Leary. The event stood out because she had been called to the scene to search a female passenger of the vehicle. When the Lieutenant arrived she found the female to be extremely bellicose and upset. As she was addressing the female Sgt. Schaubel approached her and said, "That O'Leary had gone through several test kits and wasn't seeing anything. So the Lieutenant left the female with another deputy and walked up to the car. She said, "I can't remember where I, where I grabbed, I don't know if it was something he was actually testing or if it was by the floor where he had grabbed his stuff, but I had picked it up, cause he was saying it was either coke or it was crack cocaine or it was a harder

5

O'Leary

substance and I remember picking stuff up and squeezing it and it felt like, um, it felt like the drywall putty. Like it had texture, um, it was like rubbery and I remember I looked at Schaubel, and I threw it back in the car and I looked at Schaubel and I was like, that's not what he thinks it is". She then turned things over to Sgt. Schaubel the remainder of the events will be covered in Sgt. Schaubel's interview.

Sgt. Schaubel recalled the previously described traffic stop at the Cracker Barrel in Jensen Beach involving a blue van, a white male who was under arrest, and a white female off to the side. Sgt. Schaubel stated O'Leary was searching the vehicle and had already used several field test kits. According to Sgt. Schaubel [O'Leary's use of several test kits] was a common occurrence. So much so that Sgt. Schaubel said he told O'Leary, "[test kits] don't grow on trees".

During this particular incident the female passenger had become agitated and Lt. Carde-Watson went to deal with her. Sgt. Schaubel said "I was coming around the back of O'Leary and he was picking up stuff, field testing it, and I could tell you right now it was, uh, plaster". Sgt. Schaubel went on to say, "I even mentioned that, I said, why are you field testing that? You literally just pulled it off his boots. It's plaster. O'Leary goes, oh you never know".

Not seeing anything in the van or at the scene that, in his training and experience, would be indicative of the presence of narcotics. Sgt. Schaubel asked O'Leary to show Schaubel what he was testing. Sgt. Schaubel said O'Leary "became a little agitated" and said "well it's turning blue" [indicating a positive field test]. Sgt. Schaubel said he would like to see the test kit and he said, "[O'Leary] took the test kit and threw it behind them" into a retention pond. O'Leary then stated I guess it didn't. Sgt. Schaubel recalled that O'Leary did not like being questioned by him.

During his interview Sgt. Brochu described his conversation with O'Leary on the night of January 9th. Sgt. Brochu said that once he was made aware of O'Leary's evidence not testing positive, he brought O'Leary into the sergeant's office along with Lt. Bowdoin. Sgt. Brochu questioned O'Leary about the three cases in which the seized narcotics did not test positive at the lab. O'Leary stated he was aware that some of the evidence he submitted to the Crime Lab did not test positive. Sgt. Brochu said this surprised him and when he inquired further O'Leary said, that he received the results from the lab. Sgt. Brochu asked to see the results because at that point he had not physically received the official documentation from the lab. O'Leary said that he had thrown those results away.

<u>Continued Administrative Review</u>

A short time later still on 1/11/19 Sgt. Nelson retrieved the keys to O'Leary's current assigned vehicle a Ford Crown Victoria identified by MCSO vehicle number 131. Sgt. Nelson then placed the vehicle into the Forensic Science Unit garage for safe keeping. Sgt. Nelson secured the vehicle by sealing the doors and trunk with evidence tape.

On 01/14/2019, Sgt. Nelson met with Dave Nunley [Fleet Maintenance] about O'Leary's previous patrol vehicle a Ford Explorer identified by MCSO number 808. Sgt. Nelson was told the vehicle is currently at Collision Auto in Stuart for repairs. Sgt. Nelson assigned Crime Scene Det. John Hilken and Nunley to collect the patrol vehicle and return it to the FSU garage. It was later determined vehicle number 808 was involved in an accident on 12/24/2018 and that was the reason for it being at Collision Auto in Stuart.

Vehicle 808 was secured in the FSU garage by Det. Hilken and turned over to Sgt. Nelson, who sealed the doors and rear cargo area with evidence tape leaving the vehicle secure in the FSU garage.

O'Leary

## Search Warrants of MCSO Patrol Cars

Martin County Sheriff's Office Fleet Maintenance records show that Deputy O'Leary used two vehicles during his period working for the Martin County Sheriff's Office. They were both fully marked Sheriff's Office vehicles assigned to road patrol. O'Leary was first issued Vehicle #808 which is a 2018 Ford Explorer. He was assigned the vehicle on 8/10/18. The Vehicle was new and had not been assigned to any other personnel. O'Leary stated he had this vehicle until he was involved in a crash on 12/24/18. At that time, he was issued Vehicle #131 a 2009 Ford Crown Victoria. Vehicle #131 had been a "spare" vehicle prior to this and was issued to any personnel whose vehicle was in for service and or persons who needed a marked patrol vehicle and were not issued one. O'Leary had Vehicle #131 until 1/11/2019 when he was placed on suspension.

On 01/16/2018, your affiant applied for search warrants of MCSO vehicles #131 and #808, they were granted by Judge M. McNicholas. On 01/17/2018, the search warrants for Vehicles #131 and #808 were amended by your affiant and again approved by Judge Michael McNicholas.

Sgt. Nelson had the vehicles sealed and taken to the MCSO Crime Scene garage for safe keeping for the search warrant. The vehicles were still in the Crime Scene garage when the first warrants were executed on 01/17/2019. The warrants were executed by your affiant with the assistance of Sergeant Karl Nelson, and Detective John Hilken. Also present were Captains Cummings and Budensiek, Lieutenants Dougherty and Dowdy, and State Attorney Investigator Jeff Kittredge. The following items were recovered, photographed, and submitted to evidence during the search.

### Items of note in vehicle #131

In the trunk and passenger compartment of the vehicle were multiple, complete, signed, notarized witness statements from O'Leary cases, as well as other official documents that had not been properly submitted. A notebook was found in the trunk containing a list of O'Leary's past arrests. This notebook described the locations of "dope holes" throughout the County.

A "broken figurine" was located in the trunk which appears to be a religious statue. The composition of the figurine which, appeared to be similar to suspected narcotics that O'Leary positively identified as narcotics, placed into evidence and subsequently affected arrests under agency case numbers 18-19437 and 18-20275.

Also in the trunk, were five Advil tablets wrapped in tinfoil [packaged in a manner consistent with suspected narcotics] contained in three MCSO evidence bags [unlabeled]. A Vape pen was found, this is of note because O'Leary did not personally use a Vape pen, and he has made numerous arrests where Vape pens were collected as evidence. It is against department policy to keep evidence in the back of your patrol vehicle.

A women's style gold chain was found in the trunk. It is unknown if it is evidence from a case or a civilian's personal property. O'Leary did not claim it as his personal property. A second notebook, was recovered with a blue cover and "James Woodrow Sutton" written on the inside cover. Sutton is a defendant in agency case 18-20275. Sutton has requested this item be returned to him through his attorney.

Finally, in the trunk, a single yellow and pink spray nozzle in a plastic bag was found. This spray nozzle appears to match the nozzles O'Leary turned in as evidence in case number 18-18552.

### Items of note in vehicle #808

7

O'Leary

In the rear cargo area were located three pieces of "possible gypsum" which were a white material with dark colored side which visually match evidence that O'Leary identified as "crack cocaine" and subsequently affected the arrest of individuals under MCSO case numbers 18-19437 and 18-20275.

The cargo area also contained yellow and pink plastic spray paint nozzles with possible paint residue. These spray nozzles appear to match other nozzles O'Leary turned in as evidence in agency case number 18-18552.

Finally, the cargo contained the following official documents which had not been properly submitted. Six sworn MCSO Witness Statements, a MCSO Vehicle Storage Receipt, a signed MCSO Domestic Violence Checklist, five completed Florida Uniform Traffic Citations, a completed MCSO Crime Scene sign in log, a completed MCSO Trespass Warning, and a white envelope hand addressed to Deputy Obermeyer [MCSO Civil Unit] – Martin County Sheriff – inside were two notarized MCSO witness statements.

### Gypsum Statue

On 01/18/2019, Sgt. Nelson and State Attorney Investigator Kittredge went to the FSU garage to examine the "Broken Figurine" [hereafter referred to as the "Statue"] recovered from vehicle #131 and the pieces of "possible gypsum" from Vehicle #808. Sgt. Nelson used the TruNark™ device to test the material of the statue. The test indicated that the Statue was comprised of Gypsum. This was the same result as the "Cocaine" from agency cases 18-19437 and 18-20275.

Given the obvious visual similarities between the Statue, the submitted evidence, and the three pieces found in Vehicle #808, Sgt. Nelson submitted them to the Microtrace Lab located in Elgin, Illinois.

Sgt. Nelson sent four samples to the lab labeled KN8 [the statue], SO1 [evidence submitted from ...] ...2 [evidence submitted from case 18-19437] and KN 3 [the pieces recovered out... ... of Vehicle #808].

### Microtrace Lab Results (Elgin, Illinois)

On 3/9/19, Kelly Beckert from Microtrace sent the test results to Sgt. Nelson via PDF email attach... ...nt. Here is a summary of those findings.

The ... ...ed were described by the lab as follows.

Approximately one dozen fragments, within a paper fold, received in a sealed evidence bag labeled "18-20275:SO1." This item is referred to as "Item SO1" throughout this report (Figure 1A).
Approximately one dozen fragments, within a paper fold, received in a sealed evidence bag labeled "18-19437:SO2." This item is referred to as "Item SO2" throughout this report (Figure 1B).
Two fragments within a sealed evidence bag labeled "19-00833:KN3." This item is referred to as "Item KN3" throughout this report (Figure 1C).
Broken statue, received in a sealed box labeled "19-00833:KN8." This item is referred to as "Item KN8" throughout this report (Figure 2).

The lab's objective was to "Analyze and identify the components of the statue, Item KN8, along with the three fragment samples: SO1, SO2, KN3", and to "Determine if Item KN8 could be the source of the fragments in Items SO1, SO2, and KN3".

O'Leary

The exhibits were each examined by stereomicroscopy and the report concluded that based on the results of these microscopic, crystallographic, chemical, and elemental analyses, Items S01, S02, and KN3 cannot be distinguished from Item KN8. Therefore, Item KN8 or another object with similar properties is most likely the source of Items S01, S02, and KN3.

## Agency Laptop Computer Forensic Report

During the search of D/S O'Leary's assigned patrol vehicle Unit # 131, his agency assigned laptop was removed from the vehicle. It was placed into evidence and forensic processing was requested. Sgt. Immordino from the MSCO Special Victim's unit completed that processing. He located 1 video, approximately 47 photographs, 1 audio recording, and 22 .pdf files on the hard drive. These files contain information including but not limited to pictures and interviews related to previous narcotics investigations, searches of information also related to O'Leary's past narcotics investigations, and copies of training certificates from online narcotics courses.

## Training, Experience and Employment History

Deputy Stephen O'Leary completed basic recruit law enforcement training at Central Florida College on 05/31/2016. He went on to pass the State of Florida Law Enforcement Exam on 06/03/2016 after two attempts.

## Marion County Sheriff's Office

Steven O'Leary was hired by the Marion County Sheriff's office on 06/13/2016. While working for Marion County, O'Leary made a total of eleven narcotic arrests in his eleven months there. Two were felonies [Hydrocodone and Cocaine], and the rest were misdemeanor arrests.   O'Leary voluntarily left Marion County on 05/22/2017.

## Town of Palm Beach Police Department

O'Leary was hired by the Town of Palm Beach Police Department on 05/30/2017. During his time there O'Leary issued 18 Notices to Appear for misdemeanor narcotics violations and made 4 felony narcotics arrests for Amphetamines, heroin and cocaine, hashish and heroine, and cocaine respectively in 8 months of working in that jurisdiction. O'Leary voluntarily left that agency on 01/26/2018. While working for TPBPD, O'Leary received the following training in narcotics handling and identification. On 08/02/2017, as a part of the agency training program, O'Leary participated in training provided by the Organized Crime/Narcotics unit. Documentation provided by the agency shows the training included methods of conducting investigations in narcotics, as well as identification and testing of narcotics. On 11/15/2017, **O'Leary was documented as being present for Nark II drug test kit training.**

9

O'Leary

## Martin County Sheriff's Office
## New Recruit and Field Training

O'Leary was hired by the Martin County Sheriff's office on 02/01/2018. Stephen O'Leary was first assigned to the training unit for new recruit training and high liability certification until February 19th 2018, when he began field training with Field Training Officer Corporal W. Jaques. While in field training, Deputy O'Leary and Corporal Jaques arrested Robbie J. Rubin DOB: 01/08/1964 for Possession of a Controlled Substance [Rock Cocaine] under MCSO Case 18-004872. During an interview pursuant to this case, Corporal Jaques told investigators that as a part of the investigation both Corporal Jaques and Deputy O'Leary had occasion and legal reason to enter Rubin's residence and bedroom.

While there, Corporal Jaques recognized based on his training and experience, he suspected to be [rock] cocaine on the night stand in the room Rubin claimed was his. Corporal Jaques pointed out the suspected cocaine to Deputy O'Leary. Corporal Jaques then collected the substance and took it outside where he trained O'Leary on the process to perform a field test of suspected narcotics. The substance field tested positive for cocaine and was placed into evidence. The Crime Lab subsequently confirmed that the substance was in fact cocaine.

Stephen O'Leary completed field training on 03/17/2018 and was assigned to the Uniform Patrol Division. During his time in that Division, he was assigned to midnight shift under supervisors Sergeant E. Brochu and Sergeant T. Baltes. He had three satisfactory probationary evaluations during that time.

## Uniform Patrol Division

While assigned to the Uniform patrol division O'Leary made the following narcotics related arrests in 2018 and 2019.
March 2 Felony
April 1 Felony, 1 Misdemeanor, 1 Notice to Appear
May 1 Felony, 4 Misdemeanor
June 4 Felony
July 1 Felony
August 8 Felony, 1 Misdemeanor
September 10 Felonies, 4 Misdemeanor
October 26 Felony, 2 Misdemeanor
November 8 Felony
December 15 Felony, 1 Misdemeanor
January 2 Felony

During your Affiant's investigation numerous items which had been packaged and placed into evidence by Steven O'Leary have been sent to the Indian River Crime lab. The results of the tests are as follows:

Of O'Leary's 79 total drug related cases,

10

O'Leary

- 38 cases where the main controlled substance that the defendant was arrested for tested positive.
- 17 cases where the main controlled substance that the defendant was arrested for did not test positive but other substances tested positive for a controlled substance.
- 15 cases where the main controlled substance the defendant was arrested for did not test positive for a controlled substance.
- 5 cases where the main controlled substance the defendant was arrested for was misidentified but tested positive for a different controlled substance.
- 4 cases where the main controlled substance the defendant was arrested for was unable to be identified.

The following are the MCSO case numbers [arranged by month] were your Affiant found former Deputy Sheriff Steven O'Leary to have committed criminal offenses.

**MCSO Case Number 18-08581**
**05/03/2018**
**Defendant: Devenand Jason Sharma**
**DOB: 06/23/1992**



**Charges by O'Leary : Giving false name to Law Enforcement, Contributing to the Delinquency of a Child, Obstruction of Justice, Possession of Cannabis less than 20 grams, Open Container of Alcohol in a Vehicle**
**8 Days Served, Released Time Served**

According to O'Leary's reports on 05/03/2018, O'Leary was on patrol at the Jensen Beach Causeway, Martin County Florida, when he observed a red passenger car occupied twice, and full of what appeared to be smoke. Upon contact with the driver Devenand Sharma, O'Leary smelled a strong odor of cannabis from the vehicle. O'Leary reported the Cannabis field tested positive for THC, and the open container of alcohol was photographed. FCIC/NCIC revealed that Sharma also had two open warrants out of Port St. Lucie for VOP DUI, and DWLS. O'Leary reported the open containers of alcohol were photographed, and all evidence was turned in at the Martin County Sheriff's Office.

O'Leary placed into evidence and identified the following item.
S01 - two Marijuana blunts and loose Marijuana 8 grams
It should be noted no photographs were turned in to the Martin County Sheriff's Office for this case.

Indian River Crime Lab Results
Exhibit # S01 — One sealed plastic bag containing one medium plastic zip lock bag containing some plant matter and three brown hand rolled cigarette butts. Cannabis, schedule I, net: 2.13 grams

O'Leary

**During this incident O'Leary committed the crime of:**
**False Statement**

MCSO Case Number 18-10169
05/28/2018

Defendant: David Knapp
DOB:02/18/1998



**Charges by O'Leary: Possession of a Controlled Substance (Cocaine), Obstruction/Resisting Arrest**
**Without Violence, Possession of Drug Paraphernalia**
**2 Day Served, Bonded**

According to O'Leary's reports on 05/28/2018, O'Leary conducted a traffic stop at NW Goldenrod and NW Federal Hwy, Martin County, FL, on a red Saturn bearing the Florida tag IRGP11 for a non-working tail lamp. Upon contact with the driver, David Knapp, O'Leary smelled a strong odor of marijuana from inside the vehicle. Knapp exited the vehicle and physically stood in front of the driver's door refusing to let O'Leary search. Upon a search of the vehicle O'Leary located in the center console a multi-color pipe that contained the residue of burnt cannabis. The driver's seat had a yellow seat cushion on it. Underneath the cushion O'Leary located a black straw, and a clear bag that contained a small amount of a "white rock like substance". Based on O'Leary's training and experience O'Leary documented the substance field tested positive for Cocaine.

David Knapp was arrested and transported to the Martin County Jail without incident. O'Leary reported the bag containing the small amount of "white rock like substance", and black straw were photographed before being field tested. O'Leary reported all evidence was turned in at the Martin County Sheriff's Office.

**David Knapp's Interview**

David Knapp was interviewed by your affiant as part of a criminal investigation. The following is a summary of what Daivd Knapp stated. David Knapp stated he was on US1 head south to drop off his girlfriend Samatha Turner. Knapp stated he turned into Cinnamon Tree where his girlfriend lived, and he saw a deputy make a U-turn and begin to follow him. Knapp was then pulled over in Cinnamon Tree. When O'Leary approached, he advised the tag light was out and the car smelled like marijuana. Knapp stated earlier in the week he did smoke marijuana.

Knapp said he was then asked to get out of the vehicle and for consent to search. Knapp told O'Leary he preferred if his car wasn't searched. Knapp said O'Leary then handcuffed him and told him that he was under arrest. Knapp stated his girlfriend was in the vehicle while he was being arrested. Knapp stated he saw O'Leary searching his vehicle and heard O'Leary say "got something". Knapp stated he believes O'Leary found a pipe inside the vehicle.

12

O'Leary

Knapp stated O'Leary then went to his trunk.  Once at the trunk Knapp heard O'Leary swearing. Knapp was then told that cocaine was found in his vehicle. Knapp said the white stuff in the car was drywall and that he uses drywall to support his driver's seat. Knapp stated that he does not use cocaine.  Knapp stated a second deputy showed up once he was in the back of the patrol car.  Knapp stated he was read Miranda prior to the search and he told O'Leary he was not going to say anything. When asked about the straw located in his vehicle Knapp stated the only straw in his vehicle was a straw from Wendy's and never used for a controlled substance.

O'Leary placed into evidence and identified the following items.
S01 - Cannabis bong pipe with residue
S02 - Clear bag with Cocaine residue and a black straw 0.01 grams

Your affiant viewed the items of evidence submitted and found that the straw is a full sized black straw that appears to be chewed on, plus a smaller piece of a black straw that also looks to be chewed on which is not consistent with the use of cocaine.

Indian River Crime Lab Results
Exhibit # S01 – One sealed plastic bag containing one multicolored glass smoking device. Cannabis, Schedule I, net 0.09 grams
Exhibit # S02 – One Sealed plastic bag containing two pieces of a plastic straw and one small plastic zip lock bag containing some trace plant material. No Controlled Substance.

**During this incident O'Leary committed the crimes of:**
**Official Misconduct**
**Tampering with Evidence**

**MCSO Case Number 18-14333**
**08/07/2018**

**Defendant: Grayson Kyte**
**DOB: 07/24/1987**



**Charges by O'Leary : Tampering with Evidence, Possession of Cannabis less than 20 grams**
**2 Days Served, Bonded**

According to O'Leary's reports on 08/07/2018, O'Leary conducted a traffic stop at SW Citrus Blvd and SW Quail Hollow Street, Palm City, Martin County, FL, on a black GMC Yukon bearing the Florida tag 04GIJ. Upon contact with the driver, Grayson Kyte, O'Leary smelled the odor of Cannabis emitting from inside the vehicle. Grayson by excited utterance told O'Leary "there is no longer marijuana inside the vehicle I ate the joint". Upon a search of the vehicle O'Leary located less than a gram of marijuana

O'Leary

[cannabis] rolled into a small "Joint" inside an open beer can located in the center console. O'Leary documented the cannabis was field tested positive for the presence of THC. O'Leary documented the cannabis and beer can were collected to be placed into evidence. Grayson Kyte was arrested and transported without incident to the Martin County Jail.

**Grayson Kyte's Interview**

Grayson Kyte was interviewed by your affiant as part of a criminal investigation. The following is a summary was what Kyte stated. Grayson Kyte stated the night he was arrested he was driving home from dinner in Salerno with Sara Anderson. Kyte stated he was turning onto SW Citrus when he notice a cop car backed into the bushes. Kyte then observed a patrol car driving at high rate of speed and thought it was going to run into him. Kyte stated the car then rode his bumper for 15 to 20 seconds before the blue lights came on. Kyte remembered that he did not pull over right away because Citrus is a two lane road and he could not find what he thought was a safe place to stop. Kyte stated the patrol car then went into oncom' ffic. Kyte stated this startled him so he stopped in middle of Citrus and put his hazards on. Kyt⁻ ⸺d O'Leary then walked up and asked to see his hands. Kyte put his hands out the window⸱ approached. O'Leary told Kyte, "I was about to pit maneuver you, why didn't you stop⸱ stated "I can smell weed. Are you smoking in the car? And do you know how fast ⸱ ₅r' Kyte responded to O'Leary 55 MPH and that he was not smoking in car. Kyte ⸺d he had his vehicle on cruise control.

O'Leary told Kyte to get out of the car and put him in handcuffs. Kyte stated he was then walked to the back of his car. Kyte asked why he was being detained and O'Leary told him to shut up.

Kyte stated O'Leary search the driver's side first then had Sara exit the vehicle. Sara then stood next to Kyte. After a short search O'Leary asked where were they coming from and Kyte responded dinner. O'Leary then returned to searching the vehicle now looking at the passenger side. O'Leary then stated look what I found. O'Leary then showed Kyte a beer Miller lite beer can. Kyte told O'Leary he drinks Coors light and he does not drink Miller lite. O'Leary then told Kyte he was going to jail on possession and destruction of evidence.

O'Leary placed into evidence and identified the following item.
- S01 - Open Michelob Ultra can with loose Marijuana inside 0.03 grams

Indian River Crime Lab Results
Exhibit # S01 — One sealed plastic bag containing one beer can with a paper towel and some plant matter. No controlled Substance

**During this incident O'Leary committed the crimes of:**
**Official Misconduct**
**False Imprisonment**

O'Leary

**MCSO Case Number 18-14541**
**08/11/2018**

**Defendant: Joshua Patterson**
**DOB: 07/14/2000**



**Charges by O'Leary: Possession of a controlled substance (THC Oil)**
**1 Day Served, Bonded**

According to O'Leary's reports on 08/11/2018, O'Leary conducted a traffic stop at SE Cove Rd, and SE Jack Avenue, Martin County, Florida on a black passenger car bearing the Florida tag number 012RYY for tint past the AS1 line. Upon contact with the driver Joshua Patterson, O'Leary smelled the odor of cannabis emitting from inside the vehicle. O'Leary observed Patterson attempt to hide a Vape pen in his right hand. The Vape pen contained a brown liquid substance which based on O'Leary's training, and experience O'Leary determined to be THC Oil. O'Leary documented the brown liquid substance field tested positive for the presence of THC. Subsequently Joshua Patterson was arrested and transported without incident to the Martin County Jail. O'Leary collected the Vape pen containing THC Oil and turned it into evidence. The vehicle windshield was photographed by O'Leary with the photos being placed into evidence at MCSO.

O'Leary placed into evidence and identified the following item.
S01 - Vape pen and cartridge containing THC Oil 51 grams

It should be noted no photographs were turned into the Martin County Sheriff's Office or State Attorney's Office.

Indian River Crime Lab Results
Exhibit # S01 — One sealed paper bag containing one cartridge and electronic cigarette. Tetrahydrocannabinol, Schedule I, gross 8.39 grams

**During this incident O'Leary committed the crime of:**
**False Statement**

15

O'Leary

MCSO Case Number 18-15368
08/27/2018

Defendant: Keith Waters
DOB: 02/23/1983



Charges by O'Leary: Possession of Controlled Substance (THC Oil), Possession of Cannabis less than
20 Grams, Possession of Drug Paraphernalia
1 Day Bonded

According to O'Leary's reports on 08/27/2018, O'Leary observed a black passenger car bearing
the Florida tag ABDM12 traveling eastbound on SE Pomeroy Street, Martin County, FL. The vehicle
turned right while at the red light and failed to come to a complete stop. O'Leary then initiated a
traffic stop on the vehicle. Upon contact with the driver, Keith Waters, O'Leary saw in plain view a
loose bag that contained cannabis, and a glass pipe with burnt residue. Inside the glove box O'Leary
located a plastic container that had a brown substance. Based on O'Leary's training and experience
O'Leary believed the substance to be THC Oil. The substance field tested positive for THC content.
The cannabis weighing less than 20 grams also field tested positive for THC content. O'Leary also
located in the vehicle two open containers of alcohol located on the floor board of the driver's seat,
and on the passenger seat.

From this incident Keith Waters was arrested and transported to the Martin County Jail without
incident. O'Leary collected the THC Oil, cannabis, and glass pipe and turned them into evidence at
MCSO. O'Leary documented that he photographed the open container of alcohol and disposed of it.
O'Leary turned in all required paperwork to MCSO.

O'Leary placed into evidence and identified the following items.
S01 - Marijuana in plastic bag 4 gram
S02 - brown liquid that tested positive for THC content 1 gram
S03 - pipe with residue

It should be noted no photographs were turned into the Martin County Sheriff's Office or State
Attorney's Office.

Indian River Crime Lab Results
Exhibit # S01 — One sealed plastic evidence bag containing one plastic zip lock bag containing plant
matter. Positive for Cannabis, schedule I, net: 2.61 grams
Exhibit # S02 — One sealed brown paper bag containing one plastic tube with a plastic bottle containing
brown viscous liquid. Tetrahydrocannabinol, schedule I, gross: 9.44 grams

During this incident O'Leary committed the crime of:
False Statement

16

O'Leary

MCSO Case Number 18-15593
08/29/2018

Defendant: Charles Cedeno
DOB: 02/01/1972



Charges by O'Leary: Possession of Controlled Substance (Methamphetamine)
16 Days Served, Bonded

According to O'Leary's reports on 08/29/2018, O'Leary conducted a traffic stop on a white in color vehicle at 3331 SW Stuart West Blvd, Martin County, FL, for a non-working tag light. It should be noted O'Leary documented by photographs the equipment violation. Upon contact with the driver, Charles Cedeno, O'Leary smelled the odor of Marijuana emitting from the vehicle. O'Leary could also see in plain view a spoon and syringes on the passenger seat which based on O'Leary's training and experience this type of drug paraphernalia is consistent with Heroin or Methamphetamine use. Upon lawful search of the vehicle O'Leary located a broken crack pipe with residue, and approximately four grams of a white power in the glove box of the vehicle. O'Leary documented the white power was field tested positive for Methamphetamine. Charles Cedeno was arrested and transported to Martin County Jail without incident. O'Leary collected the evidence, and turned it into the Martin County Sheriff's Office.

**Charles Cedeno's Interview**

Charles Cedeno was interviewed by your affiant as part of a criminal investigation. The following is a summary of what Charles Cedeno stated. Charles Cedeno stated he was driving home from work on I95 the day he was arrested. Cedeno stated while on I95 he observed a sign board stating that there was a law enforcement checkpoint ahead. Cedeno stated he has a suspended license so he pulled off on the exit prior to the checkpoint. Cedeno said he saw a law enforcement SUV following him as he went east from I95. Cedeno then turned left into the Cobblestone community and made a U-turn at the guard shack. At that point the SUV's emergency lights came on and he was instructed to pull over. He said two cops got out of the SUV and approached his vehicle. Cedeno stated the bigger cop was in front of O'Leary when they first approached. The other bigger cop then left to talk to guard at the guard shack while O'Leary stayed with Cedeno. O'Leary asked him, why are you so nervous? And do you have a problem with them searching the car? To which he replied, "No".

Cedeno stated O'Leary sat him down in the grass and started searching his vehicle. O'Leary showed Cedeno a bag and asked, what is this? Cedeno told O'Leary it was bread crumbs from his lunch. Cedeno said O'Leary said he found drug paraphernalia in the vehicle. Cedeno told O'Leary "I don't have anything I have five kids". Cedeno stated O'Leary then grabbed him by the throat and asked if he had drugs in his mouth. Cedeno said he was told he was under arrest and placed into a jail van. Cedeno stated he went to jail and then to the hospital. Cedeno said O'Leary wrote in the arrest affidavit that he

17

O'Leary

found "meth". Cedeno stated he did not have meth and the only thing he had in glove compartment was salt. Cedeno heard O'Leary asking D/S Albauer for a test kit. Cedeno then heard O'Leary say "I think it turned blue".

O'Leary placed into evidence and identified the following item.
S01 - Methamphetamine and spoon with Methamphetamine residue 1 gram
S02 - Two syringes and a broken crack pipe
S03 - Spoon with cotton ball and Heroin residue

It should be noted no photographs were turned into the Martin County Sheriff's Office or State Attorney's Office.

Indian River Crime Lab Results
Exhibit # S01 – One sealed plastic evidence bag containing loose off white powder / flakes and a plastic spoon. No Controlled Substance
Exhibit # S02 – One sealed plastic evidence bag containing one plastic tube with one make shift glass smoking device with wire mesh and two syringes. Cocaine, Schedule II, Net: Trace Amount, Less Than .01 grams
Exhibit # S03 – One sealed plastic evidence bag containing one plastic spoon with a piece of cotton. Not Analyzed

During this incident O'Leary committed the crime of:
**False Statement**

**MCSO Case Number 18-16197**
**09/08/2018**

**Defendant: Dwight Williams**
**DOB: 08/11/1987**



**Charge by O'Leary: Possession of Cannabis with Intent to Sell, Possession of Drug Paraphernalia**
**1 Day Served, Posted Bond**

According to O'Leary's reports on 09/08/2018, O'Leary conducted a traffic stop at SW Butler Ave, and SW Martin Hwy, Martin County, FL, on an SUV bearing the Florida tag UE45P for failure to maintain a single lane. Upon contact with the driver, Dwight Williams, O'Leary smelled the odor of Cannabis emitting from inside the vehicle. O'Leary then identified the passenger of the vehicle as James Sinclair. Upon a search of the vehicle O'Leary located on the front driver side floor board a large sealed bag of green leafy substance, and a box of clear bags. Based on O'Leary's training and experience O'Leary determined the substance to be Cannabis, and it field tested positive for THC content. Bags were located directly beside the cannabis. Based on O'Leary's training and experience plastic bags are used to distribute cannabis. O'Leary separated both the driver, and passenger. O'Leary then read Williams

18

O'Leary

his Miranda Warnings and Williams agreed to speak. Before being questioned Williams stated to O'Leary "the marijuana inside the vehicle belongs solely to me."

Dwight Williams was arrested and transported to the Martin County Jail. Once at the Martin County Jail O'Leary weighed the bag of Cannabis which resulted in the total weight of 108 Grams. O'Leary photographed the Cannabis on the scale at MCSO, and the photos was turned into evidence. O'Leary collected the box of open bags, and turned them into evidence.

O'Leary placed into evidence and identified the following items.
S01 - Marijuana in two Ziploc bags and an ounce in a small plastic bag 108 grams
S02 - Plastic bags

It should be noted no photographs were turned into the Martin County Sheriff's Office or State Attorney's Office.

Indian River Crime Lab Results
Exhibit # S01 – One sealed plastic bag containing three plastic bags with some plant matter. Cannabis, Schedule I, net 62.19 grams.
Exhibit # S02 – One sealed paper bag containing one box of plastic sandwich bags. Not Analyzed.

During this incident O'Leary committed the crime of:
False Statement

MCSO Case Number 18-16471
09/13/2018

Defendant: Samuel Palmieri
DOB: 01/27/1988



Charge by O'Leary : Possession of a Controlled Substance (Cocaine)
1 Day Served, Posted Bond

According to O'Leary's reports on 09/13/2018, O'Leary conducted a traffic stop on a black Mercedes passenger car bearing the Florida tag Z69FZP for illegal tint, in Martin County, FL. O'Leary made contact with the driver, Samuel Palmieri, who appeared to be nervous. O'Leary received consent to search the vehicle. Upon a search of the vehicle O'Leary located beside the driver's seat a small clear bag of a white substance. Based on O'Leary's training and experience O'Leary believed this substance to be cocaine. O'Leary documented the substance, and it field tested positive test for cocaine with an approximate weight of less than a gram. O'Leary read Palmieri his Miranda warnings and Palmieri agreed to speak. After a short conversation O'Leary asked Palmieri if the cocaine belong to him. Palmieri advised "well if you found it in my vehicle by my door then I [Palmieri] must be in actual possession of it."

19

O'Leary

Samuel Palmieri, was arrested and transported without incident to the Martin County Jail. O'Leary documented the evidence and the photographs were turned into evidence at the Martin County Sheriff's Office. O'Leary had the vehicle towed, and turned in the required paperwork.

O'Leary placed into evidence and identified the following item.
S01 - Small bag that contains cocaine [.05 grams]

It should be noted no photographs were turned into the Martin County Sheriff's Office or State Attorney's Office.

Indian River Crime Lab Results
Exhibit # S01 – One sealed plastic bag containing one small plastic zip lock bag containing some white residue. No controlled Substance. It should be noted the sample displayed indications of containing Fentanyl, however this could not be confirmed due to an insufficient amount of sample present.

During this incident O'Leary committed the crime of:
**False Statement**

**MCSO Case Number 18-17122**
**09/23/2018, K9 Usage**

**Defendant: Weston Landis**
**DOB: 04/14/1992**



**Charges by O'Leary: Possession of a Controlled Substance (Fentanyl), Possession of Drug Paraphernalia**
**2 Days Served Bonded**

**Defendant: Dana Schimpf**
**DOB: 12/10/1997**



**Charges by O'Leary: Possession of a Controlled Substance (Fentanyl), Possession of Drug Paraphernalia**
**2 Days Served, Posted Bond**

O'Leary

According to O'Leary's reports on 09/23/2018, O'Leary conducted a traffic stop at SE Monterey Rd and SE Willoughby Blvd, Martin County, FL, on a white Ford truck bearing Florida tag number 3727YZ for obstructing the roadway by driving carelessly and due to non-working tag lights. Upon the final stop of the vehicle O'Leary made contact with the driver, Weston Landis, and the passenger, Dana Schimpf. K-9 Deputy Albauer responded as routine back-up, and by request walked his K-9 around the vehicle. K-9 Deputy Albauer advised his K-9 alerted to the presence of a narcotic odor.

Prior to the search of the vehicle Landis was having medical issues.  Martin County Fire Rescue responded, and transported Landis to Martin Memorial Hospital. Upon a search of the vehicle O'Leary located a black cap which contained a white substance  where Landis was sitting. Based on O'Leary's training and experience O'Leary believed this substance to be Heroin. O'Leary documented the substance field tested positive for fentanyl. O'Leary immediately collected the substance and sealed it. O'Leary also located an orange syringe cap on the passenger side of the vehicle which field tested positive for fentanyl.

At the end of the traffic stop O'Leary responded to Martin Memorial Hospital North.  Upon receiving medical clearance O'Leary read Landis his Miranda Warnings and Landis stated " I will not speak with you I want an attorney." While at the hospital O'Leary read Dana her Miranda Warnings and Dana agreed to speak. Dana advised that "everything O'Leary found inside the vehicle belongs to her". O'Leary asked Dana to describe what he located inside the vehicle, and she stated a cap of Heroin. O'Leary asked does the cap located beside the passenger seat belongs to you "to which she replied yes". Dana Schimpf and Weston Landis were arrested and transported without incident to the Martin County Jail. O'Leary collected the evidence and turned the evidence into the Martin County Sheriff's Office. O'Leary documented all required paper work was turned in, and Landis was issued a traffic citation for the equipment violation.

### Dana Schimpf's Interview

Dana Schimpf was interviewed by your affiant as part of a criminal investigation. The following is a summary of what Dana Schimpf stated. On 04/17/2019, Dana Schimpf said she and Weston Landis were on their way to Benihana's when they were stopped at the intersection of SE Willoughby and SE Monterey in Stuart by a K9 deputy (Albauer).  O'Leary showed up after the stop was made and ended up arresting both of them.  Schimpf said they were told the reason for the stop was driving too slowly and illegal tint on the vehicle.

O'Leary asked if he could search the vehicle and Landis asked if he was legally obligated to consent to the search.  Schimpf said O'Leary then told both of them to get out the vehicle and sit on the sidewalk. Landis said he was having heart problems and called 911.   The K9 was walked around their vehicle and Landis was transported to the hospital.  Schimpf said after Landis was transported, O'Leary conducted a search of their vehicle.    Schimpf was told something was found in the car.  Schimpf was then picked up by her father driven to the hospital. At the hospital O'Leary showed up and questioned her about a "cap" that was found in the vehicle.  Schimpf told O'Leary there are no drugs in the car, but if there was drugs they are hers.  Schimpf stated O'Leary then handcuffed her, read her Miranda, and arrested her.

### Weston Landis' Interview

Weston Landis was interviewed by your affiant as part of a criminal investigation. The following is a summary of what Weston Landis stated. On 04/17/2019, Weston Landis stated he and Dana Schimpf were on their way to eat.  Landis said he was driving his white F250 diesel and was stopped at the intersection

21

O'Leary

of SE Willoughby and SE Monterey.  Landis said a K9 deputy [Albauer] is the one who actually pulled him over.  Landis said once he was pulled over he saw another deputy in an SUV [O'Leary] pull in behind the K9 vehicle.  The first deputy approached his window and told him he was pulled over for driving too slow and his window tint.  Landis stated the K9 deputy then told him he was obligated to exit the truck.  Landis said two more deputies then arrived and at that point more than one deputy started to search his truck.  Landis has a heart condition and needs surgery.  Landis's chest was hurting, so he called 911 Landis said the deputies continued to search his truck.

The ambulance arrived, and he was taken to the hospital.  While he was in the ambulance O'Leary patted him down to make sure he did not have any weapons. Landis was told by O'Leary, that something was found in his truck but never told him what it was.  Landis stated he was then transported to the jail.

O'Leary placed into evidence and identified the following item.
S01 - Orange cap, a black cap, and small white substance tested positive for Fentanyl 0.02 grams
S02 - Opana bottle

Indian River Crime Lab Results
Exhibit # S01 – One sealed paper bag containing one plastic evidence bag with one syringe cap, one black piece of rubber and some loose rock like material. No Controlled Substance. Both the cap and rock like material were analyzed in S01 and both were negative for the presence of any controlled substance.
Exhibit # S02 – One sealed plastic bag containing one empty pill vial. No Controlled Substance.

**During this incident O'Leary committed the crime of:**
**Official Misconduct [Landis]**
**False Imprisonment [Landis]**
**Official Misconduct [Schimpf]**
**False Imprisonment [Schimpf]**

MCSO Case Number 18-17679
10/03/2018

Defendant: Joseph Ray Sanders
DOB: 05/31/1983



Charges by O'Leary : Possession of Controlled Substance [Methamphetamine], Possession of a Controlled Substance [Buprenorphine / Suboxone], Possession of Drug paraphernalia, Possession of a Concealed Handcuff Key
71 Days Served, Released Time Served

22

O'Leary

According to O'Leary's reports on 10/03/2018, O'Leary responded to SW Martin Hwy, and SW Stuart West Blvd, Martin County, FL, in reference to a vehicle that had run off of the road. Upon contact with the driver, Joseph Ray Sanders, O'Leary received consent to search the vehicle. In the vehicle O'Leary located a black bag which contained a green glass pipe with a black tar like substance, and a white rock like substance in the mouth piece. O'Leary also located on the floor board of the vehicle lithium batteries, and a burnt light bulb. Based on O'Leary's training and experience O'Leary believed the substance to be Methamphetamine and the batteries and light bulb used to cook the Methamphetamine . O'Leary documented the substance field tested positive for Methamphetamine using an agency provided test kit. O'Leary then located inside Sanders's wallet an orange mashed pill next to a clear cut drinking straw. Based on O'Leary's training and experience O'Leary believed the substance to be Suboxone. O'Leary field tested the substance and received a positive test using an agency generated test kit. O'Leary also located a hand cuff key in Sanders' back pack. O'Leary read Sanders his Miranda Warnings and asked Sanders what did he located inside the vehicle and Sanders responded "ICE." O'Leary determined that ICE is slang for Methamphetamine. O'Leary asked Sanders were you smoking "ICE" from the glass pipe and Sanders responded "yes I have a drug problem".

O'Leary collected the handcuff key and the substances were photographed on the scale. O'Leary collected all items to be turned into evidence. Sanders was arrested and transported without incident to the Martin County Jail. O'Leary turned in all required paperwork to the Martin County Sheriff's Office, and the vehicle was towed by Aaron's Towing.

O'Leary placed into evidence and identified the following items.
S01 - Meth in a Ziploc bag 2.7 grams
S02 - Buprenorphine – with a clear straw .5 grams
S03 - Meth pipe with residue, and clear container with residue
S04 - handcuff key

It should be noted no photographs, or batteries were turned into the Martin County Sheriff's Office or State Attorney's Office for this case.

Indian River Crime Lab Results
Exhibit # S01 – One sealed plastic bag containing one medium plastic zip lock bag containing some rock like material. No Controlled Substance.
Exhibit # S02 – One sealed plastic bag containing one medium plastic zip lock bag containing some residue and a piece of a straw. Cocaine, Schedule II, net: trace amount, less than .01 grams.
Exhibit # S03 – One sealed plastic bag containing one plastic container and one glass pipe and one empty plastic tube. Methamphetamine, Schedule II, net: trace amount, less than .01 grams.

**During this incident O'Leary committed the crime of:**
**False Statement**

O'Leary

MCSO Case Number 18-18381
10/15/2018

Defendant: Robin Page
DOB: 07/13/1987



Charge by O'Leary: Possession of a Controlled Substance [Crack Cocaine]
1 Day Served, Posted Bond

Defendant: Fabricio Vasquez
DOB: 07/08/1992



Charges by O'Leary: Possession of Controlled Substance [Crack Cocaine], Possession of a
Controlled Substance [Methamphetamine]
1 Day Served, Posted Bond

According to O'Leary's reports on 10/15/2018, O'Leary conducted a traffic stop at SE Federal Highway, and SE Seabranch Blvd, Martin County, FL, on a beige car bearing the Florida tag YO4SWW for failing to stop before entering the roadway. Upon contact with the Driver, Robin Page, and the Passenger, Fabricio Vasquez, both males identified themselves by Florida identification. O'Leary requested D/S Albauer walked his K-9 around the vehicle and D/S Albauer advised his K-9 alerted to the presence of narcotics.

Upon a search of the vehicle O'Leary located in the front driver's seat, and on the front driver seat floorboard a white rock like substance. Based on O'Leary's training, and experience O'Leary believed the substance to be crack cocaine. O'Leary reported the substance later field tested positive for Crack cocaine in the presence of Deputy Albauer using an agency provided test kit. O'Leary located the same substance where Vasquez was seated. O'Leary located an off white rock crystal like substance in the door of the vehicle. Based on O'Leary's training, and experience, O'Leary believed the substance to be methamphetamine. O'Leary reported the substance later field tested positive for methamphetamine in the presence of Deputy Albauer using an agency generated test kit.

Robin Page and Fabricio Vasquez were arrested and transported to the Martin County Jail without incident. O'Leary reported the evidence was collected and turned in to the Martin County Sheriff's Office

O'Leary

### Robin Page's and Fabricio Vasquez's Interviews

Robin Page and Fabricio Vasquez was interviewed by your affiant as part of a criminal investigation. The following is a summary of what Robin Page and Fabricio Vasquez stated. On 04/04/2019, Robin Page said the night he was arrested he went to Walmart to exchange work pants. Page said he was joined by Fabricio Vasquez for the drive to Walmart. Page left the RV Park where he lives and turned right on to US1. Page stated he saw two patrol vehicles parked in a church parking lot. One of the patrol vehicles followed them eventually pulling them over around Seabranch and US1. Page stated the K9 Deputy [D/S Albauer] initiated the traffic stop. Page stated D/S Albauer then approach the driver's window stating that he failed to come to a complete stop at the stop sign. D/S Albauer also said he failed to yield to traffic.

According to Page, O'Leary approached the passenger side of the vehicle. D/S Albauer advised he was not going to write a ticket and asked for consent to search the vehicle. Page denied consent resulting in D/S Albauer walking his K9 around the vehicle. They were then told the K9 alerted to the passenger side of the vehicle. Page and Vasquez were instructed to sit down on the median. During the search O'Leary went back and forth to his police vehicle several times.

Eventually O'Leary took Page to his vehicle and showed him a field test which O'Leary said was positive for the presence of Cocaine. Page could not tell what color the drug test kit was; he told O'Leary he never used cocaine, so the test must be a false positive. O'Leary told Page that if he helped the deputies to locate more drugs he could make a deal with Page. Page replied to O'Leary that he does not associate with anyone who does drugs. O'Leary told Page that the condition of his teeth was a sign that Page was a habitual Methamphetamine user. O'Leary began to refer to Page as "Meth Mouth". Page has a mouth disease which has caused his teeth to fall out. Page was handcuffed, read Miranda, and placed into the rear of O'Leary patrol vehicle.

In his statement, Fabricio said he observed O'Leary go back and forth between the vehicles at least 3 times. Fabricio said O'Leary showed him the drug test kit, but he did not know what he was looking at and couldn't see the color. O'Leary told Fabricio the test was positive for Meth and Cocaine. O'Leary told Fabricio that the drugs were located on the floorboard and passenger side door. O'Leary told Fabricio that if he came clean he would let them go. Fabricio stated he does not use drugs and could not tell O'Leary anything because he does not know. O'Leary told Fabricio that his fingernails were a sign that he did Meth. Fabricio told O'Leary that he works in landscaping. Fabricio was handcuffed and read Miranda.

O'Leary placed into evidence and identified the following items.
S01 – Crack Cocaine in two Ziploc baggies [7 grams]
S02 – Methamphetamine [1 gram]

Your affiant viewed the evidence submitted and found that the "cocaine" looks like sand and the bag has indentations on it, like someone struck the material inside with a hard object.

Indian River Crime Lab Results
Exhibit # S01 -- One sealed plastic bag containing two zip lock bags with some rock like crystalline material. No Controlled Substance.

O'Leary

Exhibit # S02 – One sealed plastic bag containing one plastic zip lock bag with some white clumpy material. No Controlled Substance.

During this incident O'Leary committed the crime of:
Official Misconduct (Page)
Tampering with Evidence (Page)
False Imprisonment (Page)
Official Misconduct (Vasquez)
Tampering with Evidence (Vasquez)
False Imprisonment (Vasquez)

MCSO Case Number 18-18700
10/20/2018

Defendant: Kaylyn Waters
DOB: 01/16/1996



Charges by O'Leary: Possession of a Controlled Substance [THC OIL], Possession of Drug Paraphernalia
4 Days Served, Posted Bond

According to O'Leary's reports on 10/20/2018, O'Leary conducted a traffic stop at the intersection of SE Martin Highway, and SE Feroe Avenue, Martin County, FL, on a red passenger car bearing the Florida tag JJSI90 for illegal widow tint, and non-working tag lights. Upon contact with the driver, Kaylyn Waters, O'Leary smelled the odor of burnt cannabis emitting from inside the vehicle. Upon a search of the vehicle O'Leary located in the center console a multi-color Vape, and a cartridge of brown liquid. Based on O'Leary's training and experience O'Leary believed the substance to be THC Oil. O'Leary reported the substance later field tested positive for THC content using an agency generated test kit. O'Leary read Kaylyn her Miranda warnings and she agreed to speak. Kaylyn advised O'Leary that "weed" was being smoked in her vehicle earlier, and that she was down from Vero Beach with a friend. Kaylyn advised she is the owner of the vehicle, and Vape device. Kaylyn advised "I know I was in possession of the hash oil".

Kaylyn Waters was arrested and transported without incident to the Martin County Jail. O'Leary reported the evidence was collected, and turned in to the Martin County Sheriff's Office. O'Leary reported the THC Oil was tested in the presence of Deputy Coccaro.

Kaylyn Waters' Interview
Kaylyn Waters was interviewed by your affiant as part of a criminal investigation. The following is a summary of what Kaylyn Waters stated. Kaylyn Waters was arrested on the night before she was

26

O'Leary

scheduled to begin her attempt to enlistment in the Navy.   Waters stated she was heading home after being out with friends. Waters said she probably had two or three drinks throughout the evening. Waters was on Martin Hwy when she saw blue lights and pulled over into a turning lane. O'Leary walked up and asked her why she pulled over in the turning lane. He told her she was pulled over because of her tag lights and speeding. Waters admitted she was speeding. O'Leary then told her that the car smelled like marijuana to which she replied that someone smoked earlier in her vehicle. O'Leary asked to search her vehicle and she consented. Another deputy arrived and remained with her while the search was conducted. O'Leary located a Vape pen in her vehicle which she said belonged to her mother and was old. O'Leary asked if she know it contained THC. Waters said she did not and reiterated that it was her mother's Vape pen.

During the interview Waters was given the chance to review her arrest affidavit. She said O'Leary lied about her ever admitting the Vape pen was hers. She also indicated that the second deputy remained with her and never saw the field test.

O'Leary placed into evidence and identified the following item.
S01 – THC cartridge and Vape 1 gram

Indian River Crime Lab Results
Exhibit # S01 – One sealed paper bag containing two medium plastic zip lock bags, one containing a cartridge and the other with the electrical component of an e-cigarette. No Controlled Substance. It should be noted the sample indicated the presence of Nicotine, however this was not confirmed.

During this incident O'Leary committed the crime of:
**Official Misconduct**
**False Imprisonment**

MCSO Case Number 18-18750
10/20/2018

Defendant: Bradley Martin
DOB: 03/31/1994



Charge by O'Leary : Trafficking in Controlled Substance [Heroin]
80 Days Served, Dismissed

According to O'Leary's reports on 10/20/2018, O'Leary conducted a traffic stop at NE Indian River Drive and NE Palmer Street, Martin County, FL, on a 2006 Honda passenger car bearing the Pennsylvania tag number HVG6186 for expired vehicle registration, and faulty equipment. Upon

27

O'Leary

contact with the driver, Bradley Martin, O'Leary smelled a strong odor of burnt cannabis emitting from inside the vehicle. Deputy Ferreira and Deputy Corley responded for back up and O'Leary conducted a search of the vehicle. O'Leary located in the door pocket behind the driver's seat a purple crown royal bag that contained a green plastic bag tied in a knot. Within the green plastic bag there was a cut plastic bag wrapped tightly in newspaper/magazine paper. Inside the cut plastic bag which was labeled for laundry detergent was a large amount of white and light blue substance. O'Leary then located cut cigarette filters, and arm ties in the vehicle. Based on O'Leary's training and experience O'Leary determined these items are used to filter a narcotic substance and injecting an illegal substance. Based on the packaging and the paraphernalia O'Leary believed the substance was not detergent. O'Leary documented the substance was field tested in front of Deputy Ferreira for heroin using an agency test kit and found a positive test for heroin which was photographed.

O'Leary questioned Martin in the presence of Deputy Corley. Martin advised it is laundry detergent that he bought in a laundry mat in "Stuart" not "East Stuart". O'Leary tested the substance again for heroin which again tested positive. O'Leary also tested the substance for fentanyl which also returned positive. O'Leary told Martin the results of the field tests and Martin responded "It shouldn't be heroin".

Bradley Martin was arrested for Trafficking in Heroin and the total packaged weight of the substance is 162.8 grams which was photographed on a scale. O'Leary photographed all evidence which included the expired vehicle registration sticker, and the results of the test kits. O'Leary documented all photographs were turned into the Martin County Sheriff's Office. O'Leary documented the Miranda Warnings, Collection, and testing of evidence was completed in the presence of Deputy Corley, and Deputy Ferreira.

**Bradley Martin's Interview**

Bradley Martin was interviewed by your affiant as part of a criminal investigation. The following is a summary of what Bradley Martin stated. Bradley Martin and his roommate had gone to downtown Jensen for dinner and were heading home when they were pulled over. O'Leary walked up to the passenger side of the vehicle and said "I'm not here to arrest you or write you a ticket". O'Leary asked for his license and registration telling Martin that his tag light was out. Martin told O'Leary his registration was expired. O'Leary took Martin's license and walked to his patrol vehicle. O'Leary returned and told Martin, "I smell marijuana and that gives me reason to search [your vehicle]". Martin said he was smoking cigarettes and had not been smoking marijuana.

Martin stepped out of the vehicle and let O'Leary conduct his search. Martin stated both he and his roommate where together on the sidewalk when another deputy pulled up [D/S Ferreira]. O'Leary then had a conversation with Ferreira, and after the conversation D/S Ferreira returned asking Martin to sit [un-handcuffed] in the back of his patrol vehicle.

According to Martin, O'Leary appeared to search his vehicle but his view was obstructed by the back of O'Leary patrol vehicle. O'Leary walked back to Martin still seated in the back of Ferreira's patrol vehicle to ask about what was found in the car. A third cop showed up and Ferreira read Martin his Miranda warning. O'Leary then told Martin he found a bag which contents tested positive for Heroin. Martin told him there is no way the substance in the bag was Heroin. Martin told O'Leary the substance was laundry detergent and that he bought it at a laundry mat down the street.

28

O'Leary

Martin then requested that the substance be tested it again.   O'Leary asked Martin to just tell him where he got the Heroin.  O'Leary continued saying the substance tested positive for Heroin and Fentanyl.  He then told Martin "we got you" and that he was "fucked".   Martin told O'Leary to go down to laundry mat where he bought the detergent.  O'Leary kept insisting that Martin tell him where he got the Heroin.  Martin was transported in O'Leary's patrol vehicle to the jail.

O'Leary placed into evidence and identified the following item.
S01 - Heroin in two taped sealed bags 162 grams
S02 - Crown Royal bag with residue
S03 – Green bag white bag with residue
S04 – IPhone

Indian River Crime Lab Results
Exhibit # S01 – One sealed brown paper bag containing one plastic bag containing white/blue powder.  No Controlled Substance.
Exhibit # S02 – One sealed plastic evidence bag said to contain a Crown Royal bag with residue. Not Analyzed.
Exhibit # S03 – One sealed plastic evidence bag containing two plastic bags with some white/blue powder. No Controlled Substance.

During this incident O'Leary committed the crime of:
Official Misconduct
False Imprisonment

MCSO Case Number 18-18794
10/22/2018

Defendant: Joshua Russell
DOB: 02/09/2001



Charges by O'Leary: Possession of a Controlled Substance [Oxycodone], Possession of Drug Paraphernalia
1 Day Served, Turned Over to Parents

According to O'Leary's reports on 10/22/2018, O'Leary conducted a traffic stop at 3999 SE Emerald Lakes in Stuart, FL, on an orange Lexus bearing the Florida tag 9388YS for illegal window tint, and failing to stop at the stop sign.  Upon contact with the Driver, Joshua Russell, O'Leary smelled the odor of burnt cannabis emitting from inside the vehicle.  O'Leary conducted a search of the vehicle and located an Altoid can with a smashed white substance.   Based on O'Leary's training and experience O'Leary believed the substance to be a narcotic. O'Leary reported the substance field

29

O'Leary

tested positive for Oxycodone using an agency generated test kit. O'Leary conducted the field test in the presence of Deputy Albauer, and the field test was photographed. In the trunk of the vehicle O'Leary located a two foot tall "Cannabis bong" which was wrapped in a pair of gym shorts. O'Leary read Russell his Miranda Warnings and Russell agreed to speak. Russell advised "I smoke weed, and the bong is a friend of mines, but I have been using it and haven't returned it". O'Leary advised Russell that he located a substance that tested positive for Oxycodone in an Altoids can. Russell replied "I don't know how it got there". O'Leary then showed Russell the test kit and Russell stated the color in the kit was "yellow", and read out loud that yellow is a positive test of Oxycodone.

Joshua Russell was arrested and transported to the Martin County Jail without incident. O'Leary reported the evidence was collected, and Russell was released to a legal guardian. O'Leary documented all photographs and evidence were turned into to the Martin County Sheriff's Office.

O'Leary placed into evidence and identified the following item.
S01 – Oxycodone and Altoid container with residue [5 grams]
S02 – Glass bong

It should be noted no photographs were turned into the Martin County Sheriff's Office or State Attorney's Office for this case.

Indian River Crime Lab Results
Exhibit # S01 – One sealed plastic bag containing one medium plastic zip lock bag containing some clumpy material and one Altoids tin with some white residue. No Controlled Substance.
Both the tin and the clumpy material were analyzed and both were negative for the presence of any controlled substances.
Exhibit # S02 – One sealed paper bag containing one glass smoking device. Cannabis, Schedule I, net 0.07 grams.

During this incident O'Leary committed the crime of:
False Statement

**MCSO Case Number 18-18982**
**10/24/2018**

**Defendant: Charles Ruppel**
**DOB: 01/20/1964**



**Charges by O'Leary: Possession of Controlled Substance [Methamphetamine], Possession of Cannabis less than 20 grams, Trespass after Warning, Martin County Ordinance Open Container 46 Days Served, Released Time Served**

30

O'Leary

According to O'Leary's reports on 10/24/2018, O'Leary made contact with Charles who was sitting behind the business located at 2224 SE Indian St, Stuart, FL, smoking a "Cannabis joint." Based on O'Leary's training and experience O'Leary determined the male was smoking Cannabis due to the odor. Upon contact and identification O'Leary detained Charles Ruppel. Ruppel had an open container of beer at his feet, and an off white substance that appeared to be stomped into the ground. During a search of Ruppel's person, and his bag O'Leary located numerous lithium batteries. Based on O'Leary's training, and experience O'Leary determined the substance to be Methamphetamine. O'Leary reported the substance field tested positive for Methamphetamine, and was photographed. O'Leary reported the Cannabis also tested positive for THC using, and agency test kit. O'Leary read Ruppel his Miranda warnings and Ruppel advised the "weed" belongs to him. Ruppel when questioned about the Methamphetamine on the ground next to his feet advised "A lot of people do drugs back here, and I don't do drugs".

Ruppel was arrested, and transported to the Martin County Jail without incident. O'Leary reported the evidence was collected, and will be turned in.

O'Leary placed into evidence and identified the following item.
S01 – Meth in baggie [1 gram]
S02 – Loose marijuana [1 gram]
It should be noted no photographs were turned into the Martin County Sheriff's Office or the State Attorney's Office. Also the batteries were not turned into evidence.

Indian River Crime Lab Results
Exhibit # S01 – One sealed paper bag containing one medium plastic zip lock bag containing some loose rock/crystalline material, one piece of foil, one piece of cotton, and one piece of a plastic bag. No Controlled Substance
Exhibit # S02 – One sealed paper bag containing one medium plastic zip lock bag containing one piece of plastic and one small hand rolled cigarette butt. Cannabis, Schedule I, net: 0.14 grams

During this incident O'Leary committed the crime of:
False Statement

MCSO Case Number 18-18991
10/24/2018

Defendant: Melissa Morales
DOB: 06/09/1981



31

O'Leary

## Charges by O'Leary:
**Possession of a Controlled Substance [Methamphetamine], Introduction into a Correctional Facility**
**84 Days Served, Case Dismissed**

According to O'Leary's reports on 10/24/2017, O'Leary observed a male, and a female later identified as Luke Collins and Melissa Morales riding their bicycles in the area of 3259 SE Federal Hwy, Stuart, FL without lights. O'Leary conducted a consensual search of Luke's bag, located nothing, and released Luke on scene.  Upon a consensual search of Melissa's purse O'Leary noticed numerous lithium batteries (based on his training and experience commonly used by being stripped down and used to cook a "shake and bake"), and a white rock-like substance. O'Leary documented the substance field tested positive for Methamphetamine using an agency test kit. O'Leary reported this was photographed, and done in the presence of Deputy Blasak.  O'Leary read Melissa her Miranda Warnings and Melissa advised "the rock must have tested positive, but it's just a rock". O'Leary asked Melissa is it possible you had Amphetamine you forgot about in your purse from a long time ago. Melissa responded "yes a few years back I use to use Adderall". O'Leary asked Melissa do you currently have a prescription for Adderall and Melissa replied no.

Melissa Morales was transported to the Martin County Jail.  At the booking desk when Melissa was being searched O'Leary observed a white substance fall out of Melissa's pants leg and onto the ground.  O'Leary documented the substance field tested positive for Methamphetamine, and was shown to the booking staff.

O'Leary placed into evidence and identified the following item.
S01 – Meth in bag [1 gram]
It should be noted the "meth" looked like sand or dirt and evidence bag had marks on it like someone hit the substance inside with a hard object.

Indian River Crime Lab Results
Exhibit # S01 – One sealed paper bag containing two medium plastic zip lock bags with some rock like material. No Controlled Substance. It should be noted both bags were analyzed and both were negative for the presence of any controlled substance.

During this incident O'Leary committed the crime of:
**Official Misconduct**
**Tampering with evidence**
**False Imprisonment**

32

O'Leary

MCSO Case Number 18-19080
10/26/2018

Defendant: Dillon Felts
DOB: 01/07/1987



Charges by O'Leary : Trafficking in Controlled Substance MDMA [Ecstasy], Possession of Controlled
Substance [Hashish], Introduction into a Correctional Facility
50 Days Served, Posted Bond

According to O'Leary's reports on 10/26/2018, O'Leary conducted a traffic stop on a bicycle, for
no lights in front of 4431 SE Commerce Avenue, Martin County, FL. Upon contact with the operator,
Dillon Felts, O'Leary received consent to search Dillon's bag. Upon opening the bag O'Leary observed
a pill bottle with no label and numerous folded papers inside. The paper contained a white crystal like
substance. O'Leary documented this substance field tested positive for MDMA (Ecstasy) using a
department issued test kit. O'Leary reported the substance was tested in front of Deputy Castoro, and
Deputy Gonzales. O'Leary read Dillon his Miranda Warnings and Dillon agreed to speak. O'Leary asked
Dillon why there is a label-less pill bottle inside his bag. Dillon advised that is how he keeps his
headache medicine. O'Leary showed Dillon the test kit, and asked Dillon what color is it. Dillon replied,
to O'Leary "blue." Dillon advised he doesn't do drugs, and he isn't sure why the substance tested
positive.

Dillon was arrested and transported to the jail. Once at the jail O'Leary found Dillon was in
possession of Hashish [THC Oil] which was located in his front left pocket. O'Leary reported the
substance field tested positive for THC content.

O'Leary documented the weight of the substance identified to be MDMA was eighteen grams.
O'Leary photographed, collected the evidence which O'Leary advised will be turned into the Martin
County Sheriff's Office. O'Leary reported the Miranda warnings, and field tests of narcotics were all
done in the presence of Deputy Castoro, and Deputy Gonzales. O'Leary documented all required
paperwork was turned into the Martin County Sheriff's Office.

### Dillon Felts' Interview

Dillon Felts was interviewed by your affiant as part of a criminal investigation. The following is a
summary of what Dillon Felts stated. Dillon Felts was working for Cassidy Ice during the time of his
arrest. On the day he was arrested Felt's was fixing a freezer in the Commerce commercial area of
Stuart. Felts started to work on the freezer during the day but the process took longer than expected,
so he left and returned later that night. Felts returned at about 12:30 that night in order to check the
freezer pump. After checking the pump he left on his bicycle and headed home. While riding his bicycle

O'Leary

O'Leary passed him then turned around and illuminated him with a spotlight. O'Leary asked Felts what he was doing in the area at such a late hour. O'Leary made mention that there are a lot of business with expensive equipment in the area. Another officer arrived and O'Leary asked if he could look through Felts' backpack. O'Leary took his backpack to the patrol vehicle. Felts saw O'Leary go to his SUV and open the trunk area with his backpack. The other officer said to him that a substance tested positive for Meth so they were going to call another guy.

O'Leary walked over and inquired about a white substance he found in Felts' bag. Felts told O'Leary it was BC powder for his headaches. O'Leary said the substance tested positive for MDMA which according to O'Leary was a white boy party drug. O'Leary told Felts that it was in his best interest to start talking about where the MDMA had come from. Felts reiterated that the substance was aspirin for his headaches. At this point O'Leary started acting frustrated, and Felts asked O'Leary if he could test the substance again and O'Leary said ok.

Felts said another deputy then arrived and told him that if the substance tested positive twice, it would be more evidence against him resulting in a trafficking charge. O'Leary told him to put hands behind his back and subsequently arrested Felts. When O'Leary put him in the patrol vehicle Felts told him he smoked weed and admitted that a couple of days prior he had smoked. Felts admitted the THC Oil was in the backpack and not in his pocket as noted in O'Leary's report.

O'Leary placed into evidence and identified the following item.
S01 - MDMA in a bag [18 grams]
S02 - THC Oil in a plastic container [1 gram]
S03 - Pill Bottle with paper inside with residue

Indian River Crime Lab Results
Exhibit # S01 – One sealed plastic bag containing one plastic bag with some white clumpy material. No Controlled Substance. S01 indicated the presence of Aspirin and Acetaminophen and Exhibit S03 indicated the presence of Acetaminophen.
Exhibit # S02 – One sealed plastic bag containing one piece of plastic with some yellow sticky material. Tetrahydrocannabinol, Schedule I, gross: 2.36 grams.
Exhibit # S03 – One sealed plastic bag containing one amber pill vial with multiple pieces of folded paper with some white residue. No Controlled Substance.

During this incident O'Leary committed the crime of:
Official Misconduct

MCSO Case Number 18-19437
11/01/2018

Defendant: Jabari Schweitzer
DOB: 09/08/96

34

O'Leary



**Charges by O'Leary: Trafficking in Controlled Substance [Ketamine "Special K"], Possession of Controlled Substance [Crack Cocaine], Introduction of Contraband, Resisting without violence 72 Days Served, Dismissed**

According to what O'Leary reported on 11/01/2018.  O'Leary conducted a traffic stop on a bicycle for no lights at the intersection of SE Delmar St, and SE Evergreen St, Martin County, FL. O'Leary later identified the bicycle operator to be Jabari Schweitzer. After a short time Jabari was arrested for resisting without violence. When arrested Jabari was carrying a bag that contained a red substance. Jabari was then transported to the Martin County Jail during the ride O'Leary heard Jabari stomping in the back of his patrol vehicle. Once at the jail O'Leary tested the red substance which tested positive for Ketamine "Special K" with the weight of sixty nine grams.

O'Leary then returned to his vehicle inside the "sally port" and located numerous white rock like substances which field tested positive for Crack Cocaine. O'Leary documented it should be noted that Jabari was the first person in the back of his vehicle for this shift, and he cleaned the back of his vehicle after every arrest. Jabari was in possession of sixty nine grams of Ketamine, and one gram of Crack-Cocaine. Jabari Schweitzer was arrested for Trafficking in Ketamine "Special K", Possession of Crack-Cocaine, Introduction of Contraband, and Resisting without violence. The evidence was all collected, and turned in to the Martin County Sheriff's Office.

**Det. Garrett Lott's Interview**

Det. Lott was interviewed by your affiant as part of a criminal investigation. The following is a summary of what Det. Lott stated. On 05/17/2019, Det. Garrett Lott was working Road Patrol overtime when O'Leary stopped an individual on a bicycle in the Golden Gate neighborhood.  The individual was subsequently identified as Jabari Schweitzer

Det. Lott arrived as back up finding Schweitzer on the ground in handcuffs next to O'Leary patrol vehicle; the bicycle was located behind the patrol vehicle.  Schweitzer's backpack was on the ground next to him close to the patrol vehicle.  O'Leary told Det. Lott that Schweitzer resisted and did not stop when he attempted to stop him with his emergency lights.  Det. Lott stood by with Schweitzer, who was confused as to why he was being arrested, as O'Leary searched Schweitzer's backpack.  O'Leary asked Det. Lott for a drug test kit, which Det. Lott did not have.

Det. Lott also searched the backpack and did not see anything that looked like illegal drugs or paraphernalia.  O'Leary searched Schweitzer and placed him in the back of the patrol car.   O'Leary took Schweitzer to jail.  O'Leary later called Det. Lott and stated he found Crack Cocaine at the jail.

When asked about Ketamine, Det. Lott said he had never seen Ketamine.  Det. Lott was then given an opportunity to read O'Leary's arrest affidavit.  After reading the arrest affidavit Det. Lott stated he remembers the red container where O'Leary found the Ketamine.  Det. Lott stated the container was clearly marked as a supplement or vitamin container.  Det. Lott stated the substance inside the container did not look like narcotics and looked like some type of vitamin or supplement as portrayed on the exterior packaging of the container.

O'Leary

D/S O'Leary placed into evidence and identified the following items.
S01 - Ketamine [69 grams]
S02 - Crack-Cocaine [1 gram]

Your affiant viewed the evidence submitted and the "cocaine" was bright white with a dark backing on it, which is not consistent with cocaine. Also the "cocaine" was tested and found to be consistent with the statue O'Leary carried around in his patrol car. Your affiant has never seen ketamine before but the "ketamine" looked like and had the texture of a pre-workout powder which your affiant has seen multiple times.

Indian River Crime Lab Results
Exhibit # S01 — One sealed plastic bag containing one plastic evidence bag with some red clumpy material. No controlled substance.
Exhibit # S02 — One sealed plastic bag containing one medium plastic zip lock bag containing some hard substance. No controlled substance.

During this incident O'Leary committed the crime of:
Official Misconduct
Tampering with Evidence

**MCSO Case Number 18-19724**
**11/05/2018**
**Defendant: Yener Lopez**
**DOB: 03/15/91**



**Charges by O'Leary: Trafficking in Controlled Substance [Cocaine], Tampering with Evidence**
**67 Days Served, Dismissed**

According to O'Leary's reports on 11/05/2018, O'Leary conducted a traffic stop near the intersection of SE Dixie Hwy, and SE Kensington, Martin County, FL, for failing to maintain a single lane of traffic, and improper display of a license plate. Upon contact with the driver, Gustavo Vasquez, O'Leary observed an open container of alcohol behind the front passenger seat. The passenger Yener Lopez also had a container of Alcohol on the front passenger seat floor board near his feet.

O'Leary had Gustavo exit the vehicle and Gustavo advised by excited utterance "I have not been drinking, and there is nothing inside the vehicle you can look." O'Leary then had Lopez exit the vehicle, and conducted a consensual search of the vehicle. O'Leary located in the front passenger seat a white rock like substance. Based on O'Leary's training an experience O'Leary believed this substance to be Cocaine. O'Leary reported the substance field tested positive for Cocaine using an agency provided testing kit.

O'Leary

O'Leary continued the search of the vehicle and located a container with a liquid substance. O'Leary documented the liquid substance was field tested and returned a positive test for Cocaine. O'Leary also located underneath the front passenger seat what appeared to be a rock like substance which field tested positive for Crack-Cocaine. O'Leary documented based on his training, and experience Crack-Cocaine is often hid inside a user's mouth due to it not dissolving in moisture.

Upon contact with Lopez O'Leary observed something in his mouth.  O'Leary asked Lopez to open his mouth and Lopes refused.  Lopez then swallowed and advised by excited utterance "sorry you won't find it in there anymore". O'Leary then read Lopez his Miranda Warnings and Lopez agreed to speak. Lopez was still insistent that O'Leary test his mouth for Cocaine because "I [O'Leary] can't prove nothing". O'Leary then swabbed Lopez's mouth with a Q-tip, and O'Leary documented the swab field tested positive for Cocaine. O'Leary photographed the results for all test and documented it was done in the presence of Deputy Fabian.

Yener Lopez was arrested for Trafficking in Cocaine, and Tampering with Evidence.  O'Leary collected the container of the Cocaine, approximately 3 grams of loose Cocaine / Crack -Cocaine turned them into evidence at the Martin County Sheriff's Office. Lopez was transported without incident to the Martin County Jail.

**Yener Lopez's Interview**

Yener Lopez was interviewed by your affiant as part of a criminal investigation. During your affiant's interview Lopez spoke very little English and had to be translated by Det. Ingrid, a Spanish speaking Det with the Martin County Sheriff's office.

Yener Lopez confirmed he was drinking the day he was arrested, and had been drinking almost the whole day. Lopez said when his cousin, Gustavo, came to pick him up he did have an open container. Lopez recalls being stopped by the officer, and said he was not driving, and the reason was for the stop was for being over the speed limit.  Lopez denies that Gustavo had been drinking.  Lopez confirmed that his cousin gave the officer permission to search the vehicle.

Lopez said there were two deputies present that evening.  The deputy taking the case arrived first [O'Leary], and that he wrote many things down that were not true. Lopez said that O'Leary said he found cocaine but presented false proof.

Lopez confirmed that the officer, O'Leary, had checked his mouth. Lopez said he did not consent to the search of his mouth saying, "No, he had abused my trust" and "open your mouth". Lopez stated he had gum in his mouth but adamantly denies saying the statement that was written in the report, "sorry you won't find it in there anymore".  Lopez stated in English "why you taking me". Lopez believed he was only going to get an open container charge.

Lopez said that at no time did O'Leary show him anything that was purported to be cocaine. Lopez stated he had an open Modelo that the Officer had grabbed and poured it out.  Lopez was asked to say what he said to the Officer in English. Lopez replied "why you take me" and "you don't find me". (NOTE: Lopez would speak in broken English and had a difficult time recreating what he stated that night to Deputy O'leary).

D/S O'Leary placed into evidence and identified the following items.

O'Leary

S01- Container inside a plastic bag containing liquid Cocaine mixture [100 grams]
S02- Loose Cocaine/Crack Cocaine 3 grams

Your affiant viewed the evidence submitted and the "cocaine" was actual sand/rocks, and the bag has indentations on it like someone struck the material inside with a hard object.

Indian River Crime Lab Results
Exhibit # S01 – One sealed plastic tube containing one container of bubbles with some rock like material inside. No controlled substance.
Exhibit # S02 – One sealed plastic bag containing one medium plastic zip lock bag containing some rock like material. No controlled substance.

During this incident O'Leary committed the crime of:
Official Misconduct
Tampering with Evidence
False Imprisonment

MCSO Case Number 18-20062
11/10/2018

Defendant: Nikolas Cook
DOB: 08/28/98



Charges by O'Leary: Possession of Controlled Substance [Cocaine], Possession of Drug Paraphernalia, Possession of Cannabis less than 20 Grams
2 Days Served, Bonded

According to O'Leary's reports on 11/10/2018, O'Leary conducted a traffic stop at 3951 SE Commerce Avenue, Martin County, FL, on a brown car bearing the Florida tag number ID26TC for non-working tag lights.  Upon contact with the driver, Nikolas Cook, O'Leary smelled the odor of Cannabis emitting from inside the vehicle. Upon a search of vehicle O'Leary located in the center console a bag containing loose Cannabis with an approximate weight of under a gram. The center console also contained a cartridge of a brown liquid substance.  O'Leary documented the brown liquid substance field tested positive for THC content. The front driver's seat had a white rock like substance all over it, and the same substance was located on the front floor board of the vehicle, and directly behind the driver's seat close to the door. O'Leary also located behind the front driver's seat in the area between the front and back seat a clear cut drinking straw. Based on O'Leary's training, and experience O'Leary determined a cut straw is often used for the inhalation of Cocaine. O'Leary tested the substance for Cocaine which yielded a positive result using an agency provided testing kit.

O'Leary read Cook his Miranda Warnings and Cook agreed to speak. Cook advised his friends often "smoke weed" inside his vehicle, and he bought the car two months ago from a "shady" person. Cook

O'Leary

denied ownership of the substances, and stated " How can I [Cook] be charged with what is in my vehicle".

Cook was arrested for the possession of THC Oil, loose bag of Cannabis, cut straw, and the white rock like substance that field tested positive for Cocaine.  Cook was transported without incident to the Martin County Jail. O'Leary reported the evidence was all collected, and turned in to the Martin County Sheriff's Office.

Nikolas Cook's Interview

Nikolas Cook was interviewed by your affiant as part of a criminal investigation. The following is a summary of what Nikolas Cook stated. On 04/12/2019, Nikolas Cook said the night he was arrested he was driving behind Walmart on SE Commerce when he was pulled over by O'Leary.  O'Leary told Cook the reason for the traffic stop was his tag light was not working.  Cook handed O'Leary his license and registration. O'Leary then walked back to his patrol vehicle; when O'Leary returned he asked Cook to step out of the vehicle.  O'Leary told Cook the vehicle smelled like Cannabis.  As he was exiting the vehicle, Cook replied that no one smoked in the vehicle.  Cook had two passenger in the vehicle Cameron and Geo. Another Deputy stood with them while O'Leary searched the vehicle. While O'Leary was searching the vehicle his friend Cameron had a seizure. O'Leary stopped his search and stated "Code 57". An ambulance was called and Cameron was transported to the hospital.  During this time his father showed up since his fathers' shop is near the area where the stop occurred.  Cook's father left and O'Leary resumed the search. O'Leary told Cook he located Cocaine on the driver's seat and floor board. O'Leary also located a cut straw on the back seat as well as THC oil in a Vape cartridge.  Cook told O'Leary that he doesn't do drugs then asked for a drug test to prove it. Cook said he purchased the Vape cartridge at a 7-11 and it can't be THC Oil. Cook was handcuffed and read Miranda.

D/S O'Leary placed into evidence and identified the following items.
S01 - Two bags of Cocaine, and a cut straw with residue 2.0 grams
S02 - THC cartridge, and loose bag with Cannabis residue 3.0 grams

Your affiant viewed the evidence submitted and the "cocaine" appeared to be gravel/rocks.

Indian River Crime Lab Results
Exhibit # S01 – One sealed plastic bag containing 3 medium plastic zip lock bags. One with some rock like material and debris; one with some rock like material, and one with a piece of plastic straw. No controlled substance.
Exhibit # S02 – One sealed paper bag containing two cartridges. No controlled substance.
All three items were analyzed in S01. In S02 both items were analyzed and both indicated the presence of Nicotine, however this was not confirmed.

During this incident O'Leary committed the crime of:
**Official Misconduct**
**Tamping with Evidence**
**False Imprisonment**

39

O'Leary

MCSO Case Number 18-20275
11/14/2018

Defendant: James Sutton
DOB: 07/08/76



**Charges by O'Leary: Possession of Controlled Substance [Cocaine], Introduce Contraband into County Detention Facility, Breach of Peace, Resisting with Violence**
**3 Days Served, Bonded**

According to O'Leary's reports on 11/14/2018, O'Leary responded to Crawdaddy's located at 1949 NE Jensen Beach Blvd, Martin County, FL, in reference to a white male refusing to leave the restaurant. Upon O'Leary's contact with the manager Mr. Kern, Kern advised Sutton was asked to leave the restaurant and he refused. Kern advised he would like Sutton trespassed from the restaurant. Sutton was arrested for resisting with violence, and breach of peace. Sutton was transported to the Martin County Jail without incident. Once inside the sally port of the jail O'Leary noticed a white rock like substance on the back floor board of the vehicle.

O'Leary documented the substance field tested positive for Crack-Cocaine using an agency provided test kit. Sutton was then arrested for Possession of Crack Cocaine, and Introduction of contraband to a correction facility. O'Leary documented that he cleans the back seat of his patrol vehicle every time it was used to transport. O'Leary collected the evidence and turned it in at the Martin County Sheriff's Office.

**James Sutton's Interview**

James Sutton was interviewed by your affiant as part of a criminal investigation. The following is a summary of what James Sutton stated. On 04/04/2018, James Sutton had been at Crawdaddy's bar in Jensen Beach on the night he was arrested. Sutton was at the bar and had a minor disagreement with another person. The manager then asked the bartender to ask him [Sutton] to leave. Sutton was escorted out of the bar through the backdoor by the bar staff. Sutton went to retrieve his bicycle behind the bar. That's when a Deputy [O'Leary] stopped him outside. O'Leary was talking to him then violently handcuffed him. Sutton insisted he did not resist the arrest.

Sutton stated he did carry a notebook for his work. Sutton stated he possible "tapped" O'Leary with the note book. Sutton then described his note book as blue, approximately 4 inches by 3 inches, and has his name and contact information written on the inside cover [this matched the note book recovered from the trunk of vehicle 131]. Sutton stated during the encounter he was not sober, but was not using illegal narcotics. Sutton stated he used drugs in the past but his drug of choice is alcohol. Sutton stated he figured he was arrested for breach of peace or disorderly conduct. Sutton stated he asked the booking staff to drug test him multiple times to provide he did have Cocaine in his system.

40

O'Leary

**D/S Waltersdorff's Interview**

D/S Walterdorff was interviewed by your affiant as part of a criminal investigation. The following is a summary of what D/S Waltersdorff stated. Adam Waltersdorff was the first to arrive on scene the day Sutton was arrested. Waltersdorff found Sutton outside the back entrance to Harpers Pub in Jensen Beach FL and he was intoxicated. Waltersdorff stated he went back to Crawdaddys [the original incident location] while O'Leary stayed with Sutton. Waltersdorff received statements from people in Crawdaddys and the owner followed him outside. Waltersdorff saw O'Leary struggling with Sutton. Once the struggle was over O'Leary told him he found paraphernalia. Waltersdorff thought this was odd because he had previously searched the defendant and didn't find paraphernalia prior to entering Crawdaddys.

Waltersdorff was going to arrest the defendant for disorderly intoxication but, O'Leary said he was going to take the call because it was in his zone. O'Leary showed the paraphernalia to Adam, which he described to be a possible push rod for a crack pipe. Waltersdorff said he wouldn't have described the item as paraphernalia. Waltersdorff assumed the defendant was being arrested for Possession of drug paraphernalia and Disorderly Intoxication.

Waltersdorff stated the defendant had a notebook on him, which had poems in it. Waltersdorff stated he found the notebook when he first patted the defendant down for weapons. Waltesdorff stated the defendant was not physically resistant with him and was unsteady from intoxication.

D/S O'Leary placed into evidence and identified the following item.
S01 - Loose crack cocaine [2 grams]
It should be noted, one of the note books located during the search of O'Leary patrol vehicle had Sutton's name written in it.

Your affiant viewed the evidence submitted and the "cocaine" was bright white with a darker colored back similar to the evidence submitted for Schweitzer and found to be consistent with the statue O'Leary carried around in his patrol car.

Indian River Crime Lab results
Exhibit # S01 – One sealed plastic bag containing one medium plastic zip lock bag containing some hard substance. No controlled substance.

**During this incident O'Leary committed the crime of:**
**Official Misconduct**
**Tampering with Evidence**
**Petit Theft**

41

O'Leary

MCSO Case Number 18-21455
12/05/2018

Defendant: Victor Aguillon Lopez
DOB: 02/29/1996



Charges by O'Leary: Possession of Controlled Substance [Cocaine]
1 Day Served, Bonded

According to O'Leary's reports on 12/05/2018, O'Leary observed a vehicle parked behind Keller Williams located at 2650 SW Matheson Avenue, Martin County, FL. This vehicle was occupied by a male in all black clothing. Upon contact with the male O'Leary observed the male trying to wipe a white powder like substance from his pants. Based on O'Leary's training, and experience O'Leary believed the substance to be Cocaine. Victor Lopez identified himself, and advised he was from Miami in the area to pick up a friend.

O'Leary field tested the substance located on Lopez's jeans which field tested positive for Cocaine using an agency provided test kit. O'Leary also located the substance in the seat, and on the front floor board of the vehicle. O'Leary attempted to read Lopez his Miranda Warnings and Lopez stated "I forgot English".

Victor Lopez was arrested and transported to the Martin County Sheriff's Office. O'Leary reported the substance with an approximate weight of one gram was collected, and will be turned into evidence at the Martin County Sheriff's Office.

**Victor Guillermo Aguillon Lopez's Interview**
Victor Guillermo Aguillon Lopez was interviewed by your affiant as part of a criminal investigation. The following is a summary of what Victor Guillermo Aguillon Lopez stated. Victor Guillermo Aguillon Lopez was interviewed with the help of a translator provided by the attorney representing him. In the interview Lopez said he was in Martin County with a friend named Alma. Lopez doesn't know anyone in Martin County, and Alma was only coming to visit her family. Lopez said they couldn't find a parking spot at the place where Alma's family lived so they parked in a parking lot near a bank. [They were actually parked in front of Keller Williams Reality in Palm City which is located in a converted bank building] After he parked, it was about 4 minutes before police made contact with him. Lopez was waiting in the car while Alma went to see her family.

Lopez said two officers made him get out of his vehicle. When the officer told Victor to step out, that's when he told Lopez that he found cocaine. Lopez stated O'Leary was speaking English to him and he understood some words, but told the officer that he doesn't speak fluent English. One of the officers put on gloves, pulled a bag from his car, and put it in Victor's car. Lopez stated he could see something in the bag and it looked like round marbles, but doesn't remember exactly. According to Lopez, the officer never asked for his license, just told him to get out of the car and immediately put him in

42

O'Leary

handcuffs. Lopez said that after he was cuffed, the officer hit him and kicked him before placing him in the back of a patrol car. Prior to this Lopez had never been arrested and he did not have cocaine. Lopez doesn't do drugs and or drink alcohol. Lopez denied having white "stuff" on his clothes as described in O'Leary's official report.

D/S O'Leary placed into evidence and identified the following items.
S01- Loose Cocaine collected in bag and two latex gloves 0.05 grams

Indian River Crime Lab Results
Exhibit # S01 — One sealed paper bag containing one medium plastic zip lock bag containing some plastic, one foil wrapper, some residue, and two latex gloves (one with residue). No controlled substance.

During this incident O'Leary committed the crime of:
**Official Misconduct**
**False Imprisonment**
**Battery**

**MCSO Case Number 18-22844**
**12/29/2018**

**Defendant: Jason Farrenkopf**
**DOB: 07/12/77**

**Charges by O'Leary: Possession of Controlled Substance [Oxycodone], Possession of a Controlled Substance [Methamphetamine], Possession of Drug Paraphernalia**
**14 Days Served, Dismissed**

According to O'Leary's reports on 12/29/2018, O'Leary made contact with a white male who was sitting in a white vehicle in the Publix parking lot located at 4231 NW Federal Hwy, Martin County, FL. O'Leary identified the male, Jason Farrenkopf, by Florida license and advised him he was free to leave. While speaking with Jason, O'Leary asked "may I look inside your vehicle." Jason responded "sure go ahead" while exiting the vehicle.

Upon a search of the vehicle O'Leary located on the driver side floor board, and on the driver's seat a loose clear crystal like substance, and a spoon with an off white residue. O'Leary reported the substance field tested positive for Methamphetamine, and the residue on the spoon tested positive for Heroin. Inside the center console O'Leary located a small bag of white powder. O'Leary documented this powder field tested positive for Oxycodone. O'Leary read Jason his Miranda Warnings, and Jason advised he did not want to talk.

O'Leary

O'Leary reported the evidence was collected, and turned in to the Martin County Sheriff's Office. O'Leary reported Jason Farrenkopf was transported without incident to the Martin County Jail.

**Jason Farrenkopf's Interview**

Jason Farrenkopf was interviewed by your affiant as part of a criminal investigation. The following is a summary of what Jason Farrenkopf stated. On 3/28/2019, Jason Farrenkopf when he was arrested he was homeless due to a fight with his wife. Farrenkopf was sleeping in the driver's seat of his vehicle in the Publix parking lot located at 4231 NW Federal Highway. Farrenkopf stated he woke up to police officers at his window. Farrenkopf told the officers that he was sleeping in the parking lot because he was homeless. Farrenkopf was told by the officers to exit his vehicle. Farrenkopf was immediately handcuffed, read Miranda, and placed in to the rear of a patrol vehicle. Farrenkopf said there were three officers on scene. The three officers were searching the front seat of his vehicle. Once they were done searching his vehicle one officer took him to jail.

Once at the jail Farrenkopf asked why was he at the jail and why was he arrested. Farrenkopf said he thought he was arrested because he was homeless and sleeping in his vehicle. Farrenkopf was asked for consent to search his vehicle after he was handcuffed. Farrenkopf did have his medication with him in his vehicle, and that during the incident he was taking his medications. Farrenkopf thought maybe the officer's mistook his medication for illegal narcotics. Farrenkopf explained that he stored his medications in the trunk of the vehicle and they were in prescription bottles with his name on the label.

D/S O'Leary placed into evidence and identified the following items.
S01- Bag of Oxycodone 1 gram
S02 – Bag of loose Meth 1 gram
S03 – Spoon with Heroin residue

Indian River Crime Lab Results
Exhibit # S01 – One sealed plastic bag containing one small plastic zip lock bag containing some white clumpy material. No controlled substance.
Exhibit # S02 – One sealed plastic bag containing one medium plastic zip lock bag containing some crystalline material. No controlled substance.
Exhibit # S03 – One sealed paper bag containing one metal spoon and one small plastic zip lock bag containing some residue. No controlled substance.

**During this incident O'Leary committed the crime of:**
**Official Misconduct**
**False Imprisonment**

O'Leary

MCSO Case Number 18-22904
12/30/2018

Defendant: Kristin Schmier
DOB: 05/29/88



Charge by O'Leary: Possession of a Controlled Substance (Oxycodone)
1 Day Served, Bonded

According to O'Leary's reports on 12/30/2018, O'Leary conducted a traffic stop near the intersection of Jensen Beach Blvd, and Goldenrod on a black BMW bearing the Florida tag IDWG38 for illegal window tint, and improper method of turning at an intersection. Upon contact with the driver, Kristin Schmier, O'Leary smelled a faint odor of Cannabis from inside the vehicle. O'Leary told Kristin he smelled the odor of Cannabis and Kristin advised by excited utterance "yeah my boyfriend smokes inside my vehicle".

Upon a search of the vehicle O'Leary located loose "shake" on the floor board. O'Leary documented the "shake" field tested positive for THC content. Inside a purse on the passenger seat O'Leary located a loose capsule with a white substance inside. Due to the totality of the circumstances O'Leary field tested the substance using an agency generated test kit. O'Leary documented this test yielded a positive result for Oxycodone. O'Leary documented Kristin agreed to speak to him. Kristin advised "I don't have a prescription for any medication." Kristin also advised "a bartender must have dropped the "oxy" in my purse.

Kristin Schmier was arrested and transported without incident to the Martin County Jail. O'Leary reported the evidence was collected, and turned into the Martin County Sheriff's Office.

**Kristen Schmier's Interview**

Kristen Schmier was interviewed by your affiant as part of a criminal investigation. The following is a summary of what Kristen Schmier stated. On 04/04/2019, Kristen Schmier was driving home from work when she was pulled over. Schmier said the traffic stop occurred around US1 and Jensen Beach Blvd, Martin County, FL. While stopped the deputy stated the vehicle smelled like "weed". Schmier exited her vehicle and the deputy started a search of her vehicle. Two other deputies showed up during the traffic stop. Schmier stood by with the other two deputies while [O'Leary] was searching her vehicle.

Schmier stated [O'Leary] returned from searching her vehicle and advised he found a "cap" in her purse. Schmier explained that she does not use drugs and the "cap" did not belong to her. At the bar where Schmier works she places her purse behind the bar and there are several other bartenders working at a given time. Her purse is in an unsecure location and she said it was possible that the "cap" could have inadvertently fallen in her purse from another bartender. Schmier was told by [O'Leary] that the "cap" tested positive for Oxycodone and he can't just look the other way. Schmier was told to not freak out and

45

O'Leary

[O'Leary] put her in hand cuffs. Schmier was placed into the rear of a patrol vehicle and driven to the jail. Schmier stated at the jail she got out of the patrol vehicle and entered the jail.

**D/S Killough's Interview**
 D/S Killough was interviewed by your affiant as part of a criminal investigation. The following is a summary of what D/S Killough stated. D/S Killough recalled on December 30 (MCSO C/N 18-22904), O'Leary conducted a traffic stop near Goldenrod and Jensen Beach Blvd which resulted in Oxycodone being found. D/S Killough described the usage of the test kit and believed O'Leary used the test kit properly. D/S Killough stated the test O'Leary used contained multiple vials of liquid which were broken and shaken after adding the suspected material. D/S Killough said his only concern about the investigation was the very minor change in color of the test kit to indicated Oxycodone.

D/S O'Leary placed into evidence and identified the following items.
S01- Half a cap / loose Oxy

Indian River Crime Lab Results
Exhibit # S01 – One sealed plastic bag containing one plastic zip lock bag with some tan powder and half of a clear capsule. No controlled substance.

**During this incident O'Leary committed the crime of:**
**Official Misconduct**
**False Imprisonment**

**Conclusion**
During his eleven months working for the Martin County Sheriff's Office Steven O'Leary made eighty-six arrests for narcotics related charges. In many cases, especially early in his tenure, these cases centered on Cannabis and THC oil. In the vast majority of those cases he was successful in locating and identifying the controlled substances in question. However, as his number of felony cases increased, the number of instances where no controlled substance was found also exponentially increased.
 Of those cases, there are fourteen cases where an arrest was made and no controlled substance was present. In two of those cases an independent lab has found evidence submitted by O'Leary was completely fabricated, most likely taken from a statue he had in his vehicle.
 These facts combined with O'Leary's false statements to Sgt. Nelson regarding his lack of narcotics training, which were refuted by training records from the town of Palm Beach, show that he did not merely make an honest mistake.

Due to these facts the following violations occurred:

17 Cases where O'Leary is in violation of Official Misconduct due to O'Leary being a public servant who knowingly and intentionally falsified an official record or document.

13 cases where O'Leary is in violation of False Imprisonment due to O'Leary forcibly confined and imprisoned these individuals against their will with no lawful authority.

46

O'Leary

8 cases where O'Leary is in violation of Tampering with or Fabricating Physical Evidence due to; O'Leary knew that a criminal proceeding of this state was pending and O'Leary knowing to be false made and presented items of evidence.

9 cases where O'Leary knowingly made a false statements in writing with the intent to mislead a public servant in the performance of his or her official duty.

O'Leary is also in violation of Petit Theft due to O'Leary temporarily and permanently depriving James Sutton's of his personal effects to include a note book since his wrongful arrest.

O'Leary is also in violation of Battery due to O'Leary unlawfully kicking Victor Guillermo Aguillon Lopez during his wrongful arrest.

I swear the above statement is true and correct
To the best of my knowledge and belief.

_____  6α/1812
Affiant's Signature

Sworn and subscribed before me the undersigned
Authority, on this 26 day of July 2019

_____  6 T. 11468
LEO/ASA/Notary Public

47

# DIRECT FILE ISSUE CAPIAS COUNT 50
## IN THE CIRCUIT COURT FOR THE NINETEENTH JUDICIAL CIRCUIT OF THE STATE OF FLORIDA, FOR MARTIN COUNTY

STATE OF FLORIDA

-vs-

Case No. (s):
43-2019-CF-000872-A

(A) Steven O'Leary - 08/16/1990 - W/M
Defendant(s)

(A)   Ct. 1:  Official Misconduct (F 3)
(A)   Ct. 2:  Official Misconduct (F 3)
(A)   Ct. 3:  Official Misconduct (F 3)
(A)   Ct. 4:  Official Misconduct (F 3)
(A)   Ct. 5:  Official Misconduct (F 3)
(A)   Ct. 6:  Official Misconduct (F 3)
(A)   Ct. 7:  Official Misconduct (F 3)
(A)   Ct. 8:  Official Misconduct (F 3)
(A)   Ct. 9:  Official Misconduct (F 3)
(A)   Ct. 10:  Official Misconduct (F 3)
(A)   Ct. 11:  Official Misconduct (F 3)
(A)   Ct. 12:  Official Misconduct (F 3)
(A)   Ct. 13:  Official Misconduct (F 3)
(A)   Ct. 14:  Official Misconduct (F 3)
(A)   Ct. 15:  Official Misconduct (F 3)
(A)   Ct. 16:  Official Misconduct (F 3)
(A)   Ct. 17:  Official Misconduct (F 3)
(A)   Ct. 18:  False Official Statement (M 2)
(A)   Ct. 19:  False Official Statement (M 2)
(A)   Ct. 20:  False Official Statement (M 2)
(A)   Ct. 21:  False Official Statement (M 2)
(A)   Ct. 22:  False Official Statement (M 2)
(A)   Ct. 23:  False Official Statement (M 2)
(A)   Ct. 24:  False Official Statement (M 2)
(A)   Ct. 25:  False Official Statement (M 2)
(A)   Ct. 26:  False Official Statement (M 2)
(A)   Ct. 27:  Tampering With Evidence (F 3)
(A)   Ct. 28:  Tampering With Evidence (F 3)
(A)   Ct. 29:  Tampering With Evidence (F 3)
(A)   Ct. 30:  Tampering With Evidence (F 3)
(A)   Ct. 31:  Tampering With Evidence (F 3)
(A)   Ct. 32:  Tampering With Evidence (F 3)
(A)   Ct. 33:  Tampering With Evidence (F 3)
(A)   Ct. 34:  Tampering With Evidence (F 3)

FILED FOR RECORD
MARTIN CO., FL
2019 AUG -9 PM 3: 47

1

EXHIBIT "B"

(A)   Ct. 35:   False Imprisonment (F 3)
(A)   Ct. 36:   False Imprisonment (F 3)
(A)   Ct. 37:   False Imprisonment (F 3)
(A)   Ct. 38:   False Imprisonment (F 3)
(A)   Ct. 39:   False Imprisonment (F 3)
(A)   Ct. 40:   False Imprisonment (F 3)
(A)   Ct. 41:   False Imprisonment (F 3)
(A)   Ct. 42:   False Imprisonment (F 3)
(A)   Ct. 43:   False Imprisonment (F 3)
(A)   Ct. 44:   False Imprisonment (F 3)
(A)   Ct. 45:   False Imprisonment (F 3)
(A)   Ct. 46:   False Imprisonment (F 3)
(A)   Ct. 47:   False Imprisonment (F 3)
(A)   Ct. 48:   Second Degree Petit Theft (M 2)
(A)   Ct. 49:   Battery (M 1)
(A)   Ct. 50:   Official Misconduct (F 3)

## INFORMATION

IN THE NAME AND BY THE AUTHORITY OF THE STATE OF FLORIDA:
   BE IT REMEMBERED that BRUCE H. COLTON, State Attorney for the Nineteenth Judicial Circuit of the State of Florida, prosecuting for the State of Florida, in Martin County, under oath, information makes that in Martin County:

COUNT 1:  On or about May 28, 2018 Steven O'Leary did as a public servant, with corrupt intent to obtain a benefit for any person or to cause harm to another, falsify, or cause another person to falsify, any official record or official document; OR conceal, cover up, destroy, mutilate, or alter any official record or official document or cause another person to perform such an act; OR obstruct, delay, or prevent the communication of information relating to the commission of a felony that directly involves or affects the public agency or public entity served by the public servant, in violation of Florida Statute 838.022; ███████████████

COUNT 2:  On or about August 7, 2018 Steven O'Leary did as a public servant, with corrupt intent to obtain a benefit for any person or to cause harm to another, falsify, or cause another person to falsify, any official record or official document; OR conceal, cover up, destroy, mutilate, or alter any official record or official document or cause another person to perform such an act; OR obstruct, delay, or prevent the communication of information relating to the commission of a felony that directly involves or affects the public agency or public entity served by the public servant, in violation of Florida Statute 838.022; ███████████████

COUNT 3:  On or about September 23, 2018 Steven O'Leary did as a public servant, with corrupt intent to obtain a benefit for any person or to cause harm to another, falsify, or cause another person to falsify, any official record or official document; OR conceal, cover up, destroy, mutilate, or alter any official record or official document or cause another person to perform such an act; OR obstruct, delay, or prevent the communication of information relating to the commission of a felony that directly involves or affects the public agency or public entity served

by the public servant, in violation of Florida Statute 838.022; ████████████████

COUNT 4:  On or about September 23, 2018 Steven O'Leary did as a public servant, with corrupt intent to obtain a benefit for any person or to cause harm to another, falsify, or cause another person to falsify, any official record or official document; OR conceal, cover up, destroy, mutilate, or alter any official record or official document or cause another person to perform such an act; OR obstruct, delay, or prevent the communication of information relating to the commission of a felony that directly involves or affects the public agency or public entity served by the public servant, in violation of Florida Statute 838.022; ██████████████

COUNT 5:  On or about October 15, 2018 Steven O'Leary did as a public servant, with corrupt intent to obtain a benefit for any person or to cause harm to another, falsify, or cause another person to falsify, any official record or official document; OR conceal, cover up, destroy, mutilate, or alter any official record or official document or cause another person to perform such an act; OR obstruct, delay, or prevent the communication of information relating to the commission of a felony that directly involves or affects the public agency or public entity served by the public servant, in violation of Florida Statute 838.022; ██████████████]

COUNT 6:  On or about October 15, 2018 Steven O'Leary did as a public servant, with corrupt intent to obtain a benefit for any person or to cause harm to another, falsify, or cause another person to falsify, any official record or official document; OR conceal, cover up, destroy, mutilate, or alter any official record or official document or cause another person to perform such an act; OR obstruct, delay, or prevent the communication of information relating to the commission of a felony that directly involves or affects the public agency or public entity served by the public servant, in violation of Florida Statute 838.022; ████████████

COUNT 7:  On or about October 20, 2018 Steven O'Leary did as a public servant, with corrupt intent to obtain a benefit for any person or to cause harm to another, falsify, or cause another person to falsify, any official record or official document; OR conceal, cover up, destroy, mutilate, or alter any official record or official document or cause another person to perform such an act; OR obstruct, delay, or prevent the communication of information relating to the commission of a felony that directly involves or affects the public agency or public entity served by the public servant, in violation of Florida Statute 838.022; [████████████

COUNT 8:  On or about October 20, 2018 Steven O'Leary did as a public servant, with corrupt intent to obtain a benefit for any person or to cause harm to another, falsify, or cause another person to falsify, any official record or official document; OR conceal, cover up, destroy, mutilate, or alter any official record or official document or cause another person to perform such an act; OR obstruct, delay, or prevent the communication of information relating to the commission of a felony that directly involves or affects the public agency or public entity served by the public servant, in violation of Florida Statute 838.022; ████████████]

COUNT 9:  On or about October 24, 2018 Steven O'Leary did as a public servant, with corrupt intent to obtain a benefit for any person or to cause harm to another, falsify, or cause another person to falsify, any official record or official document; OR conceal, cover up, destroy, mutilate, or alter any official record or official document or cause another person to perform such

an act; OR obstruct, delay, or prevent the communication of information relating to the commission of a felony that directly involves or affects the public agency or public entity served by the public servant, in violation of Florida Statute 838.022; ████████████████ ]

COUNT 10:  On or about October 26, 2018 Steven O'Leary did as a public servant, with corrupt intent to obtain a benefit for any person or to cause harm to another, falsify, or cause another person to falsify, any official record or official document; OR conceal, cover up, destroy, mutilate, or alter any official record or official document or cause another person to perform such an act; OR obstruct, delay, or prevent the communication of information relating to the commission of a felony that directly involves or affects the public agency or public entity served by the public servant, in violation of Florida Statute 838.022; ████████████████

COUNT 11:  On or about November 1, 2018 Steven O'Leary did as a public servant, with corrupt intent to obtain a benefit for any person or to cause harm to another, falsify, or cause another person to falsify, any official record or official document; OR conceal, cover up, destroy, mutilate, or alter any official record or official document or cause another person to perform such an act; OR obstruct, delay, or prevent the communication of information relating to the commission of a felony that directly involves or affects the public agency or public entity served by the public servant, in violation of Florida Statute 838.022; ████████████████

COUNT 12:  On or about November 5, 2018 Steven O'Leary did as a public servant, with corrupt intent to obtain a benefit for any person or to cause harm to another, falsify, or cause another person to falsify, any official record or official document; OR conceal, cover up, destroy, mutilate, or alter any official record or official document or cause another person to perform such an act; OR obstruct, delay, or prevent the communication of information relating to the commission of a felony that directly involves or affects the public agency or public entity served by the public servant, in violation of Florida Statute 838.022; ████████████

COUNT 13:  On or about November 10, 2018 Steven O'Leary did as a public servant, with corrupt intent to obtain a benefit for any person or to cause harm to another, falsify, or cause another person to falsify, any official record or official document; OR conceal, cover up, destroy, mutilate, or alter any official record or official document or cause another person to perform such an act; OR obstruct, delay, or prevent the communication of information relating to the commission of a felony that directly involves or affects the public agency or public entity served by the public servant, in violation of Florida Statute 838.022; ████████████████

COUNT 14:  On or about November 14, 2018 Steven O'Leary did as a public servant, with corrupt intent to obtain a benefit for any person or to cause harm to another, falsify, or cause another person to falsify, any official record or official document; OR conceal, cover up, destroy, mutilate, or alter any official record or official document or cause another person to perform such an act; OR obstruct, delay, or prevent the communication of information relating to the commission of a felony that directly involves or affects the public agency or public entity served by the public servant, in violation of Florida Statute 838.022; ████████████

COUNT 15:  On or about December 5, 2018 Steven O'Leary did as a public servant, with corrupt intent to obtain a benefit for any person or to cause harm to another, falsify, or cause another

person to falsify, any official record or official document; OR conceal, cover up, destroy, mutilate, or alter any official record or official document or cause another person to perform such an act; OR obstruct, delay, or prevent the communication of information relating to the commission of a felony that directly involves or affects the public agency or public entity served by the public servant, in violation of Florida Statute 838.022▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Lopez]**

COUNT 16:  On or about December 29, 2018 Steven O'Leary did as a public servant, with corrupt intent to obtain a benefit for any person or to cause harm to another, falsify, or cause another person to falsify, any official record or official document; OR conceal, cover up, destroy, mutilate, or alter any official record or official document or cause another person to perform such an act; OR obstruct, delay, or prevent the communication of information relating to the commission of a felony that directly involves or affects the public agency or public entity served by the public servant, in violation of Florida Statute 838.022; ▮▮▮▮▮▮▮▮▮▮▮▮

COUNT 17:  On or about December 30, 2018 Steven O'Leary did as a public servant, with corrupt intent to obtain a benefit for any person or to cause harm to another, falsify, or cause another person to falsify, any official record or official document; OR conceal, cover up, destroy, mutilate, or alter any official record or official document or cause another person to perform such an act; OR obstruct, delay, or prevent the communication of information relating to the commission of a felony that directly involves or affects the public agency or public entity served by the public servant, in violation of Florida Statute 838.022; [▮▮▮▮▮▮▮▮▮▮▮▮]

COUNT 18:  On or about May 3, 2018 Steven O'Leary did knowingly make a false statement in writing, with the intent to mislead a public servant in the performance of the public servant`s official duty, in violation of Florida Statute 837.06; ▮▮▮▮▮▮▮▮▮▮▮▮▮

COUNT 19:  On or about August 11, 2018 Steven O'Leary did knowingly make a false statement in writing, with the intent to mislead a public servant in the performance of the public servant`s official duty, in violation of Florida Statute 837.06; ▮▮▮▮▮▮▮▮▮

COUNT 20:  On or about August 27, 2018 Steven O'Leary did knowingly make a false statement in writing, with the intent to mislead a public servant in the performance of the public servant`s official duty, in violation of Florida Statute 837.06; ▮▮▮▮▮▮▮▮

COUNT 21:  On or about August 29, 2018 Steven O'Leary did knowingly make a false statement in writing, with the intent to mislead a public servant in the performance of the public servant`s official duty, in violation of Florida Statute 837.06; ▮▮▮▮▮▮▮

COUNT 22:  On or about September 8, 2018 Steven O'Leary did knowingly make a false statement in writing, with the intent to mislead a public servant in the performance of the public servant`s official duty, in violation of Florida Statute 837.06; ▮▮▮▮▮▮▮▮▮▮

COUNT 23:  On or about September 13, 2018 Steven O'Leary did knowingly make a false statement in writing, with the intent to mislead a public servant in the performance of the public servant`s official duty, in violation of Florida Statute 837.06; ▮▮▮▮▮▮▮▮▮

COUNT 24: On or about October 3, 2018 Steven O'Leary did knowingly make a false statement in writing, with the intent to mislead a public servant in the performance of the public servant's official duty, in violation of Florida Statute 837.06; ▮▮▮▮▮▮▮▮▮▮▮

COUNT 25: On or about October 22, 2018 Steven O'Leary did knowingly make a false statement in writing, with the intent to mislead a public servant in the performance of the public servant's official duty, in violation of Florida Statute 837.06; ▮▮▮▮▮▮▮▮▮▮▮

COUNT 26: On or about October 24, 2018 Steven O'Leary did knowingly make a false statement in writing, with the intent to mislead a public servant in the performance of the public servant's official duty, in violation of Florida Statute 837.06; ▮▮▮▮▮▮▮▮▮▮▮

COUNT 27: On or about May 28, 2018 Steven O'Leary did unlawfully, knowing that a criminal trial or proceeding or an investigation by the State Attorney, a law enforcement agency, or grand jury, was pending or about to be instituted, alter, destroy, conceal, or remove a record, document, or thing with the purpose to impair its verity or availability in such proceeding or investigation, or make, present, or use a record, document, or thing, knowing it to be false, in violation of Florida Statute 918.13(1); ▮▮▮▮▮▮▮▮▮▮▮

COUNT 28: On or about October 15, 2018 Steven O'Leary did unlawfully, knowing that a criminal trial or proceeding or an investigation by the State Attorney, a law enforcement agency, or grand jury, was pending or about to be instituted, alter, destroy, conceal, or remove a record, document, or thing with the purpose to impair its verity or availability in such proceeding or investigation, or make, present, or use a record, document, or thing, knowing it to be false, in violation of Florida Statute 918.13(1); ▮▮▮▮▮▮▮▮▮▮▮

COUNT 29: On or about October 15, 2018 Steven O'Leary did unlawfully, knowing that a criminal trial or proceeding or an investigation by the State Attorney, a law enforcement agency, or grand jury, was pending or about to be instituted, alter, destroy, conceal, or remove a record, document, or thing with the purpose to impair its verity or availability in such proceeding or investigation, or make, present, or use a record, document, or thing, knowing it to be false, in violation of Florida Statute 918.13(1); ▮▮▮▮▮▮▮▮▮▮▮

COUNT 30: On or about October 24, 2018 Steven O'Leary did unlawfully, knowing that a criminal trial or proceeding or an investigation by the State Attorney, a law enforcement agency, or grand jury, was pending or about to be instituted, alter, destroy, conceal, or remove a record, document, or thing with the purpose to impair its verity or availability in such proceeding or investigation, or make, present, or use a record, document, or thing, knowing it to be false, in violation of Florida Statute 918.13(1); ▮▮▮▮▮▮▮▮▮▮▮

COUNT 31: On or about November 1, 2018 Steven O'Leary did unlawfully, knowing that a criminal trial or proceeding or an investigation by the State Attorney, a law enforcement agency, or grand jury, was pending or about to be instituted, alter, destroy, conceal, or remove a record, document, or thing with the purpose to impair its verity or availability in such proceeding or investigation, or make, present, or use a record, document, or thing, knowing it to be false, in

violation of Florida Statute 918.13(1); ▇▇▇▇▇▇▇▇▇▇▇

COUNT 32: On or about November 5, 2018 Steven O'Leary did unlawfully, knowing that a criminal trial or proceeding or an investigation by the State Attorney, a law enforcement agency, or grand jury, was pending or about to be instituted, alter, destroy, conceal, or remove a record, document, or thing with the purpose to impair its verity or availability in such proceeding or investigation, or make, present, or use a record, document, or thing, knowing it to be false, in violation of Florida Statute 918.13(1); ▇▇▇▇▇▇▇

COUNT 33: On or about November 10, 2018 Steven O'Leary did unlawfully, knowing that a criminal trial or proceeding or an investigation by the State Attorney, a law enforcement agency, or grand jury, was pending or about to be instituted, alter, destroy, conceal, or remove a record, document, or thing with the purpose to impair its verity or availability in such proceeding or investigation, or make, present, or use a record, document, or thing, knowing it to be false, in violation of Florida Statute 918.13(1); [▇▇▇▇▇▇▇▇

COUNT 34: On or about November 14, 2018 Steven O'Leary did unlawfully, knowing that a criminal trial or proceeding or an investigation by the State Attorney, a law enforcement agency, or grand jury, was pending or about to be instituted, alter, destroy, conceal, or remove a record, document, or thing with the purpose to impair its verity or availability in such proceeding or investigation, or make, present, or use a record, document, or thing, knowing it to be false, in violation of Florida Statute 918.13(1); ▇▇▇▇▇▇

COUNT 35: On or about August 7, 2018 Steven O'Leary did unlawfully and forcibly, by threat, or secretly confine, abduct, imprison or restrain the person of ▇▇▇▇▇▇▇▇▇▇ without lawful authority and against that person's will, in violation of Florida Statute 787.02;

COUNT 36: On or about September 23, 2018 Steven O'Leary did unlawfully and forcibly, by threat, or secretly confine, abduct, imprison or restrain the person of ▇▇▇▇▇▇▇▇ without lawful authority and against that person's will, in violation of Florida Statute 787.02;

COUNT 37: On or about September 23, 2018 Steven O'Leary did unlawfully and forcibly, by threat, or secretly confine, abduct, imprison or restrain the person of ▇▇▇▇▇▇▇ without lawful authority and against that person's will, in violation of Florida Statute 787.02;

COUNT 38: On or about October 15, 2018 Steven O'Leary did unlawfully and forcibly, by threat, or secretly confine, abduct, imprison or restrain the person of ▇▇▇▇▇▇▇▇ without lawful authority and against that person's will, in violation of Florida Statute 787.02;

COUNT 39: On or about October 15, 2018 Steven O'Leary did unlawfully and forcibly, by threat, or secretly confine, abduct, imprison or restrain the person of ▇▇▇▇▇▇▇ without lawful authority and against that person's will, in violation of Florida Statute 787.02;

COUNT 40: On or about October 20, 2018 Steven O'Leary did unlawfully and forcibly, by threat, or secretly confine, abduct, imprison or restrain the person of ▇▇▇▇▇▇▇ without lawful authority and against that person's will, in violation of Florida Statute 787.02;

COUNT 41:  On or about October 20, 2018 Steven O'Leary did unlawfully and forcibly, by threat, or secretly confine, abduct, imprison or restrain the person of ███████████ without lawful authority and against that person's will, in violation of Florida Statute 787.02;

COUNT 42:  On or about October 24, 2018 Steven O'Leary did unlawfully and forcibly, by threat, or secretly confine, abduct, imprison or restrain the person of ███████████ without lawful authority and against that person's will, in violation of Florida Statute 787.02;

COUNT 43:  On or about November 5, 2018 Steven O'Leary did unlawfully and forcibly, by threat, or secretly confine, abduct, imprison or restrain the person of ███████, without lawful authority and against that person's will, in violation of Florida Statute 787.02;

COUNT 44:  On or about November 10, 2018 Steven O'Leary did unlawfully and forcibly, by threat, or secretly confine, abduct, imprison or restrain the person of ███████████ without lawful authority and against that person's will, in violation of Florida Statute 787.02;

COUNT 45:  On or about December 5, 2018 Steven O'Leary did unlawfully and forcibly, by threat, or secretly confine, abduct, imprison or restrain the person of ██████████ **Lopez**, without lawful authority and against that person's will, in violation of Florida Statute 787.02;

COUNT 46:  On or about December 29, 2018 Steven O'Leary did unlawfully and forcibly, by threat, or secretly confine, abduct, imprison or restrain the person of ███████, without lawful authority and against that person's will, in violation of Florida Statute 787.02;

COUNT 47:  On or about December 30, 2018 Steven O'Leary did unlawfully and forcibly, by threat, or secretly confine, abduct, imprison or restrain the person of ██████████ without lawful authority and against that person's will, in violation of Florida Statute 787.02;

COUNT 48: On or about November 14, 2018 Steven O'Leary did unlawfully and knowingly obtain or use or endeavor to obtain or to use the property of another, to-wit: notebook, the property of ████████ as owner or custodian, of the value of less than $100.00, with intent to either permanently or temporarily deprive the true owner of a right to the property or a benefit therefrom or to appropriate the property to the use of the taker or to the use of any person not entitled thereto, in violation of Florida Statute 812.014;

COUNT 49:  On or about December 5, 2018 Steven O'Leary did intentionally touch or strike ██████████████████████ against that person's will or did intentionally cause bodily harm to said person, in violation of Florida Statute 784.03(1);

COUNT 50: On or Between May 1, 2018 and January 1, 2019 Steven O'Leary did as a public servant, with corrupt intent to obtain a benefit for any person or to cause harm to another, falsify, or cause another person to falsify, any official record or official document;  OR conceal, cover up, destroy, mutilate, or alter any official record or official document or cause another person to perform such an act;  OR obstruct, delay, or prevent the communication of information relating

to the commission of a felony that directly involves or affects the public agency or public entity served by the public servant, in violation of Florida Statute 838.022;

contrary to the form of the Statute in such case made and provided, and against the peace and dignity of the State of Florida.

I do hereby state that I am instituting this prosecution in good faith.

Nita G. Denton
Assistant State Attorney for the
Nineteenth Judicial Circuit of
Florida, prosecuting for said State
Fla. Bar No. 599972
Designated eService address:
SA19eService@sao19.org

STATE OF FLORIDA
County of Martin

Personally appeared before me Nita G. Denton, Assistant State Attorney for the Nineteenth Judicial Circuit of the State of Florida, who being first duly sworn, says that the allegations as set forth in the foregoing information are based upon facts that have been sworn to by the material witnesses as true and which, if true, would constitute the offense(s) therein charged.

The foregoing instrument was acknowledged before me this 9th day of August, 2019 by Nita G. Denton, who is personally known to me and who did take an oath.

Notary Public

KELLY M. EDMONDS
Commission # FF 944036
Expires January 2, 2020
Bonded Thru Troy Fain Insurance 800-385-7019

9