UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 21-cv-14469-Cannon/McCabe

BRADLEY MARTIN, et al.

      Plaintiffs,

v.

WILLIAM D. SNYDER, in his official
capacity as Sheriff of Martin County,
Florida, and STEVEN O'LEARY, individually,

      Defendants.

_____/

## REPORT AND RECOMMENDATION

THIS CAUSE comes before the Court on a Motion for Summary Judgment ("Motion") (DE 65) filed by Sheriff William D. Snyder in his official capacity ("Defendant"), which was referred to the undersigned by United States District Judge Aileen M. Cannon (DE 68). For the reasons set forth below, the undersigned **RECOMMENDS** that the Motion be **GRANTED** in part and **DENIED** in part.

## I.    OVERVIEW

This case concerns a former deputy sheriff of the Martin County Sheriff's Office, Steven O'Leary ("Deputy"), who made a series of false arrests with fabricated evidence during his probationary term of employment in 2018 and 2019. Deputy is currently serving a seventeen-year prison sentence due to his misconduct. Among other persons, Deputy arrested each of the Plaintiffs in this case. As a result, Plaintiffs brought this suit against Deputy and Defendant alleging violations of their civil rights.

The Amended Complaint alleges a "*Monell*" claim against Defendant (Count II), so-named for *Monell v. Department of Social Services*, 436 U.S. 658 (1978), the Supreme Court case that articulated the standard for holding municipal entities liable under 42 U.S.C. § 1983 (DE 11).  The Amended Complaint also alleges a state law claim against Defendant (Count IIII) for false arrest and imprisonment, seeking to hold Defendant vicariously liable for Deputy's misconduct (DE 11).

On June 15, 2023, Defendant filed this Motion, seeking summary judgment on two grounds:  (1) Plaintiffs' § 1983 claims fail because Plaintiffs cannot meet the standard set forth in *Monell*; and (2) Plaintiffs' state law claims fail under Florida's sovereign immunity statute, Fla. Stat. § 768.28 (DE 65).

## II.  SUMMARY JUDGMENT STANDARD

A district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  To satisfy this burden, the movant must show the court that "there is an absence of evidence to support the non-moving party's case."  *Id.* at 325.

After the movant has met its burden under Rule 56(a), the burden of production shifts, and the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  As Rule 56 explains, "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact ... the court may ... grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the

movant is entitled to it." Fed. R. Civ. P. 56(e)(3).  Therefore, the non-moving party "may not rest upon the mere allegations or denials in its pleadings" but instead must present "specific facts showing that there is a genuine issue for trial." *Walker v. Darby*, 911 F.2d 1573, 1576-77 (11th Cir. 1990).  "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Quigg v. Thomas Cnty. Sch. Dist.*, 814 F.3d 1227, 1235 (11th Cir. 2016) (cleaned up).

In deciding a motion for summary judgment, the Court must view the facts in the light most favorable to the non-moving party.  *Davis v. Williams*, 451 F.3d 759, 763 (11th Cir. 2006).  The Court also must resolve ambiguities and draw justifiable inferences in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  Ultimately, "the trial court may … deny summary judgment in a case where there is reason to believe that the better course would be to proceed to a full trial." *Id.*

## III.   UNDISPUTED FACTS

The record shows the following undisputed facts.

### A.   Events Prior to Plaintiffs' Arrests

Defendant hired Deputy on a probationary period of employment beginning February 1, 2018 (DE 67 ¶ 9).  During Deputy's tenure, he met all requirements to serve as a law enforcement officer in Florida, including training related to making lawful arrests, searches, and seizures (DE 67 ¶ 114).  Defendant initially assigned Deputy to a training unit for new recruits, then to the Uniform Road Patrol Division, where he worked the midnight shift (DE 67 ¶¶ 10-13).

During his period of employment, Deputy developed a reputation for making a high number of narcotics arrests (DE 75-5 at 37-38, 41-42; DE 76-1 at 19-20).  Although the record is

not clear as to timing, at some point Deputy's supervisors even had discussions whether his numbers were "too good to be true" (DE 75-5 at 42).

From May 3, 2022 to December 30, 2018, Deputy made a series of arrests, during which he tampered with evidence, made false official statements, and committed other official misconduct (DE 76-9 at 22-57). On numerous occasions, Deputy seized purported narcotics evidence that later tested negative for controlled substances or positive for a controlled substance other than the one he claimed to have seized (DE 66-1 at 5-23).

### B. Plaintiffs' Arrests

Deputy arrested each of the Plaintiffs as follows.

### 1. Grayson Kyte

On August 7, 2018, Deputy made a road-side traffic stop of Plaintiff Kyte allegedly for improper display of a license plate (DE 67 ¶ 15). Deputy claimed that, as he approached the vehicle, he smelled the odor of marijuana and heard Kyte make an excited utterance admitting to possession of marijuana (DE 67 ¶ 16). Deputy then searched the vehicle and claimed to find marijuana inside an open container in the center console (DE 67 ¶¶ 17-18). Deputy field-tested the substance and claimed to find a positive result for THC (DE 67 ¶ 19). As a result, Deputy arrested Kyte for, inter alia, possession of marijuana (DE 67 ¶ 20). Laboratory analysis later showed the substance that Deputy claimed to recover from Kyte contained no controlled substances (DE 66-1 at 5).

### 2. Samuel Palmeri

On September 13, 2018, Deputy made a road-side traffic stop of Plaintiff Palmeri allegedly for illegal window tint (DE 67 ¶ 22). Deputy searched Palmeri's vehicle and claimed to find a white powdery substance in a clear plastic bag (DE 67 ¶ 24). Deputy field-tested the substance

and claimed to find a positive result for cocaine (DE 67 ¶ 25).  As a result, Deputy arrested Palmeri

for possession of cocaine (DE 67 ¶ 26).  Laboratory analysis later showed the substance that

Deputy claimed to recover from Palmeri contained no controlled substances (DE 66-1 at 6).

### 3.     Cicilio Perez

On September 18, 2018, Deputy made a road-side traffic stop of Plaintiff Perez allegedly

for running a stop sign (DE 67 ¶ 28).  Deputy claimed that, as he approached the vehicle, he

observed Perez sweating profusely and shaking (DE 67 ¶ 29).  Deputy requested a K-9 unit and

claimed the K-9 alerted to the presence of narcotics inside the vehicle (DE 67 ¶ 30).  Deputy also

claimed that, during the stop, Perez emptied his pockets and Deputy found a lipstick container

containing a white substance inside (DE 67 ¶ 31).  Deputy field-tested the substance and claimed

to find a positive result for cocaine (DE 67 ¶ 32).  As a result, Deputy arrested Perez for, inter alia,

possession of cocaine (DE 67 ¶ 33).  Laboratory analysis later showed the substance that Deputy

claimed to recover from Perez contained no controlled substances (DE 66-1 at 7).

### 4.     Gary Saunders

On October 18, 2018, Deputy approached Plaintiff Saunders in a parked vehicle (DE 67 ¶

35).  Deputy claimed that, as he approached the vehicle, he smelled the odor of marijuana and

observed two syringes in plain view in a center cup holder (DE 67 ¶ 36).  Deputy searched the

vehicle and claimed to find THC oil, an off-white powdery substance, two glass pipes with burnt

residue, several white rocks, and several syringes (DE 67 ¶¶ 37-38).  Deputy field-tested the

substances and claimed to find positive results for fentanyl and cocaine (DE 67 ¶ 39).  Deputy then

arrested Saunders for, inter alia, possession of THC oil, cocaine, and heroin (DE 67 ¶ 40).

Laboratory analysis later showed the substances that Deputy claimed to recover from Saunders

contained tetrahydrocannabinol and cocaine, but no other no controlled substances (DE 66-1 at 8-9).

### 5. Bradley Martin

On October 20, 2018, Deputy made a road-side traffic stop of Plaintiff Martin allegedly for an expired registration (DE 67 ¶ 42).  Deputy claimed that, as he approached the vehicle, he smelled the odor of marijuana (DE 67 ¶ 43).  Deputy searched the vehicle and claimed to find a plastic bag labeled "laundry detergent" with a white and blue substance inside (DE 67 ¶¶ 44-45). Deputy field-tested the substance and claimed to find positive results for heroin and fentanyl (DE 67 ¶ 46).  As a result, Deputy arrested Martin for trafficking in heroin (DE 67 ¶ 47).  Laboratory analysis later showed the substance that Deputy claimed to recover from Martin contained no controlled substances (DE 66-1 at 10-11).

### 6. John Veltre

On October 23, 2018, Deputy approached Plaintiff Veltre on the street as Veltre stood next to a closed business (DE 67 ¶ 49).  Deputy claimed he observed an orange straw in the fold of Veltre's wallet (DE 67 ¶ 50).  Deputy searched Veltre and claimed to find a white powdery substance in Veltre's wallet, another white powdery substance in an ice cream container in Veltre's bag, and marijuana in Veltre's sock (DE 67 ¶¶ 51-53).  Deputy field-tested these substances and claimed to find positive results for cocaine, oxycodone, and THC (DE 67 ¶¶ 51-53).  As a result, Deputy arrested Saunders for, inter alia, possession of a cocaine, oxycodone, and cannabis (DE 67 ¶ 54).  Laboratory analysis later showed the substance that Deputy claimed to recover from Veltre contained cannabis, but no other controlled substances (DE 66-1 at 13-14).

### 7.    Melissa Morales

On October 24, 2018, Deputy made a road-side traffic stop of Plaintiff Morales allegedly for riding a bicycle with no lights (DE 67 ¶ 56).  Deputy searched Morales and claimed to find a white rock-like substance in her purse (DE 67 ¶¶ 57-58).  Deputy also claimed to find a white substance that fell out of her pant leg (DE 67 ¶ 59).  Deputy field-tested these substances and claimed to find positive results for methamphetamine (DE 67 ¶¶ 58-59).  As a result, Deputy arrested Morales for, inter alia, possession of methamphetamine (DE 67 ¶ 60).  Laboratory analysis later showed the substances that Deputy claimed to recover from Morales contained no controlled substances (DE 66-1 at 15).

### 8.    Dillon Felts

On October 26, 2018, Deputy made a road-side traffic stop of Plaintiff Felts for riding a bicycle with no lights (DE 67 ¶ 62).  Deputy searched Felts's backpack and claimed to discover a white crystal-like substance (DE 67 ¶¶ 63-64).  Deputy field-tested the substance and claimed to find positive results for MDMA (DE 67 ¶ 65).  As a result, Deputy arrested Felts for, inter alia, trafficking in MDMA (DE 67 ¶ 66).  Laboratory analysis later showed the substance that Deputy claimed to recover from Felts contained tetrahydrocannabinol, but no other controlled substances (DE 66-1 at 16-17).

### 9.    James Sutton

On November 14, 2018, Deputy arrested Plaintiff Sutton allegedly for disorderly conduct, after which Deputy transported Sutton to the county jail (DE 67 ¶ 68).  Once at the jail's sallyport, Deputy claimed to discover a white rock on the back floorboard of his patrol vehicle, close to the area where Sutton had been sitting (DE 67 ¶ 69, DE 76-9 at 51).  Deputy field-tested the substance and claimed to find a positive result for cocaine (DE 67 ¶ 70).  As a result, Deputy added additional

arrest charges to Sutton for possession of cocaine and introduction of contraband into a detention facility (DE 67 ¶ 71). Laboratory analysis later showed the substance that Deputy claimed to recover from the back of the patrol car contained no controlled substances (DE 66-1 at 18).

### 10. Matthew Crull

On December 5, 2018, Deputy approached Plaintiff Crull as he was asleep in a parked car (DE 67 ¶ 73). Deputy claimed to observe an open container, as well as drug paraphernalia and a green leafy substance in plain view (DE 67 ¶ 74). Deputy searched the vehicle and claimed to discover a white substance in the driver's side door (DE 67 ¶ 75). Deputy field-tested the substances and claimed to find positive results for THC and heroin (DE 67 ¶ 76). As a result, Deputy arrested Crull for, inter alia, trafficking in heroin and possession of marijuana (DE 67 ¶ 77). Laboratory analysis later showed the substance that Deputy claimed to recover from Crull contained cannabis, but no other controlled substances (DE 66-1 at 19-20).

### 11. Kenneth Hogan and Kelsea Callahan

On December 9, 2018, Deputy approached Plaintiffs Hogan and Callahan, just before midnight, as they were camping within the Dupois Management Area (DE 67 ¶ 79). Deputy claimed a neighboring camper had lodged a complaint about loud noises and a suspicious vehicle (DE 67 ¶ 80). Deputy claimed to discover THC oil, cannabis, and drug paraphernalia in Callahan's possession, so he arrested her (DE 67 ¶¶ 84-85, DE 66-11 at 3). Deputy also arrested Hogan for refusing to identify himself, after which Deputy transported Hogan to the county jail (DE 67 ¶ 83, DE 66-11 at 3). Once at the jail's sally port, Deputy claimed to find a plastic container with an off-white substance in the back of his patrol vehicle, close to the area where Hogan had been sitting (DE 67 ¶ 82, DE 66-11 at 3). Deputy field-tested the substance and claimed to find positive results for heroin (DE 67 ¶ 82). As a result, Deputy added arrest charges to Hogan for possession of

heroin and possession of drug paraphernalia (DE 67 ¶ 83).  Laboratory analysis later showed the substances that Deputy claimed to recover from Hogan and Callahan contained cocaine, heroin, and tetrahydrocannabinol (DE 66-1 at 21-22).

### 12.   Kristin Schmier

On December 30, 2018, Deputy made a road-side traffic stop of Plaintiff Schmier, allegedly for illegal window tint and an improper turn (DE 67 ¶ 87).  Deputy claimed that, as he approached the vehicle, he smelled the odor of marijuana (DE 67 ¶ 88).  Deputy searched the vehicle and claimed to find "shake" on the floorboard of the vehicle and a loose pill in Schmier's purse (DE 67 ¶ 89).  Deputy field-tested these substances and claimed to find positive results for THC and oxycodone (DE 67 ¶ 90).  As a result, Deputy arrested Schmier for possession of controlled substances (DE 67 ¶ 91).  Laboratory analysis later showed the substances that Deputy claimed to recover from Schmier contained no controlled substances (DE 66-1 at 23).

### C.    Events After Plaintiffs' Arrests

On or about January 11, 2019, an Assistant State Attorney ("ASA") contacted Defendant's office to advise that laboratory testing in three unrelated cases had shown samples seized as controlled substances, in fact, contained no controlled substances at all (DE 67 ¶ 93).  Defendant's records showed that, in all three cases, Deputy had made the arrests, field-tested the evidence, and submitted it to the evidence unit (DE 66 ¶ 94).

On the same day as the ASA's phone call, one of Deputy's supervisors went immediately to the evidence unit to review past evidence seized by Deputy (DE 76-1 at 15).  The supervisor immediately knew that "something was wrong with the evidence" (DE 76-1 at 15).  On January 11, 2019 – still the same day as the ASA's phone call – Defendant placed Deputy on administrative

leave and commenced a criminal investigation (DE 67 ¶ 98).  Defendant thereafter rescinded Deputy's probationary period of employment, effectively terminating him (DE 67 ¶ 99).

Following the criminal investigation, Martin County Sheriff's Office Detective Mark Diapoules (hereinafter "Detective") prepared a Complaint Affidavit, asserting probable cause to believe that, between February 2018 and January 2019, Deputy, while acting under color of law, engaged in an ongoing pattern of crime, including official misconduct, fabricating evidence, false imprisonment, and false official statement (DE 67 ¶ 100).

Thereafter, on August 9, 2019, the State Attorney ("State") charged Deputy by way of a fifty-count criminal Information, *State v. Steven O'Leary*, Case No. 2019CF000872 (DE 67 ¶ 108). The Information included eighteen counts of official misconduct, nine counts of false official statement, eight counts of tampering with evidence, thirteen counts of false imprisonment, one count of second-degree petit theft, and one count of battery (DE 67 ¶ 108).  The Information included crimes committed against Plaintiffs Kyte, Martin, Felts, Sutton, Schmier, Morales, and Palmeri, represented as, respectively, counts 2, 7, 8, 9, 10, 14, 17, 23, 26, 30, 34, 35, 40, 41, 42, 47, 48 and 50 of the State's Information (DE 67 ¶ 102, DE 75-9 at 3-10).

On December 2, 2021, Deputy pled nolo contendere to all counts of the Information (DE 67 ¶ 110).  The state court adjudicated him guilty and sentenced him to seventeen years' imprisonment (DE 67 ¶ 111, DE 66-4).  As of the date of this Report and Recommendation, Deputy remains in prison (DE 67 ¶ 112).

## IV.   *MONELL* CLAIM

Count II alleges a claim under 42 U.S.C. § 1983, which provides a remedy against "every person" who, under color of state law, deprives another of rights secured by the Constitution and laws of the United States.  In *Monell,* 436 U.S. at 658, the Supreme Court recognized that a

municipality qualifies as a "person" subject to suit under § 1983.  To demonstrate liability against a municipality, however, a plaintiff must do more than merely show the municipality employed a tortfeasor, as the doctrine of respondeat superior does not apply to § 1983 actions.  *Id.* at 691.  "[A] city is not vicariously liable under § 1983 for the constitutional torts of its agents:  It is only liable when it can be fairly said that the city itself is the wrongdoer."  *Collins v. City of Harker Heights*, 503 U.S. 115, 122 (1992).

As such, the Supreme Court has defined very narrow circumstances under which a municipality can be held liable for a constitutional injury.  In this case, Plaintiffs have identified three recognized theories of § 1983 *Monell* liability:

- where the municipality adopts an "official policy" that causes constitutional injury;

- where the municipality follows a "custom or practice" that causes a constitutional injury; and

- where the municipality's "failure to train or supervise" causes a constitutional injury.

The Court will address each theory in turn.

### A.    Official Policy

First, *Monell* recognizes that § 1983 liability attaches when the municipality itself adopts a formal policy, rule, or regulation that causes constitutional violations.  436 U.S. at 658.  In *Monell*, for example, the municipality adopted a formal policy that required pregnant employees to take unpaid maternity leave before such leave was medically necessary.  *Id.* at 660-61.  As such, the municipality had adopted a formal policy that served as the "moving force" for a constitutional violation inflicted on female employees.  *Id.* at 694-95.

The undisputed facts here show Plaintiffs have no viable claim under this theory. Defendant never adopted any formal policies that directed employees such as Deputy to make

arrests without probable cause, to fabricate false evidence, or to make false statements in police records.  To the contrary, Defendant's policies forbade such conduct (DE 66 ¶¶ 119, 122).  To the extent Plaintiffs pursue a *Monell* claim under the "official policy" theory, summary judgment should be entered in Defendant's favor.

### B.      Custom or Practice

Next, *Monell* recognizes that municipalities may follow informal customs or practices that cause constitutional violations even though such customs or practices have "not received formal approval through the body's official decisionmaking channels."  *Id.* at 690-91 (cleaned up).  To prove a custom or practice, a plaintiff must establish a widespread pattern of conduct "so permanent and well settled as to constitute a 'custom or usage' with the force of law."  *Brown v. City of Fort Lauderdale*, 923 F.2d 1474, 1481 (11th Cir. 1991) (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988)).  As the custom must be widespread and repeated, "random acts or isolated incidents are insufficient to establish a custom[.]"  *Depew v. City of St. Mary's*, 787 F.2d 1496, 1499 (11th Cir. 1986); *see also Casado v. Miami-Dade Cnty.*, 340 F. Supp. 3d 1320, 1328 (S.D. Fla. 2018) ("[T]he plaintiff must allege a 'pattern' of excessive force including specific facts of numerous incidents[.]").

The undisputed facts here show Plaintiffs have no viable claim under this theory.  Defendant's employees did not engage in a widespread pattern of making arrests without probable cause, fabricating evidence, or making make false statements in police records.  To the extent Plaintiffs pursue a *Monell* claim under the "custom or practice" theory, summary judgment should be entered in Defendant's favor.

The Court rejects Plaintiffs' argument that Deputy's misconduct was so widespread – in and of itself – as to constitute a "custom or practice" for *Monell* purposes.  Plaintiffs point out that

Deputy made thirteen false arrests in only four months (DE 75 at 7). The Court finds, however, that the actions of a single rogue employee cannot establish *Monell* liability under the "custom or practice" theory. *Cf. Victoria W. v. Larpenter*, 205 F. Supp. 2d 580, 589 (E.D. La. 2002) (noting that "a single, isolated unconstitutional action by 'rogue' employees of the municipality will almost never trigger municipal liability under § 1983"). Rather, as discussed below, the actions of a single rogue employee should be analyzed under the "failure to train/supervise" theory of *Monell* liability. Likewise, to the extent a single rogue employee engages in a widespread pattern of misconduct, such pattern should be considered for purposes of placing the municipal entity on actual or constructive notice of the need for further training and supervision of the rogue employee.

### C.    Failure to Train/Supervise

Next, the Supreme Court recognizes "limited circumstances" under which "failure to train" can give rise to § 1983 liability. *City of Canton v. Harris*, 489 U.S. 378, 387 (1989). Specifically, inadequate training "may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Id.* at 388. To show "deliberate indifference" in a failure to train/supervise case, "a plaintiff must present some evidence that the municipality knew of a need to train and/or supervise in a particular area and that the municipality made a deliberate choice not to take any action." *Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998). The Eleventh Circuit has repeatedly held that, without notice of a need to train or supervise in a particular area, a municipality cannot be liable as a matter of law under a *Monell* failure to train/supervise theory. *Id.*; *see also Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 407-08 (1997) ("In addition, the existence of a pattern of tortious conduct by inadequately trained employees may tend to show that the lack of

proper training, rather than a one-time negligent administration of the program or factors peculiar to the officer involved in a particular incident, is the 'moving force' behind the plaintiff's injury.").

The Supreme Court has cautioned that rigorous standards of fault and causation must be employed so that failure-to-train/supervise claims do not collapse into respondeat superior claims. *See Canton*, 489 U.S. at 379 ("To adopt lesser standards of fault and causation would open municipalities to unprecedented liability under § 1983."). "In virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city 'could have done' to prevent the unfortunate incident." *Id*. at 392; *see also Bd. of Cnty. Comm'rs*, 520 U.S. at 405 ("Where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee.").

Defendant argues summary judgment should be granted here because Plaintiffs cannot show two of the essential elements necessary for a failure-to-train/supervise claim, namely, (1) proof that Defendant had notice of materially similar past constitutional violations, and (2) proof that the alleged failure to train/supervise caused Plaintiffs' injuries. The Court will address each argument in turn.[1]

---

[1] Plaintiffs argue the Court should deny summary judgment on the failure-to-train/supervise claim, on collateral estoppel grounds, because the Court denied summary judgment on a similar claim raised in a separate case involving the same defendants, *Page, et. al. v. O'Leary, et. al*., Case No. 2:20-cv-14460-AMC (DE 75 at 2-3). The Court disagrees and questions whether collateral estoppel can attach to an order that denies summary judgment. Even if the doctrine could apply to such orders, it would not apply here because the issues at stake are not "identical" to the ones decided in the *Page* case. *See CSX Transp., Inc. v. Bhd. of Maint. of Way Emps.*, 327 F.3d 1309, 1317 (11th Cir. 2003) (noting the elements of collateral estoppel). *Page* involved a different set of plaintiffs, with a different set of arrests, decided upon a different summary judgment record.

1.      **Notice**

To satisfy the notice requirement, Plaintiffs must prove that Defendant "knew based on at least one earlier instance of unconstitutional conduct materially similar to [Deputy's] violation of [Plaintiffs'] constitutional rights that [additional] [training/supervision] was needed to avoid [similar constitutional violations] likely recurring in the future." *See* Eleventh Circuit Pattern Jury Instruction (Civil) No. 5.11, Government Entity Liability for Failure to Train or Supervise.  Notice can be either "actual" or "constructive." *Connick v. Thompson*, 563 U.S. 51, 61 (2011).  The Eleventh Circuit has emphasized, however, that "[e]stablishing notice of a need to train or supervise is difficult." *AFL-CIO v. City of Miami*, 637 F.3d 1178, 1189 (11th Cir. 2011).

Plaintiffs cannot rely upon evidence that post-dates their respective arrests to show notice. *See Wright v. Sheppard*, 919 F.2d 665, 674 (11th Cir. 1990) (affirming judgment where "court found no evidence of a history of widespread *prior* abuse by Department personnel that would have put the sheriff on notice of the need for improved training or supervision") (emphasis added). Here, the Amended Complaint names thirteen Plaintiffs with arrests spanning over a four-month period.  As to each respective Plaintiff, Defendant cannot be charged with knowledge of events that took place after each respective arrest.  Likewise, Defendant cannot be charged with knowledge of test results from the Indian River Crime laboratory, which showed Deputy had seized non-narcotics evidence, where those test results came back *after* Plaintiffs' respective arrests.

The Court nevertheless finds that Plaintiffs have proffered sufficient evidence to create a genuine issue of material fact as to notice.  In particular, Defendants have proffered two categories of evidence that, in combination, give rise to a jury issue:  (1) supervisory knowledge of the unusually high number of narcotics arrests made by Deputy, and (2) obvious abnormalities with

evidence seized by Deputy prior to Plaintiffs' arrests.  In the Court's view, neither category of evidence would be sufficient to create a jury issue on its own, but in combination they suffice.

First, the undisputed facts show Deputy made an unusually high number of narcotics arrests, especially for someone new to the job, within his probationary period of employment, and not assigned to a narcotics unit.  Deposition testimony included the following:

- Sergeant Brochu, Deputy's immediate supervisor, knew Deputy was making "more than normal" felony arrests in a month and more narcotics arrests than the average deputy (DE 75-5 at 37, 39).

- Captain Budensiek questioned Deputy, "[Y]ou're making a lot of arrests.  How are you doing it?" (DE 76-1 at 20).

- Sergeant Brochu testified that three supervisors held discussions regarding Deputy's high number of narcotic arrests questioning whether they were "too good to be true" (DE 75-5 at 42).

- Lieutenant Bowdoin testified that he knew Deputy was making a lot of narcotic arrests and that he had a meeting with Deputy regarding his "high numbers" (DE 76-2 at 21, 23).

The Court notes the record remains unclear as to the timing of these suspicions by various supervisors.  To the extent such ambiguities exist in the record, the Court resolves them in favor of the non-moving party.  *See Anderson*, 477 U.S. at 255.  Accordingly, the Court interprets the record evidence to mean that Deputy had exhibited an unusually high number of narcotics arrests, and that his supervisors had become suspicious as a result, prior to Plaintiffs' arrests.

Next, Plaintiffs point to a series of abnormalities in evidence seized prior to their own arrests, including the following:

- On May 3, 2018, Deputy arrested a suspect for possession of cannabis (DE 76-9 at 22-23). Deputy claimed to have taken photographs and turned them into evidence but, in truth, he turned in no photographs (DE 76-9 at 22). The State later charged Deputy with false official statement for this incident (DE 76-9 at 7).

- On May 28, 2018, Deputy arrested a suspect for possession of cocaine (DE 76-9 at 23-24). Deputy claimed to have photographed a black straw with cocaine residue and a small amount of "white rock like substance" (DE 76-9 at 23). In truth, he submitted no photographs and a straw that "appear[ed] to be chewed on," which was "not consistent with the use of cocaine" (DE 76-9 at 24). The State later charged Deputy with official misconduct and tampering with evidence for this incident (DE 76-9 at 3, 8).

- On August 7, 2018, Deputy arrested Plaintiff Kyte for possession of cannabis (DE 76-9 at 24-25). Deputy's arrest affidavit claimed he found "marijuana rolled into a small joint inside an open beer can" (DE 76-9 at 24-25). He then submitted into evidence a beer can with some plant matter inside, but no "rolled joint" (DE 76-9 at 25). The State later charged Deputy with official misconduct and false imprisonment for this incident (DE 76-9 at 3, 9).

- On August 11, 2018, Deputy arrested a suspect for possession of THC oil (DE 76-9 at 26). Deputy claimed to have taken photographs and turned them into evidence but, in truth, he turned in no photographs (DE 76-9 at 26). The State later charged Deputy with false official statement for this incident (DE 76-9 at 7).

- On August 27, 2018, Deputy arrested a suspect for possession of THC oil, cannabis, and drug paraphernalia (DE 76-9 at 27). Deputy claimed to have taken photographs

and turned them into evidence but, in truth, he turned in no photographs (DE 76-9 at 27).  The State later charged Deputy with false official statement for this incident (DE 76-9 at 7).

- On August 29, 2018, Deputy arrested a suspect for possession of methamphetamine (DE 76-9 at 28).  Deputy claimed to have taken photographs and turned them into evidence but, in truth, he turned in no photographs (DE 76-9 at 29).  The State later charged Deputy with false official statement for this incident (DE 76-9 at 7).

- On September 8, 2018, Deputy arrested a suspect for possession of cannabis and drug paraphernalia (DE 76-9 at 29-30).  Deputy submitted drugs into evidence, reporting a weight of 108 grams, but laboratory testing later showed a weight of only 62.19 grams (DE 76-9 at 30).  Deputy also claimed to have taken photographs of the evidence while on the scale but, in truth, he turned in no photographs (DE 76-9 at 30).  The State later charged Deputy with false official statement for this incident (DE 76-9 at 7).

- On September 13, 2018, Deputy arrested Plaintiff Palmieri for possession of cocaine (DE 76-9 at 30-31).  Deputy claimed to have taken photographs and turned them into evidence but, in truth, he turned in no photographs (DE 76-9 at 31).  The State later charged Deputy with false official statement for this incident (DE 76-9 at 7).

- On October 3, 2018, Deputy arrested a suspect for possession of methamphetamine (DE 76-9 at 33-34).  Deputy claimed to have photographed a "white rock like substance" on a scale but, in truth, he turned in no photographs (DE 76-9 at 34).

The State later charged Deputy with false official statement for this incident (DE 76-9 at 8).

- On October 15, 2018, Deputy arrested two suspects for possession of crack cocaine and methamphetamine (DE 76-9 at 35-37). Deputy claimed to recover a white rock like substance that field-tested positive for crack cocaine and a white crystal like substance that field-tested positive for methamphetamine (DE 76-9 at 35). In truth, Deputy submitted into evidence a substance that "look[ed] like sand and the bag ha[d] indentations on it, like someone struck the material inside with a hard object" (DE 76-9 at 36-37). The State later charged Deputy with official misconduct, tampering with evidence, and false imprisonment for this incident (DE 76-9 at 5, 8-10).

- On October 20, 2018, Deputy arrested Plaintiff Martin for trafficking in heroin (DE 76-9 at 38-40). Deputy submitted into evidence a plastic bag labeled "laundry detergent," which contained a white and blue powder substance (DE 76-9 at 39). The state later charged Deputy with official misconduct and false imprisonment (DE 76-9 at 6, 10).

- On October 22, 2018, Deputy arrested a suspect for possession of oxycodone and drug paraphernalia (DE 76-9 at 40-41). Deputy claimed to have submitted photographs of a "smashed white substance" that field-tested positive for oxycodone (DE 76-9 at 40-41). In truth, no photographs were submitted (DE 76-9 at 41). The State later charged Deputy with false official statement for this incident (DE 76-9 at 8).

- On October 24, 2018, Deputy arrested a suspect for possession of cannabis, trespass after warning, and open container (DE 76-9 at 41-42).  Deputy claimed to have taken photographs and turned them into evidence but, in truth, he turned in no photographs (DE 76-9 at 42).  In addition, Deputy claimed to have submitted batteries into evidence but, in truth, he turned in no batteries (DE 76-9 at 42).  The State later charged Deputy with false statement for this incident (DE 76-9 at 8).

- On October 24, 2018, Deputy arrested Plaintiff Morales for, inter alia, possession of methamphetamine (DE 67 ¶ 60).  Deputy submitted into evidence a "white rock like substance" that "looked like sand or dirt and [the] evidence bag had marks on it like someone hit the substance inside with a hard object" (DE 76-9 at 43).  The State later charged Deputy with official misconduct, tampering with evidence, and false imprisonment for this incident (DE 76-9 at 6, 8, 10).

- On November 1, 2018, Deputy arrested a suspect for trafficking in ketamine, possession of crack cocaine, and introduction of contraband into a corrections facility (DE 76-9 at 45-47).  Deputy submitted into evidence a substance that was "clearly marked as a supplement or vitamin container" which "did not look like narcotics and looked like some type of vitamin or supplement as portrayed in the exterior packaging of the container" (DE 76-9 at 46).  The alleged "ketamine" substance "looked like and had the texture of a pre-work out powder" (DE 76-9 at 47).  The alleged "cocaine" substance was "bright white with dark backing" and "not consistent with cocaine" (DE 76-9 at 47).  The State later charged Deputy with official misconduct, false imprisonment, and tampering with evidence for this incident (DE 76-9 at 3, 8, 10).

- On November 5, 2018, Deputy arrested a suspect for trafficking in cocaine and tampering with evidence (DE 76-9 at 47-49).  Deputy claimed to recover a liquid substance that field-tested positive for cocaine and a rock-like substance that field-tested positive for crack cocaine (DE 76-9 at 47-48).  Deputy submitted into evidence a substance that "was actual sand/rocks, and the bag ha[d] indentations on it like someone struck the material inside with a hard object" (DE 76-9 at 49).  The State later charged Deputy with official misconduct, false imprisonment, and tampering with evidence for this incident (DE 76-9 at 4, 8-9).

- On November 10, 2018, Deputy arrested a suspect for possession of cocaine, drug paraphernalia, and cannabis (DE 76-9 at 49-50).  Deputy claimed to recover a white rock-like substance that field-tested positive for cocaine and a brown liquid substance that field-tested positive for THC (DE 76-9 at 49).  Deputy submitted into evidence a substance that "appeared to be gravel/rocks" (DE 76-9 at 50).  The State later charged Deputy with official misconduct, false imprisonment, and tampering with evidence for this incident (DE 76-9 at 4, 8-9).

- On November 14, 2018, Deputy arrested Plaintiff Sutton for, inter alia, possession of cocaine (DE 76-9 at 51-52).  Deputy once again submitted into evidence a substance that was "bright white with a darker colored back" which was not consistent with cocaine (DE 76-9 at 52).  The State later charged Deputy with official misconduct and tampering with evidence for this incident (DE 76-9 at 4, 9-10).

Plaintiffs argue Defendant was aware, or should have been aware, of these abnormalities based on Defendant's own Standard Operating Procedure on Evidence and Property Control,

which provided that narcotics evidence had to be weighed and signed off by a supervisor (DE 66-7 at 106; DE 66-5 at 66) ("In any case where narcotics … is being taken, a supervisor shall initial the receipt prior to [the narcotics] being turned into evidence.").  In interpreting these procedures, one of Deputy's supervisors testified as follows:

> PLAINTIFFS' COUNSEL:  And so my question is, when [a narcotic] stop … has occurred, are there any other procedures in place whereby additional supervisors kind of check on the paperwork?
>
> …
>
> CHIEF DEPUTY BUDENSIEK:  [T]here's several procedures … that are part of the process.  [Deputy] make an arrest.  [Deputy] recover the drugs.  The supervisor has to sign off on the drugs before [the drugs are] turned in to evidence.  The evidence custodian pulls the drugs out, verifies that what the deputy says is in the bag is actually in the bag, as far as what they – not retesting it.  … But [deputy] says there's a white powdery substance that weighs 14 grams, they're verifying that, and then placing that into evidence.

(DE 76-1 at 27-28, DE 76 ¶¶ 125-26).

The Court agrees this evidence creates a genuine issue of material fact as to notice.  In this regard, the Court notes that, on the same day the ASA notified Defendant of the potential evidence problem, Defendant commenced a criminal investigation, in part, based upon a simple visual inspection of past evidence seized by Deputy:

> PLAINTIFFS' COUNSEL:  … Did there come a point in time where it shifted from an administrative investigation to a criminal investigation?
>
> CHIEF DEPUTY BUDENSIEK:  Yes.  And that happened quickly.  After Sergeant Nelson and, at that time, Sergeant Croft, who's now captain, after they spent a short period of time in evidence going through [Deputy's] cases, they knew – I want to say they knew on the 11th *that something was wrong with the evidence*.  Because they had found a couple of other cases where what was supposed to have been turned into evidence didn't actually – wasn't actually in evidence.

(DE 76-1 at 15) (emphasis added).

The Court rejects Defendant's argument that *Monell* liability cannot attach unless the elected Sheriff himself had *actual* notice of the need to train/supervise Deputy (DE 79 at 5-6).  In a failure to train/supervise case, notice can be either "actual" or "constructive." *Connick*, 563 U.S. at 61 ("Thus, when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program.").  In this regard, "knowledge may come from actual notice or may be imputed via constructive notice through notice to an appropriate senior official." *D.D.T. by & through S.C. v. Rockdale Cnty. Pub. Sch.*, 580 F. Supp. 3d 1314, 1336 (N.D. Ga. 2021)

Here, Defendant's own policies and procedures required that a supervisor weigh and "sign off" on narcotics evidence (DE 76-1 at 27-28, DE 76 ¶¶ 125-26).  Moreover, a simple visual inspection of Deputy's evidence – made on the day of the ASA's phone call – led at least one supervisor to conclude immediately that "something was wrong with the evidence" (DE 76-1 at 15).  Given these facts, a reasonable jury might conclude that earlier inspections (as per Defendant's policies) might have led to the same immediate conclusions.  This, in combination with the other evidence set forth above, leads the Court to find that a genuine issue of material fact remains as to whether Defendant had constructive notice of at least one earlier instance of unconstitutional conduct materially similar to Deputy's violations of Plaintiffs' constitutional rights.  *See* Eleventh Circuit Pattern Jury Instruction (Civil) No. 5.11, Government Entity Liability for Failure to Train or Supervise.   Summary judgment should therefore be denied on this issue.

### 2.    Causation

Defendant next argues the undisputed facts show Plaintiffs cannot prove causation.  To prevail on a *Monell* claim, a plaintiff must prove that the municipality's action was "the moving

force behind and direct cause of the constitutional violation." *Bd. of Cnty. Comm'rs*, 520 U.S. at 404-15; *see also Troupe v. Sarasota Cnty.*, 419 F.3d 1160, 1165 (11th Cir. 2005) ("A § 1983 claim requires proof of an affirmative causal connection between the defendant's acts or omissions and the alleged constitutional deprivation."); *Jackson v. Sauls*, 206 F.3d 1156, 1168 n.16 (11th Cir. 2000) ("[A] plaintiff must show that except for that constitutional tort, such injuries and damages would not have occurred and further that such injuries and damages were the reasonably foreseeable consequences of the tortious acts or omissions at issue.").

The Court finds that a genuine issue of material fact remains as to causation.  The Court has already concluded in section IV.C.1 above that a genuine issue of material fact remains as to notice.  Assuming a reasonable jury determined that Defendant had notice of at least one prior, materially similar constitutional violation committed by Deputy, and that Defendant deliberately chose not to train/supervise Deputy in response, then a reasonable jury could also conclude that such failure caused the constitutional violations committed against the Plaintiffs.  *See Quigg v. Thomas Cnty. Sch. Dist.*, 814 F.3d 1227, 1235 (11th Cir. 2016) ("A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the non-moving party."); *Estate of Heenen ex rel. Heenen v. City of Madison*, 111 F. Supp. 3d 929, 961 (W.D. Wis. 2015) ("Plaintiff has also put forth sufficient evidence from which a reasonable jury could conclude that there was a 'causal link' between the City's deliberate indifference to supervision of its officers and the violation of [plaintiff's] constitutional rights.") (cleaned up).

## V.    STATE LAW CLAIMS

Count III alleges a state law claim for false arrest and imprisonment, seeking to hold Defendant vicariously liable for Deputy's misconduct (DE 11 at 31-32).  Defendant moves for

summary judgment based on Florida's sovereign immunity statute.  As set forth below, the Court agrees in part.

### A.        Failure to Comply with Fla. Stat. § 768.28(6)(a)

First, Defendant argues that nine of the Plaintiffs failed to comply with the notice provisions of Fla. Stat. § 768.28(6)(a).  Under that provision, the State of Florida and its political subdivisions agree to a limited waiver of sovereign immunity, but only upon compliance with certain conditions, including timely presentation of the claim to the appropriate agency:

> An action may not be instituted on a claim against the state or one of its agencies or subdivisions unless the claimant presents the claim in writing to the appropriate agency, and also, except as to any claim against a municipality, county, or the Florida Space Authority, presents such claim in writing to the Department of Financial Services, within 3 years after such claim accrues and the Department of Financial Services or the appropriate agency denies the claim in writing; ....

Fla. Stat. § 768.28(6)(a).

A plaintiff must comply with this provision as a condition precedent to suing a state agency or political subdivision under Florida law.  *See Com. Carrier Corp. v. Indian River Cnty.*, 371 So. 2d 1010, 1022 (Fla. 1979) ("Compliance with [§ 768.28(6)(a)] is clearly a condition precedent to maintaining a suit.").  Since § 768.28(6)(a) functions as a waiver of sovereign immunity, the statute "must be strictly construed."  *Levine v. Dade Cnty. Sch. Bd.*, 442 So. 2d 210, 212 (Fla. 1983); *see also Menendez v. N. Broward Hosp. Dist.*, 537 So. 2d 89, 91 (Fla. 1988) ("[T]he language in the state's notice provision is clear and must be strictly construed.").

The Court finds that genuine issues of fact remain as to compliance with this section. Defendant has submitted an affidavit claiming it received no "claim letters in compliance with the requirements of Florida Statute § 768.28(6)" from Plaintiffs Crull, Felts, Hogan, Morales, Saunders, Sutton, Veltre, Palmieri, or Perez (DE 66-9).  Plaintiffs, in contrast, claim they sent the required notices and even included copies of them in the summary judgment record (DE 75-10).

Defendant has not explained how these notices failed to comply with the statute.  As such, a genuine issue of fact remains, and summary judgment must be denied on this issue.

### B.        Failure to Comply with Fla. Stat. § 768.28(9)(a)

Next, Defendant points to Fla. Stat. § 768.28(9)(a), which sets a limitation upon the type of conduct for which the State and its political subdivisions agree to waive sovereign immunity. Specifically, the statute provides:

> The state or its subdivisions shall not be liable in tort for the acts or omissions of an officer, employee, or agent committed while acting outside the course and scope of her or his employment *or committed in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property.*

Fla. Stat. § 768.28(9)(a) (emphasis added).

To meet the "wanton and willful" standard under § 768.28(9)(a), the conduct must be "worse than gross negligence."  *Sierra v. Associated Marine Insts., Inc.*, 850 So.2d 582, 593 (Fla. 5th DCA 2003).   In addition, it must be "more reprehensible and unacceptable than mere intentional conduct."  *Richardson v. City of Pompano Beach*, 511 So. 2d 1121, 1123 (Fla. 4th DCA 1987). "For conduct to be willful and wanton, it must be shown that the defendant knew, or reasonably should have known in light of the surrounding circumstances, that his conduct would naturally or probably result in injury and, with such knowledge, disregarded the foreseeable injurious consequences."  *Gregory v. Miami-Dade Cnty.*, 86 F. Supp. 3d 1340, 1343 (S.D. Fla. 2015), *aff'd*, 719 F. App'x 859 (11th Cir. 2017).

Given the summary judgment record, Defendant argues that no reasonable jury could reach any conclusion except that Deputy's conduct falls within the scope of § 768.28(9)(a).  The Court agrees, but only as to the Plaintiffs Kyte, Martin, Felts, Sutton, Schmier, Morales, and Palmeri. As to each of these Plaintiffs, the state court adjudicated Deputy guilty of crimes represented as,

respectively, counts 2, 7, 8, 9, 10, 14, 17, 23, 26, 30, 34, 35, 40, 41, 42, 47, 48 and 50 of the State's Information (DE 67 ¶ 102, DE 75-9 at 3-10).  As to these Plaintiffs, no reasonable jury could reach any conclusion except that Deputy committed his offenses "in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights" within the meaning of § 768.28(9)(a).  As such, summary judgment should be entered in Defendant's favor on these claims. *See N.R. by Ragan v. Sch. Bd. of Okaloosa Cnty., Florida*, 418 F. Supp. 3d 957, 998 (N.D. Fla. 2019) ("[I]f the facts alleged can occur only from [deputy's] bad faith or malicious or wanton and willful conduct, then the claim against the government entity fails on sovereign immunity grounds [under Florida law.]") (cleaned up).

Summary judgment should be denied as to the remaining Plaintiffs, who were not part of the Information or plea, i.e., Plaintiffs Crull, Hogan, Callahan, Saunders, Perez, and Veltre.  Given that the State never charged any criminal conduct with reference to these Plaintiffs, and that Deputy never entered any plea with respect to these Plaintiffs, genuine issues of fact remain as to application of the sovereign immunity statute.

## VI.   PUNITIVE DAMAGES

Finally, the WHEREFORE clause of Count II seeks punitive damages (DE 11 at 31). Defendant seeks summary judgment, arguing that punitive damages cannot be recovered in a § 1983 action against a municipal entity (DE 65 at 12).  *See City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981) ("[A] municipality is immune from punitive damages under 42 U.S.C. § 1983.").  The Court agrees.  To the extent Plaintiffs seek punitive damages in this case, summary judgment should be entered in Defendant's favor.

## VII.    CONCLUSION & NOTICE OF RIGHT TO OBJECT

Based on the foregoing, the undersigned **RECOMMENDS** that Defendant's Motion (DE

65) be **GRANTED** in part and **DENIED** in part as follows:

(1)    The Motion should be **GRANTED** as to Count II to the extent Plaintiffs pursue

claims under the "official policy" or "custom or practice" theories, but **DENIED** to

the extent Plaintiffs pursue claims under the "failure to train/supervise" theory.

(2)    The Motion should be **GRANTED** as to Count III as to Plaintiffs Kyte, Martin,

Felts, Sutton, Schmier, Morales, and Palmeri, but **DENIED** as to Plaintiffs Crull,

Hogan, Callahan, Saunders, Perez, and Veltre.

(3)    The Motion should be **GRANTED** as to any request for punitive damages.

The parties shall have fourteen (14) days from the date of being served with a copy of this

Report and Recommendation within which to file written objections, if any, with United States

District Judge Aileen M. Cannon.    Failure to file objections timely shall bar the parties from a *de

novo* determination by the District Judge of an issue covered in the Report and Recommendation

and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions

contained in this Report and Recommendation.   *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474

U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1.

**RESPECTFULLY SUBMITTED** in Chambers at West Palm Beach in the Southern

District of Florida, this 28th day of July 2023.

RYON M. MCCABE
U.S. MAGISTRATE JUDGE